FILED
08/08/2019
Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 17, 2019 Session

## STATE OF TENNESSEE v. BRANDON ROBERT VANDENBURG

**Appeal from the Criminal Court for Davidson County**
**No. 2015-C-1517     Monte Watkins, Judge**

_____

### No. M2017-01882-CCA-R3-CD

_____


A Davidson County jury convicted Brandon Robert Vandenburg, Defendant, of five counts of aggravated rape, two counts of aggravated sexual battery, and one count of unlawful photography. On appeal, Defendant argues the following: (1) the trial court's denial of his motion to dismiss the superseding indictment violated his right to due process and protection from double jeopardy and violated Tennessee Rule of Criminal Procedure 8; (2) prosecution on the superseding indictment created a realistic likelihood of vindictive prosecution; (3) the trial court erred in excluding the testimony of Dr. J. Sidney Alexander; (4) the trial court erred by denying Defendant's request to question potential jurors about recent rape cases in national news and by failing to timely admonish prospective jurors; (5) the trial court erred in denying Defendant's motion to suppress the June 27, 2013 interrogation and evidence obtained based on that interrogation; (6) the trial court erred in excluding Defendant's voicemail on Joseph Quinzio's cell phone; (7) the trial court erred by instructing the jury on the requisite culpability for criminal responsibility and on "presence and companionship" as it relates to criminal responsibility; (8) the State committed prosecutorial misconduct during closing arguments; (9) the evidence was insufficient for a rational juror to have found Defendant guilty beyond a reasonable doubt; (10) Tennessee Code Annotated section 39-13-605 is void for vagueness; (11) the trial court erred in ordering Defendant to serve an excessive sentence; (12) the trial court erred in denying Defendant's motion to recuse; (13) the trial court erred by excluding evidence of the co-defendants' prior bad acts; (14) the trial court erred by denying Defendant's Tennessee Rule of Evidence 412 motion; and (15) the cumulative errors in Defendant's trial warrant a new trial. After a thorough review of the facts and applicable case law, we affirm the trial court's judgments in counts one through four and six through eight. Although not raised by either party, we determine that Defendant's conviction of aggravated rape in count five must be vacated.

We modify the conviction in count five to attempted aggravated rape and remand to the trial court for sentencing in count five.[1]

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Vacated in Part and Remanded**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and TIMOTHY L. EASTER, JJ., joined.

Randall E. Reagan, Knoxville, Tennessee (on appeal), Troy Bowlin, Morristown, Tennessee, and Albert Perez, Jr., West Covina, California (at trial) for the appellant, Brandon Robert Vandenburg.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Tom Thurman and Jan Norman, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural Background**

This appeal stems from Defendant's participation in the aggravated rape, aggravated sexual battery, and unlawful photography of the victim, E.L.,[2] along with Co-defendants Corey Batey, Jaborian McKenzie, and Brandon Banks. In August 2013, the Davidson County Grand Jury indicted Defendant and his co-defendants on five counts of aggravated rape, two counts of aggravated sexual battery, one count of tampering with evidence, and one count of unlawful photography. Defendant and Co-defendant Batey proceeded to trial in January 2015. The jury found Defendant guilty of four counts of

---

[1] After the jury returned a verdict in the previous trial, the trial court granted a new trial. The State then obtained a superseding indictment which included five counts of aggravated rape and several other offenses. The State made an election of offenses in both trials. In the first trial, the State elected to proceed in count four with "the penile-vaginal penetration of the victim by Mr. Batey." The jury in the previous trial found Defendant guilty as charged with the exception of count four in which the jury found Defendant guilty of attempted aggravated rape, a lesser included offense of aggravated rape. In the subsequent trial, the State elected to proceed in count five with the penile-vaginal penetration of the victim by Mr. Batey, and the jury found Defendant guilty of aggravated rape in count five. Because the jury in the previous trial found Defendant guilty of the lesser included offense of attempted aggravated rape in count four, Defendant's conviction of aggravated rape for the same particular incident in count five of the subsequent trial violates double jeopardy principles.

[2] It is the custom of this court to refer to victims of sexual crimes by their initials to protect their identity. We intend no disrespect.

aggravated rape, one count of attempted aggravated rape, two counts of aggravated sexual battery, one count of tampering with evidence, and one count of unlawful photography. On June 23, 2015, the trial court granted Defendant's motion to declare a mistrial[3] because the jury foreperson failed to disclose that he had been named a victim of statutory rape in a prior criminal case. The trial court determined that the jury foreperson's conduct "g[ave] rise to a presumption of bias" and that the foreperson was not "a fair and impartial juror."

On July 7, 2015, the Davidson County Grand Jury issued a second indictment that charged Defendant and his co-defendants with five counts of aggravated rape, two counts of aggravated sexual battery, and one count of unlawful photography. Defendant proceeded to trial in June 2016.

### *Jury trial*

Captain Donnie Harville[4] testified that he worked for the Vanderbilt Police Department (VPD) in the Investigation Division. Captain Harville explained that the VPD had "a memorandum of understanding with [the Metro Nashville Police Department] where they investigate certain crimes for the [VPD] when major felonies happen on campus. They usually come in and assist us or they can take lead over the investigation." Captain Harville explained that the VPD began investigating the current offenses because "[t]he Housing Unit was reviewing the video surveillance on the NICE System,[5] and it came across some suspicious activity, and they alerted the [VPD] to investigate." He learned of the video on the morning of June 26, 2013. When Captain Harville reviewed the June 23, 2013 surveillance footage from multiple cameras in Gillette Hall, a dormitory for athletes on Vanderbilt's campus, he observed "four males carrying an unconscious female into Gillette Hall."

Captain Harville identified the DVDs that contained the surveillance footage from multiple cameras in Gillette Hall during the time period that the offenses occurred. He testified that the video surveillance footage depicted a vehicle approaching one entrance

---

[3] Defendant's motion for mistrial or to set aside the verdict was not included in the appellate record. Additionally, a transcript of the evidentiary hearing related to Defendant's motion was not included in the appellate record. The appellant bears the burden of preparing an adequate record on appeal, *see State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993), which includes the duty to "have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b).

[4] Captain Harville testified that, at the time of the offenses, he held the rank of lieutenant detective at the VPD.

[5] Captain Harville explained that the NICE system was Vanderbilt's video surveillance system in the campus dorms and buildings.

of the dorm. A person, whom Captain Harville identified as Defendant, exited the vehicle and attempted to enter the dorm by scanning an ID card. The video surveillance footage also depicted Defendant speaking with two individuals, Co-defendants McKenzie and Banks, outside of the dorm. Another individual, whom Captain Harville identified as Co-defendant Batey, approached Defendant. The video then depicted Defendant carrying an unconscious female from the vehicle into the dorm. Video surveillance footage from inside Gillette Hall depicted Defendant carrying the unconscious female, whom Captain Harville identified as E.L., into the dorm with Co-defendants McKenzie, Banks, and Batey. Co-defendant McKenzie pushed the elevator button while Defendant carried E.L. Defendant and Co-defendant Banks entered the elevator with E.L. and rode it to the second floor. Co-defendants Batey and McKenzie later joined Defendant, Co-defendant Banks, and E.L. on the second floor. On cross-examination, Captain Harville agreed that Defendant appeared to struggle to carry E.L. while he waited for the elevator to arrive on the first floor of Gillette Hall.

After Defendant and Co-defendant Banks arrived on the second floor, Defendant picked E.L. up off the elevator floor and placed her on the hallway floor. The video of the second-floor surveillance camera depicted Co-defendant Banks taking a photograph of E.L. on his cell phone while she lay on the hallway floor. Defendant and Co-defendant Banks then picked up E.L. and carried her down the hallway. Surveillance footage then depicted Defendant carrying E.L. into Room 213 at 2:37 a.m. Co-defendants Banks and Batey followed Defendant into the room. Around 3:09 a.m., Defendant left Room 213 with a towel on his head and approached one of the surveillance cameras. Defendant placed the towel on the camera to block its view; by 3:26 a.m., someone had removed the towel. During cross-examination, Captain Harville stated that surveillance footage depicted Defendant experiencing "some type of emotion" around 3:13 a.m.

Around 3:14 a.m., the surveillance video in East Hall dormitory depicted Chris Boyd and Michael Retta exit Mr. Boyd's room; Mr. Boyd had a cell phone in his hand. Dillon van der Wal exited his room and spoke with Mr. Boyd and Mr. Retta. A few minutes later, the surveillance video depicted Mr. Boyd, Mr. Retta, and Mr. van der Wal exiting East Hall around 3:18 a.m. At 3:21 a.m., the surveillance video in Gillette Hall depicted Defendant walking to the main lobby of the second floor and opening the door for Mr. Boyd, Mr. van der Wal, Mr. Retta, and Deandre Woods.

At 4:16 a.m., the surveillance video in East Hall depicted Defendant standing in a hallway speaking with Mr. van der Wal, Austyn Carta-Samuels, and Mr. Boyd. From 4:52 a.m. to 5:14 a.m., E.L. exited Room 213, entered the bathroom, and either returned to Room 213 or walked around the hallway several times. Around 11:50 a.m., E.L., who

- 4 -

had entered Room 214 around 8:00 a.m., left with another female, exited Gillette Hall, and drove off in her vehicle which was parked in front of the dorm.

On cross-examination, Captain Harville testified that he had asked Kevin Colon, an athletic department official, to bring Defendant to the VPD office. Captain Harville then introduced Defendant to Detective Jason Mayo and Sergeant Michael Shreeve. On redirect examination, Captain Harville explained that he met Defendant outside of a VPD administration building, where administrative staff in plain clothes worked.

G.L. Black testified that, in June 2013, he worked at Vanderbilt University as an Associate Dean and Director of Student Conduct and Academic Integrity. Mr. Black explained that his role at Vanderbilt involved "reviewing and resolving student violations of university policy[.]" Mr. Black received regular reports from "different entities on campus" that concerned academic or nonacademic misconduct. Around 4:30 p.m. on June 24, 2013, Mr. Black learned of "some video footage" that pertained to student misconduct. To begin his investigation, Mr. Black viewed "a few video clips that . . . showed a woman, who appeared to be incapacitated in some way, . . . being carried into a residence hall by several males." On June 25, Mr. Black "convened a group of people in the middle of the day to look at the video to try to help identify these students . . . on the video." The group did not include any VPD officers but did involve three athletic department officials—David Williams, Candace Lee, and Mr. Colon. Mr. Black arranged for nine students identified on the video to come to his office to discuss the footage that afternoon: Defendant; Co-defendants McKenzie, Banks, and Batey; Jacob Bernstein; Mr. van der Wal; Mr. Boyd; Deandre Woods; and Mack Prioleau. Mr. Black met with the students individually and recorded the interviews.

During his interview with Mr. Black, Defendant stated that he saw E.L., whom he had met previously at Tin Roof, a local bar, on the night of June 22. He explained that both he and E.L. were intoxicated that night. They attempted to get into her apartment but were unable, so Defendant drove them in E.L.'s vehicle to Gillette Hall. Defendant told Mr. Black that E.L. was not very coherent but had not passed out during the drive. Once they arrived at Gillette Hall, Co-defendants McKenzie, Batey, and Banks helped Defendant carry E.L. to his room on the second floor. Defendant told Mr. Black that they put E.L. in his bed; he then went to East Hall to spend the night because E.L. had thrown up in the room. Defendant denied that he or any of the Co-defendants had sexual contact with E.L., took photographs of her, or had sexual intercourse with her. Later in the interview, Defendant explained that he covered up the security camera on the second floor of Gillette Hall because he "wasn't thinking clearly" and "there was a girl passed out in [his] room." Defendant gave a signed, written statement to Mr. Black that reiterated his verbal statement. On the evening of Friday, June 28, Mr. Black placed Defendant on interim suspension from Vanderbilt University.

- 5 -

Detective Mayo testified that he had worked for the Metro Nashville Police Department ("MNPD") since 2000. In June 2013, Detective Mayo worked in the Sex Crimes Unit of the MNPD. On June 26, 2013, Detective Mayo received a phone call from his supervisor, Sergeant Shreeve, around 2:30 p.m. Sergeant Shreeve asked Detective Mayo to respond to the VPD's administrative building. When Detective Mayo arrived, he met with Sergeant Shreeve and a VPD officer. He observed several still shots obtained from the surveillance videos while another officer interviewed E.L. With the assistance of the VPD and other Vanderbilt officials, Detective Mayo identified the individuals depicted in the still photographs. Detective Mayo described E.L. as "somewhat confused" and "dumbfounded" about the events of June 23. Detective Mayo noted that because the still photographs were timestamped, he could estimate when the offenses occurred. He estimated that eighty to ninety hours elapsed between the time when the offenses occurred and when the VPD and the MNPD interviewed E.L. Detective Mayo asked E.L. to consent to a medical-legal examination at Vanderbilt University Hospital. After the examination, E.L. retrieved clothing that she wore during the offenses "[f]or possible evidence collection."

On the morning of June 27, Detective Mayo and Sergeant Shreeve returned to the VPD administrative building and interviewed several individuals, including Defendant, in Captain Harville's office. During the interview, Defendant initially stated that he "might have taken a picture" of E.L., but if he did, he deleted the photograph. Later during the interview, Defendant stated the following:

> They helped me bring her up to the room and -- man, I can't even talk about this s[**]t. Right as I got in there, I changed to my pajamas. At some point, they told me [Co-defendant McKenzie] took off his shirt. He told me -- after we all got interrogated, they told me . . . hey we all need to get the same story, we need to . . . have an explanation for why [Co-defendant McKenzie] took off his shirt and all this stuff.

> And -- and anyways, so as I brought her in there, she was on the floor throwing up and I sat on my bed. My roommate was there. He kind of woke up a little bit. I mean I'm sure he saw me sitting on my bed. And she was on the floor and they just -- they turned her over and they were just messing with her and slapping her leg or slapping her butt and fingering her and s[**]t. And I don't -- honestly, I don't even know everybody -- who was [there] because at one point they turned off the light. And after that, they're all laughing about it and -- I don't know if they had sex with her or not. I couldn't tell. I was pretty inebriated.

> . . . .

- 6 -

And they were like, "You need to sleep -- you need to sleep in here with her and act like nothing happened and all this stuff. And at one point, like I know you guys saw like I -- I put the towel over the camera 'cause right before they left, I wanted them to help take her back to the room or something and that's when I called [Mr.] Boyd and [Mr. van der Wal] because I mean I knew something bad just really happened and it like -- I was just trying to bring her up to my room to put her in the bed and like I couldn't carry her myself and like -- just f[****]d up, man. Like I sat there and like saw it happening and I didn't tell them to stop, you know, but I d[**]n well didn't do anything. I didn't even touch the girl.

. . . .

I didn't know what to do. I -- you know, I was intoxicated. I mean obviously you see the camera footage. But I didn't do anything to stop it, and that's when I called [Mr. Boyd] and -- [Mr. Boyd] and [Mr. van der Wal] and they said they would be right up and that's when I told them. Like I told them everything that happened, that they did all this stuff and that I just needed help. And -- and they told me to sleep in . . . his room and we'll talk about it in the morning.

And I texted her in the morning. And all those guys talked to me the next day, the guys that did it. They're like, "You need to be quiet. You can't talk about this stuff. You need to have sex with her to like try to cover it up like whatever happened." And so the next day I had her come over. I don't know if she told you that or not. And we ended up having sex unprotected and that was that. And after they investigated us or they called us in. They told me I needed to get my story straight and say nothing happened. And they said that [Co-defendant McKenzie] took his shirt off because I threw water on him. And say that I covered up the camera because -- I don't even know why.

And I just feel -- I'm just scared because . . . they're going to say that like I did something and it's like -- I know at least my roommate was there for a little bit but he was sleeping. But at least he saw that I was on the bed the whole time. I didn't even touch her. Like I have no reason to. She -- like we had sex the next day. . . . I don't have sex with a girl throwing up. That's disgusting.

Defendant again stated that he did not think that Co-defendants Banks, Batey, or McKenzie took photographs of E.L. during the offenses. Defendant told Detective Mayo,

- 7 -

however, that he took a video of his co-defendants digitally penetrating E.L. and that he sent the video to Mr. Boyd and Mr. Carta-Samuels. Defendant also admitted to flushing condom wrappers down the toilet after he placed a towel over the security camera in the hallway. Defendant did not recall that E.L. made any noise during the offenses. Defendant consented to allow Detective Mayo and Sergeant Shreeve to inspect his phone and to collect a DNA sample.

After the interview, Captain Harville accompanied Defendant to his dorm room to collect his cell phone. Detective Mayo met E.L. at the Vanderbilt University Crisis Center; when he informed E.L. that she had been raped and sexually assaulted, she was "[p]retty shocked[,]" "visibly upset[,]" and "[c]ried." After speaking with E.L., Detective Mayo returned to the VPD administration building and collected Defendant's phone. Around 2:00 p.m., Detective Mayo, Sergeant Shreeve, and Captain Harville went to Room 213 in Gillette Hall and met with Defendant and his roommate, Mr. Prioleau. With the consent of Defendant and Mr. Prioleau, the officers examined Room 213. Detective Mayo asked for the MNPD Identification (ID) Unit to come to the room to collect evidence. On June 28, Detective Mayo executed search warrants to gather digital data from Co-defendants McKenzie, Batey, and Banks' cell phone. Detective Mayo also returned to Room 213 to search Defendant's laptop computer.

On cross-examination, Detective Mayo testified that he interviewed Co-defendant McKenzie on July 7, 2013, September 9, 2013, and July 14, 2014. He also interviewed E.L. and Mr. Prioleau. During his investigation, Detective Mayo collected Mr. Boyd's and Mr. Carta-Samuels' phones. Detective Mayo agreed that he asked Defendant to make a controlled phone call to Co-defendant Batey and that Defendant complied. Detective Mayo recovered an iPhone 4 from Joseph Quinzio.

Investigator Felicia Evans worked for the MNPD as a crime scene investigator in the Crime Scene Investigation Unit at the time of the offenses. On June 27, 2013, Investigator Evans responded to Gillette Hall to assist Investigator Sharon Tilley. Investigator Tilley walked through the scene first with Detective Mayo, then with Investigator Evans. Investigator Tilley photographed the room; later, she and Investigator Evans marked items for collection of evidence. Investigators Evans and Tilley also performed a panoscan[6] of Room 213 and used an "alternative light source" to look for body fluids but did not find any. Investigator Evans photographed a "container" or "tub" near a desk that contained "vomitus-type material on the bottom of the tub." She also collected a scraping of the substance from the bottom of the container. Additionally,

---

[6] Investigator Evans explained that a panoscan was a 360-degree photograph of an area. She stated that a panoscan "allows for any still photographs that were taken to be embedded into that actual scan."

Investigators Evans and Tilley processed the room for latent prints and collected a green towel and a red and white towel. Investigator Evans testified that the red and white towel smelled strongly of urine. When Investigator Evans scanned the green towel with the alternative light source, the light indicated the presence of "bodily fluid or semen" near the edge of the towel. She also processed a condom box and loose condoms found in a drawer for latent prints. Further, Investigator Evans found latent prints on the interior side of the door. On cross-examination, Investigator Evans clarified that she collected two fingerprints on the condom box.

Detective Chad Gish testified that he worked for the MNPD in the Surveillance and Investigative Support Unit of the Criminal Investigative Division. Defendant and the State stipulated that Detective Gish was an expert in digital forensics. Detective Gish explained that the Surveillance and Investigative Support Unit "work[ed] a lot of major crimes, especially crimes that have a digital aspect involved, such as cell phones, computers, video anything of that nature." In July 2013, Detective Mayo and Sergeant Shreeve asked Detective Gish to assist in digitally analyzing electronic devices they had seized while investigating the current offenses. Detective Gish requested Defendant's interview with Detective Mayo and Sergeant Shreeve at the VPD administrative office as well as the surveillance video from Gillette Hall. With these items of evidence, Detective Gish created a timeline of the offenses. Next, Detective Gish connected the electronic devices that MNPD had seized to "a forensic piece of software[] to extract the data from that telephone." Detective Gish was unable to recover any deleted photographs or videos from Defendant's iPhone, but he found other evidence that the phone had previously held photographs or videos related to the offenses, such as "references to 'rape' in iMessages" and "numerous, numerous[] calls" during the timeframe of the offenses. Detective Gish also observed that "[t]he content of the messages seemed to be that whoever was responding to these messages had seen a video[] or a picture." Additionally, Detective Gish "saw references in the recovered text message of this timeframe[] . . . to Facetime."[7] Detective Gish also examined the search history of Defendant's iPhone and found that a user had searched Google on June 26, 2013 for the following phrase: "Can police retrieve deleted picture messages." After the Google search engine provided the user with a list of websites that met the search criteria, the user went to a website that discussed "police mine deleted texts from your cell phone[.]" The user also searched on The Student Room web server for the following phrase: "Police Power/capabilities on Recovering Deleted Messages from a Sams[u]ng phone." Detective Gish continued to examine Defendant's iPhone and found "a lot of missing images that had been deleted" from Defendant's phone during the timeframe of the offenses. Further, Detective Gish examined a

---

[7] Detective Gish explained that Facetime is "basically, a phone call, a video phone call, streamed over the web."

"thumbnail database"[8] on Defendant's iPhone and "recovered images from this thumbnail database[] that were taken in the timeframe of 2:38 to 3:10 in the morning, inside the room with the victim" from the day that the offenses occurred. Detective Gish was able to recover "nine images that were taken from [Defendant]'s cell phone out of the thumbnails"; the thumbnails were from photographs or still images of videos. Detective Gish testified that the thumbnails depicted the following, in pertinent part:

- E.L. lying on the carpet in the hallway of the second floor of Gillette Hall with her skirt pulled up, her underwear removed. Her buttocks are red and her top is pulled up, exposing her breasts;
- E.L. lying on the floor of Defendant's dorm room with Co-defendant Batey kneeling over her while touching his genital area;
- E.L. lying on the floor of Defendant's dorm room with her skirt pulled up above her waist, her underwear removed, and her legs "spread open." Co-defendant Banks's hand is depicted in the photograph holding a cell phone;
- E.L. lying face down with her underwear removed, her skirt pulled up, and her legs spread open with Co-defendant Batey penetrating E.L.'s vagina with his fingers;
- E.L. lying on the floor of Defendant's dorm room with her underwear removed, her skirt pulled up, and a bottle penetrating her anus;
- E.L. lying face down with her underwear removed and Co-defendant Batey penetrating E.L.'s vagina with his fingers while Co-defendant Banks takes a photograph with his cell phone;
- E.L. lying on the floor of Defendant's dorm room with her underwear removed, her skirt pulled up, and Co-defendant Batey kneeling near her head with his pants pulled down to his waist and holding his penis in his hand;
- E.L. lying in the hallway of the second floor of Gillette Hall with her skirt pulled up.

Detective Gish also forensically examined Co-defendant Batey's iPhone; he extracted data that included messages, photographs, and videos. Detective Gish discovered that "there were images taken from [Co-defendant] Batey's phone, but like [Defendant]'s they had been deleted and they weren't recovered." Using the same process of recovering the thumbnail database on Co-defendant Batey's iPhone, Detective Gish was able to recover thumbnail images. He described the images as the following:

---

[8] Detective Gish explained that computers do not delete the thumbnail views of files when a user deletes the original file. Similarly, iPhones do not delete the thumbnail images of files that have been deleted from the phone's memory.

- E.L. lying in Defendant's dorm room with her skirt pulled up, her underwear removed, and her top pulled up;
- E.L. lying on her back with her bra pulled up or removed to expose her breasts;
- E.L. lying on her back while Co-defendant Banks spreads her labia open and takes a photograph of her vagina;
- E.L. lying in Defendant's dorm room with her underwear removed and her skirt removed or pulled up so that her lower body is exposed. Her buttocks appeared red;
- E.L. lying on her stomach in Defendant's dorm room while Co-defendant Batey spread her buttocks open to expose her anus and labia;
- E.L. lying in the hallway of the second floor of Gillette Hall with her underwear removed, her skirt pulled up, and her buttocks appeared red;
- Close-up photographs of E.L.'s genitals and anus.

Detective Gish conducted the same forensic digital exam on Co-defendant Banks's cell phone as he had conducted on Defendant's and Co-defendant Batey's iPhones. Similarly, he was able to recover thumbnail images of deleted photographs or videos from Co-defendant Banks's phone. The thumbnail images depict the following:

- E.L. lying in Defendant's dorm room with her shirt pulled up and Co-defendant Batey kneeling near her head while touching his genital area;
- Two close-up images of E.L.'s buttocks with her underwear removed or pulled down and her buttocks spread apart so that her anus and labia are exposed. Co-defendant Batey is depicted digitally penetrating E.L.'s vagina;
- E.L. lying face down in Defendant's dorm room with her underwear pulled down below her thighs while Co-defendant Batey digitally penetrates her anus;
- E.L. lying in Defendant's dorm room with her underwear removed, her top and skirt pulled up while Co-defendant Batey kneels on a red and white towel;
- E.L. lying in Defendant's dorm room with a bottle penetrating her anus;
- Multiple close-up photographs of Co-defendant Banks's hand spreading E.L.'s labia open to expose her vagina;
- E.L. lying on her back in Defendant's dorm room while her face appears wet;
- E.L. lying on her back with her shirt pulled up to expose her breasts and an object covering her face;
- E.L. lying on her back with her underwear and skirt removed while Co-defendant Batey squats over her face with his underwear pulled down;
- A close-up image of Co-defendant Batey squatting over E.L.'s face with his underwear pulled down;

Detective Gish forensically examined Defendant's laptop computer and found that the internet browsing history had been deleted. However, he was able to recover "a picture of the actual website that was accessed by the user." Detective Gish observed four "web page previews of pornography sites that were accessed" during the timeframe of the offenses. Detective Gish learned that Defendant's iPhone called or received calls from the phones of Miles Finley and Mr. Quinzio during the timeframe of the offenses. In July 2013, Detective Gish, Detective Mayo, and Sergeant Shreeve traveled to Palm Desert, California, to speak with Mr. Finley and Mr. Quinzio and "to conduct search warrants on the mobile devices and electronic devices of these two individuals[.]"

Detective Gish seized a MacBook Pro laptop from Mr. Quinzio; he conducted a digital forensic analysis of the computer and found photographs or videos relating to the offenses. One video was approximately twelve seconds long and was recorded at 2:35 a.m. on June 23; the file was labeled IMG_1398.mov, which corresponded to a file that had been deleted from Defendant's iPhone. The video depicts E.L. lying in the hallway of the second floor of Gillette Hall mumbling incoherently with her skirt pulled up while Co-defendant Banks takes a photograph of E.L.'s genitals on his phone. During the video, Defendant says, "My phone's motherf[**]king dead right now. My phone's motherf[**]king dead." Detective Gish noted that the angle of this video and the timeframe matched Defendant's actions seen on the surveillance video from Gillette Hall.

Mr. Quinzio received another video from Defendant through iMessage that was recorded at 2:40 a.m. on June 23; this video was labeled IMG_1400.mov and was almost seven seconds in length. IMG_1400.mov depicts Co-defendant Batey digitally penetrating E.L.'s anus with his right index finger in Defendant's dorm room while E.L.'s underwear is pulled down and her skirt is pushed up. E.L.'s left buttock appears red. Defendant can be heard laughing while he films. Detective Gish noted that this video also corresponded to a file that had been deleted from Defendant's iPhone.

After Defendant sent these videos to Mr. Quinzio and Mr. Finley, the three men had the following exchange on iMessage:

> MR. FINLEY: UR gunna get in trouble
>
> MR. FINLEY: Delete that s[**]t
>
> MR. FINLEY: Lol
>
> MR. QUINZIO: Yeah Brandon you a dumbass.
>
> MR. FINLEY: Get out of there

MR. FINLEY: She could call rape so done.

MR. FINLEY: Soon

MR. FINLEY: Delete that s[**]t

MR. QUINZIO:  Seriously!

. . . .

MR. FINLEY: Dog kick that b[***]h out or gangbang her

MR. FINLEY: Don't let her wake up

MR. QUINZIO: Raping girls at vandy

DEFENDANT: U gotta delete this text

Defendant sent a third video to Mr. Quinzio, Mr. Finley, Mr. Boyd, and Mr. Carta-Samuels through iMessage; this file was labeled IMG_1401.mov.  The video was approximately forty-one seconds long and was recorded at 2:40 a.m.  Detective Gish determined that Defendant was the individual who recorded this video because "when he points the phone down you see his blue jeans and his shoes that he was wearing in the surveillance video."  When the video begins, E.L. is lying face down on the dorm room floor with a plastic bottle penetrating her anus.  Defendant laughs and says, "Squeeze that s[**]t, squeeze that s[**]t, squeeze that s[**]t[,]" and Co-defendant Banks squeezes and twists the bottle.  Defendant says "I can't do this shit bro" and laughs.  Detective Gish testified that another person in the room says, "Let's go back to Tin Roof.  Hey, do you guys want to go back to Tin Roof?"  Co-defendant Batey kneels on the left side of E.L.'s body in his underwear.  Defendant says, "Dude, I can't do this.  I can't f[**]king do this right now.  Bro, you ain't even hard, bro[,]" as Co-defendant Batey leans forward with his hands near his genital area and then pulls away from E.L's body.  Detective Gish testified that the video appeared to depict Co-defendant Batey penetrating E.L.'s vagina with his penis.  In response to the video, Mr. Finley messaged, "Lol[,]" and Defendant responded, "FaceTime[.]"

During a message exchange with Mr. Quinzio on June 22 at 6:06 p.m., the evening before the offenses, Defendant mentioned that he "smashed last night but didn't."  Defendant then sent the following messages to Mr. Quinzio, in pertinent part: "Ever since that god damn pro hormone dude . . . .!"; "Limp.."; "I know..but like I was hard AF at

- 13 -

first"; "Well we gunna try again tonight cuz ima f[**]k a different girl"; "Ima make sure I f[**]k tonight." Detective Gish found another conversation between Defendant and Mr. Quinzio on Mr. Quinzio's laptop from June 26. During the message exchange, Defendant asked Mr. Quinzio to "[s]end" "[a]ll 3[.]" In response, Mr. Quinzio sent Defendant the three video files that Defendant had sent to Mr. Quinzio during the offenses.

Detective Gish obtained the call log from Defendant's iPhone and identified the following phone calls that Defendant placed on June 23, in pertinent part:

| Call recipient | Time | Length |
|---|---|---|
| Joseph Quinzio | 2:48 a.m. | None |
| Miles Finley | 2:52 a.m. | 0:10 |
| | 2:53 a.m. | 0:05 |
| | 3:08 a.m. | 0:02 |
| Chris Boyd | 3:14 a.m. | 2:31 |
| Austyn Carta-Samuels | 3:17 a.m. | 0:03 |
| Miles Finley | 3:18 a.m. | 0:03 |
| Austyn Carta-Samuels | 3:19 a.m. | None |
| Dillon van der Wal | 3:19 a.m. | None |
| | 3:19 a.m. | 0:01 |
| Joseph Quinzio | 3:36 a.m. | 0:33 |
| Chris Boyd | 4:01 a.m. | 0:03 |
| Corey Batey | 4:13 a.m. | 0:01 |

Detective Gish testified that these phone calls had been deleted, but he was able to recover them from Defendant's phone. Additionally, Detective Gish found a number of calls to or from Co-defendant Batey on Defendant's phone, some of which had been deleted but were recovered:

- 14 -

| Direction | Date/Time | Length |
|---|---|---|
| Missed | June 23 1:54 p.m. | None |
| Missed | June 25 11:44 p.m. | None |
| Outgoing | June 25 11:45 p.m. | 1:21 |
| Missed | June 25 11:50 p.m. | None |
| Outgoing | June 25 11:51 p.m. | None |
| Outgoing | June 26 4:42 p.m. | 0:02 |
| Incoming | June 26 4:47 p.m. | 0:39 |
| Outgoing | June 26 4:54 p.m. | 0:08 |
| Outgoing | June 26 9:51 p.m. | 0:06 |
| Incoming | June 26 9:52 p.m. | 1:40 |
| Outgoing | June 26 9:57 p.m. | 0:02 |
| Outgoing | June 26 9:57 p.m. | 0:02 |
| Outgoing | June 26 11:13 p.m. | 0:03 |
| Missed | June 26 11:35 p.m. | None |
| Missed | June 26 11:36 p.m. | None |
| Outgoing | June 27 10:00 a.m. | 2:24 |

On June 27, 2013, a user of Defendant's computer viewed a page labeled "sexual assault" on the website of Southern Illinois University at Carbondale.

Detective Gish testified that he obtained an iPhone 4 from Mr. Quinzio, but this phone did not contain any evidence relevant to his investigation. Detective Gish also obtained an iPhone 5 from Mr. Quinzio. During his forensic analysis of this phone, Detective Gish recovered a voicemail that Defendant left for Mr. Quinzio shortly after the offenses occurred. This voicemail correlated to the thirty-three second phone call from Defendant to Mr. Quinzio on June 23 at 3:36 a.m. Detective Gish also obtained an iPhone from Mr. Finley during his execution of search warrants in California. Detective Gish testified that Mr. Finley's phone "had just been wiped" when he executed the search warrant of Mr. Finley's person. Detective Gish was unable to recover any evidence from this phone during his forensic examination. Detective Gish also conducted forensic analysis of computers found at Mr. Finley's residence, but he found no evidence related to the current offenses. Additionally, Detective Gish obtained and analyzed Mr. Carta-Samuels' phone, but again, he found no evidence related to the current offenses.

Detective Gish obtained and analyzed Mr. Boyd's phone and found an iMessage conversation between Defendant and Mr. Boyd. The conversation had been deleted, but Detective Gish was able to recover it. The conversation began at 2:49 a.m. and ended at 3:21 a.m. and included the following exchange:

- 15 -

DEFENDANT: I'm coming

DEFENDANT: My phones at 1%

DEFENDANT: Meet me outside the [e]mergency door at east

MR. BOYD: Come get us

DEFENDANT: Ok I'm leaving now my phones gunna charge in my room

MR. BOYD: I'm at Gillette

DEFENDANT: I'll come out from of Gillette

MR. BOYD: Hurry

MR. BOYD: DDR hurry

On June 25 and 26, Defendant had the following conversation with E.L. over iMessage:

E.L.: Are you okay? I'm worried.

DEFENDANT: No I'm not:( this is all so messed up like I didn't do anything and I feel like I'm getting blamed for stuff that didn't even happen. I just wanna cry

E.L.: That's f[**]ked up. Want to come to the pool and talk about it???

DEFENDANT: Me and a bunch of teammates are probably going to get kicked off the team unless something changes

DEFENDANT: Not tonight, tomorrow can we?

E.L.: Definitely. Are you sure not tonight? If you tell me what happened I might be able to help

E.L.: I don't want anyone to get into trouble because of me

- 16 -

E.L.: It's going to be okay!

DEFENDANT: Maybe I'll call you later

E.L.: I'll do everything I can to clear your name

DEFENDANT: I heard jakes spreading rumors and stuff idk y

E.L.: Seriously?

DEFENDANT: Idk it's all rumors but this stuff is so whack I would never do anything like that

. . . .

E.L.: I just got contacted by vanderbilt women's center wanting me to come in so they can help me but I asked someone from student conduct to come too so I can try to clear this up

DEFENDANT: Ok great this is such a mess, I'm never helping anyone get home ever

DEFENDANT: Next time just not gunna care lol. I feel like I'm getting punished for taking care of u that night. .

E.L.: You were just trying to help me I'll tell them that.

E.L.: I understand why you're upset. I'm trying my best to make it right

E.L.: You should be!

DEFENDANT: I'm just frustrated

E.L.: I'll take care of it.

. . . .

E.L.: They're going to show me the video

E.L.: So that should help

DEFENDANT: Ok cool

. . . .

DEFENDANT: What happened today

E.L.: I don't really know much more than you do

DEFENDANT: I thought u said u talked to everyone today and watched the video?

E.L.: Yeah I didn't end up seeing it and they didn't really tell me anything

DEFENDANT: That's weird cuz [sic] they said u watched it this afternoon

E.L.: They wouldn't tell me anything I was so confused

DEFENDANT: Hmm that's weird well I was told I wasn't supposed to talk to u till all this is over…:(

E.L.: Yeah me either

DEFENDANT: Alright then I guess we can't talk right now…I wuld [sic] never let what they're saying happen to you that's messed up

DEFENDANT: I'm so upset right now

. . . .

E.L.: Why did y'all cover up the cameras

E.L.: I'm just so confused right now

Mr. Quinzio, testified that he had known Defendant since the age of thirteen. He stated that in June 2013, he owned and used an iPhone 4. During the evening of June 22 and early morning of June 23, Mr. Quinzio did not converse with Defendant over FaceTime. However, Mr. Quinzio received phone calls from Defendant during that period. Defendant left a voicemail on Mr. Quinzio's phone, but Mr. Quinzio stated that

- 18 -

he "couldn't make out much of the story. [Defendant] was talking to others, as well as [Mr. Quinzio]. And [Defendant] just told [Mr. Quinzio] to call him back[.]" The voicemail was approximately thirty-three seconds long.

Approximately a week later, Defendant came to Mr. Quinzio's house in California, removed the video files from the computer, put them on a flash drive, and attempted to delete and reinstall the "software" from Mr. Quinzio's computer. Defendant also drove Mr. Quinzio's vehicle to retrieve his own vehicle. After Defendant drove Mr. Quinzio's vehicle, Mr. Quinzio discovered that his iPhone 4 was missing from his vehicle. Defendant informed Mr. Quinzio that he would return Mr. Quinzio's iPhone 4, but Defendant did not do so. Defendant later informed Mr. Quinzio that the phone had been destroyed, and Defendant purchased an iPhone 5 for Mr. Quinzio. Mr. Quinzio stated that, based on his involvement in the current offenses, he entered a conditional guilty plea to attempted accessory after the fact and received a sentence of eleven months and twenty-nine days, suspended to unsupervised probation.

On cross-examination, Mr. Quinzio clarified that, in addition to leaving a voicemail on his phone, Defendant called him early in the morning of June 23. Mr. Quinzio agreed that, during the phone call, Defendant sounded intoxicated. Mr. Quinzio also agreed that he told Detective Mayo that he had never seen Defendant that intoxicated and that Defendant was not a big consumer of alcohol. He further agreed that he told Detective Mayo that he knew "what was going on" and that it "was wrong[,]" but that Defendant did not. Mr. Quinzio also agreed that Defendant asked him to send the videos of the offenses back because Defendant did not remember what had occurred.

Co-defendant McKenzie testified that he currently lived in Mississippi and was out on bond. In June 2013, Co-defendant McKenzie attended Vanderbilt University on a football scholarship. He stated that Co-defendant Banks was his roommate and that he, Co-defendant Banks, and Co-defendant Batey were best friends. He did not know Defendant prior to June 23, 2013. On the evening of Saturday, June 22, Co-defendants McKenzie, Banks, and Batey listened to music in McKenzie and Banks' room in Gillette Hall and drank alcoholic beverages. Later, the three co-defendants went to a party in East Hall and consumed more alcoholic beverages. Co-defendants McKenzie, Banks, and Batey returned to Gillette Hall with Batey's friend, "Quela." Co-defendant McKenzie explained that they were "buzzed" from having consumed alcoholic beverages, but they were able to walk and talk on their own. Co-defendant Batey and "Quela" went to Co-defendant Batey's room; Co-defendants Banks and McKenzie returned to their room to change clothes and then left the dorm to purchase food. As Co-defendants Banks and McKenzie returned to Gillette Hall with food for Co-defendant Batey, they observed Defendant pulling up to the dorm and Co-defendant Batey exiting Gillette Hall with "Quela[.]" Defendant informed Co-defendant McKenzie that "he had

been out to the Tin Roof and he's pretty drunk, and he had this young lady in the car, and he needed [their] help to get her to his room." Co-defendant McKenzie stated that Defendant did not have trouble communicating. Defendant and Co-defendant Banks carried E.L. out of the vehicle, into Gillette Hall, up the elevator, and into the second-floor hallway. Co-defendant McKenzie and Co-defendant Batey went up to the second floor a few minutes later. Co-defendant McKenzie did not know E.L. but observed that she was "passed out" and did not make any sounds while she was in Defendant's room.

After Defendant carried E.L. into his dorm room, the co-defendants followed. Defendant attempted to wake up his roommate, Mr. Prioleau. Co-defendant Batey began touching E.L. and removing clothes. Co-defendant McKenzie identified himself in the photographs of the offenses; he stood near the doorway and wore a white shirt and blue and white shoes. He identified Defendant's voice on the videos of the offenses; Defendant stated, "We have this b[***]h in here[,]" and "We're going to f[**]k her." Defendant then "grabbed condoms out of the dresser drawer and passed the box around." Co-defendant McKenzie testified that "everyone" took a condom. Co-defendant McKenzie recalled that Co-defendant Batey digitally penetrated E.L.'s vagina and that Co-defendant Banks squeezed a bottle that had been inserted into E.L.'s anus. Co-defendant McKenzie also testified that Co-defendant Batey penetrated E.L.'s vagina and mouth with his penis while Defendant filmed the offenses. Additionally, Co-defendant McKenzie testified that, prior to sitting on E.L.'s face with his genitals exposed, Co-defendant Batey stated that "he had never had his a[**] ate before." Co-defendant McKenzie testified that, after Defendant filmed Co-defendant Batey penetrating E.L., Defendant "grabbed his laptop and turned on porn, and grabbed a bottle of water and put it on himself in an attempt to get a hard on." Defendant was unable to achieve an erection and stated that "he had done to[o] much coke." Co-defendant Batey slapped E.L.'s buttocks five or more times. When Co-defendant McKenzie stated that E.L. would wake up, Defendant said "she's not going to wake up" and also slapped E.L.'s buttocks. Next, Co-defendant Batey stated that he was going to urinate on E.L., and he proceeded to do that. Co-defendant McKenzie admitted that he took a condom from Defendant and took a photograph and video on Co-defendant Batey's phone at Co-defendant Batey's request.

Regarding Defendant's apparent level of intoxication, Co-defendant McKenzie stated that this was his first interaction with Defendant; however, he could tell that Defendant was "kind of" drunk but stated that Defendant was able to communicate and walk without assistance. Co-defendant McKenzie described Defendant as "amped," "aggressive," and "bossy." Co-defendant McKenzie stated that he was unaware that Defendant's roommate, Mr. Prioleau, was in the room until Defendant attempted to wake him up. After the offenses occurred, Defendant and Co-defendants McKenzie and Banks left Defendant's room and went into the bathroom. Co-defendant McKenzie stated that

he and Co-defendant Banks were "freaking out" but that Defendant "assured" them that "everything would be okay." While they were in the bathroom, Defendant flushed their condoms down a toilet. After Defendant and Co-defendants McKenzie and Banks left the bathroom, Defendant asked them to help him carry E.L. back to her vehicle. Co-defendants McKenzie and Banks refused, and Defendant "put a towel over his head and went and covered the camera." Co-defendant McKenzie testified that Defendant put E.L. in the hallway outside his dorm room.

Defendant and Co-defendants McKenzie, Batey, and Banks met the day after the offenses in a dorm room. Co-defendant McKenzie stated that a teammate had received a video of the offenses, and the teammate questioned Co-defendant McKenzie about the video because the teammate recognized Co-defendant Batey and Co-defendant McKenzie on the video. Defendant and Co-defendants McKenzie, Batey, and Banks met to discuss how aware E.L. was of what had occurred during the offenses. Co-defendant McKenzie asked Co-defendant Batey if he penetrated E.L. during the offenses, and Co-defendant Batey responded that he had. Defendant stated that he was going to call E.L. over to his room and have sex with her. After the Vanderbilt University Student Conduct officials questioned Defendant and Co-defendants McKenzie, Batey, and Banks, the four men met at a Popeye's restaurant and discussed what each had told the Student Conduct officials about the offenses. Co-defendant McKenzie admitted that he lied to the Student Conduct officials. He also lied when he spoke with the MNPD on June 27, 2013. At his first meeting with the MNPD and the District Attorney's Office, Co-defendant McKenzie's statement contained some truthful information and some false information; Co-defendant McKenzie admitted that he exaggerated how intoxicated Defendant and Co-defendants Banks and Batey were during the offenses. Co-defendant McKenzie testified that he was truthful in his interview with the District Attorney's Office after he was charged for the current offenses.

During cross-examination, Co-defendant McKenzie agreed that when he spoke with Detective Mayo on June 27, he stated that "nothing happened" to E.L. while he was in Defendant's dorm room. He also informed Detective Mayo that he did not observe anyone take a photograph or video of E.L. Co-defendant McKenzie also agreed that in his interview with MNPD on July 17, 2013, he stated that Defendant and Co-defendant Batey were intoxicated to the point that they "didn't know what [they] w[ere] doing[.]" Additionally, he agreed that during the July 17 interview, he stated that Defendant was "freaking out" about what happened in his room. On redirect examination, Co-defendant McKenzie explained that Defendant was "bossy" and "in control" during the offenses because Defendant pushed Co-defendants McKenzie and Batey off the elevator, handed out condoms, and covered the camera.

Mr. Prioleau testified that he was a senior at Vanderbilt University. In June 2013, Mr. Prioleau lived in Gillette Hall on Vanderbilt's campus; he and Defendant were roommates. On the evening of Saturday, June 22, he spent time with a friend on the sixth floor of Gillette Hall and returned to his and Defendant's room "sometime after midnight[.]" In the early morning hours of June 23, Mr. Prioleau woke up and saw four other football players in the room with the lights on; he identified these individuals as Defendant and Co-defendants Banks, Batey, and McKenzie. From his location in the top bunk of the bunk bed, Mr. Prioleau also observed a female lying face down on the floor of the bedroom. "Throughout the night, [Mr. Prioleau] heard them use the F word in regards to having sex with her. [Mr. Prioleau] heard [Defendant] say he couldn't get an erection due to cocaine use at some point." Additionally, Mr. Prioleau heard pornography playing on a computer. He did not hear E.L. make any noise while she was in the bedroom. As soon as Defendant and Co-defendants Banks, Batey, and McKenzie left the room, Mr. Prioleau also left; at that time, E.L. was in Defendant's bed on the bottom bunk. Mr. Prioleau went to the sixth floor of Gillette Hall and stayed with a friend for the remainder of the night.

Mr. Prioleau stated that Defendant kept condoms in a drawer in the room. When Mr. Prioleau returned to the dorm room around noon on June 23, the room was empty. Later that day, Defendant texted Mr. Prioleau to ask "if he could have the room to be with a girl." After speaking with Detective Mayo a few days later, Mr. Prioleau saw Defendant and Co-defendants Banks, Batey, and McKenzie. Co-defendant Banks asked Mr. Prioleau to "help them out[.]" Mr. Prioleau said "okay" and walked away.

Special Agent Charley Castelbuono testified that she worked in the Forensic Biology Unit of the Tennessee Bureau of Investigation (TBI). Defendant and the State stipulated that Special Agent Castelbuono was an expert in the field of DNA analysis. Special Agent Castelbuono received evidentiary items for testing from Detective Mayo. She tested vaginal swabs from E.L. for the presence of semen and found that the DNA profile of the sperm fraction matched Defendant as a minor contributor. She also tested a green towel that Detective Mayo recovered near the door of the dorm room; Defendant matched the DNA profile found on this item. Additionally, Special Agent Castelbuono tested a green towel that Detective Mayo found hanging on the wall of the room. She examined two stains on the item; the analysis of the first stain was inconclusive as to Defendant and the second stain matched Defendant. Special Agent Castelbuono also found Defendant's sperm on the brown fitted sheet recovered from the lower bunk bed.

On cross-examination, Special Agent Castelbuono stated that she found a few sperm cells on E.L.'s panties that could have been from an old sperm stain or transferred from another surface. Special Agent Castelbuono did not find enough male DNA from this item to confirm an identity.

Mr. van der Wal testified that in June 2013, he lived in East Hall on the Vanderbilt University campus. Mr. van der Wal stated that early in the morning on June 23, 2013, Mr. Boyd received a phone call; based on that phone call, Mr. Boyd and Mr. van der Wal walked to Gillette Hall with Mr. Retta. Mr. Woods met the three men at Gillette Hall. As he entered the second floor of Gillette Hall, Mr. van der Wal observed "a female on the ground with her dress above her midriff area. She was laying [sic] face down and there were handprints on her . . . butt." The female, E.L., was nude from the waist down. Mr. van der Wal also observed a towel draped over the security camera in the hallway. He stated that, after he arrived, Defendant, Mr. Boyd, and Mr. Woods carried E.L. into Defendant's dorm room and put her in Defendant's bed. As Mr. van der Wal entered Defendant's dorm room, Mr. Prioleau got out of the upper bunk bed and left the room. Mr. van der Wal stated that, after he left Defendant's dorm room, he was "standing in the hallway for a second and there was a video being shown." Mr. van der Wal then returned to East Hall with Defendant, Mr. Boyd, and Mr. Retta.

While the group of men walked back to East Hall, Defendant told multiple versions of what occurred with E.L. Defendant stated that "nothing happened, that he was too drunk to remember[,]" and that "he attempted to have sex with her but couldn't get himself to do it" because Defendant was "too drunk to get an erection." Defendant also stated that Co-defendant Batey had sex with E.L. "and other people did as well." Additionally, Defendant stated that "there were condoms that were disposed of and then there was a water bottle used in some way." When the group arrived at East Hall, Defendant went into Mr. Carta-Samuels' room. Mr. van der Wal observed that, while Defendant was in Mr. Carta-Samuels' room, Defendant had Mr. Carta-Samuels' phone in his hand. Mr. van der Wal described Defendant as "intoxicated, but no more intoxicated than any other night" when Mr. van der Wal socialized with Defendant. Mr. van der Wal stated that Defendant was "conversing" and "walking without . . . assistance[.]" Mr. van der Wal testified that Defendant spent the night in his room in East Hall. When Mr. van der Wal woke up later in the morning of June 23, Defendant had left the room. Mr. van der Wal met Defendant at Waffle House later that morning for breakfast, but Defendant did not express concern for E.L. during their meeting.

During cross-examination, Mr. van der Wal testified that he was aware that E.L. and Defendant had a relationship prior to the offenses at issue. Mr. van der Wal clarified that, while he ate breakfast at Waffle House later in the morning of June 23, Defendant again told "multiple stories about what had happened." Mr. van der Wal stated that Defendant's versions of the events "didn't make sense." He explained that Defendant "was shocked that his other teammates had . . . had sex with her[;] he was telling it as if he was shocked that it happened."

Lauren Miller testified that in June 2013, she lived in the Village at Vanderbilt Apartments as E.L.'s roommate. Ms. Miller stated that she was "extremely close friends" with E.L. and that they were both members of Vanderbilt University's dance team. During the evening of June 22, 2013, Ms. Miller and E.L. hosted a gathering at their apartment. After hanging out in the apartment kitchen and having a few drinks, E.L., Ms. Miller, and their guests "got in a cab and went to Tin Roof" around midnight. After the group arrived at Tin Roof, the group "started taking some pictures of [their] friends" and greeted some people. Ms. Miller did not notice anything unusual about E.L.'s behavior when the group arrived at Tin Roof. After the group took some photographs, they "walked around the bar[.]" Ms. Miller greeted some friends from Vanderbilt and left shortly after because she had to get up early the next morning. Ms. Miller observed E.L. with Defendant before she left, and she stated that E.L. "seemed totally normal[.]" Ms. Miller saw Defendant hand E.L. a drink before Ms. Miller left Tin Roof. Ms. Miller stayed up until 3 a.m. on June 23 talking to a friend; she did not hear any unusual noise outside of the apartment, did not hear a knock on the door, and did not receive any phone calls.

Ms. Miller saw E.L. in the early afternoon of June 23 when E.L. returned to the apartment. She testified that she was "initially pretty shocked" by E.L.'s appearance. Ms. Miller stated that E.L. was "extremely disheveled" and that her hair appeared to have "gotten wet and then been dried again." She also noticed "vomit encrusted in her hair." E.L.'s clothing "had a very strange consistency to them, and her shirt also had some vomit encrusted on it." Ms. Miller observed "a huge gash" on E.L.'s knee and small bruises on her legs. Ms. Miller had not observed bruises on E.L.'s legs previously. E.L. did not remember how she sustained the bruises and laceration, but she assumed she had fallen. After changing clothes, E.L. and Ms. Miller met their friend Madison Jensen and ate breakfast at Pancake Pantry. Ms. Miller stated that E.L. "kept getting progressively and progressively more and more ill." While waiting in line at Pancake Pantry, E.L. stated that "she had never felt this sick before in her life and she just didn't even know what had happened to make her feel that sick." During the evening of June 24, Ms. Miller overheard a phone conversation between E.L. and Defendant. While on speakerphone, Defendant told E.L. "that he was being accused of some things that he would've never done and that it wasn't fair, and that all he wanted to do was come over and hang out with her and that sort of thing." Defendant also stated that "he would've never done what he was being accused of." Ms. Miller testified that she and E.L. were "really confused" about Defendant's statements. A few days later, E.L. told Ms. Miller that "she was having some pain on her rear end and kind of the back side of her legs." Ms. Miller observed "some pretty big bruises" on E.L.'s buttocks and took a photograph to show E.L.

- 24 -

On cross-examination, Ms. Miller clarified that E.L. also consumed alcohol at their apartment prior to going to Tin Roof. However, Ms. Miller did not mix E.L.'s drinks, so she did not know how much alcohol E.L. consumed. She stated that she was not concerned that E.L. stayed at Tin Roof with Defendant because "they had been hanging out for a while, so [E.L. and Ms. Miller] trusted him."

Julianna Martel testified that, in June 2013, she lived in Nashville while taking an organic chemistry class at Vanderbilt University and working part-time at Vanderbilt's football camps. She explained that she knew E.L. because they both participated on Vanderbilt's dance team. Ms. Martel met Defendant when he visited Vanderbilt's campus to learn about the football program. On June 22, 2013, Ms. Martel saw Defendant at the Bristol Apartments. Around midnight, Ms. Martel arrived at Tin Roof bar. She saw E.L. arrive shortly after with other members of the dance team. Ms. Martel described E.L.'s behavior as "completely normal." Ms. Martel also saw Defendant at Tin Roof; she explained that she did not interact with him much, but she did not notice any unusual behavior. Prior to leaving Tin Roof around 1:30 a.m., Ms. Martel spoke with E.L. and noticed that she was holding "a blue drink[.]" Ms. Martel again described E.L.'s behavior as normal.

Elizabeth Parnell testified that she was a women's health nurse practitioner and that she was "certified as a Sexual Assault Nurse Examiner for adults." Defendant and the State stipulated that Ms. Parnell was an expert in sexual assault examinations. On June 26, 2013, Detective Mayo asked Ms. Parnell to travel to the emergency department of Vanderbilt University Medical Center. Ms. Parnell met with E.L. in a triage room and discussed E.L.'s health history and her reason for being at the hospital. E.L. told Ms. Parnell that she remembered being at Tin Roof with friends around midnight, but she could not remember anything until she woke up around 8 a.m. in Defendant's dorm room. Because more than seventy-two hours had passed between the offenses and Ms. Parnell's examination of E.L., Ms. Parnell explained that it was difficult to collect evidence. Ms. Parnell noted that E.L. had bathed, changed clothes, and engaged in other activities that could have reduced evidence since the offenses occurred. E.L. reported to Ms. Parnell that "she drank more than usual" on the night of the offenses. E.L. also informed Ms. Parnell that she had consensual vaginal intercourse around 5 p.m. on June 23.

E.L. signed a consent form, and Ms. Parnell conducted a physical examination of E.L.'s person. Ms. Parnell also noted "physical trauma on her extremities and her buttocks." She observed a scabbed wound immediately below E.L.'s right knee and bruises on the front of E.L.'s left thigh, below her left buttocks, on her right buttocks, and on her left calf. Ms. Parnell also observed scratches on E.L.'s right and left ankles. Ms. Parnell did not observe any visible trauma to E.L.'s vaginal wall or her rectum. Ms.

- 25 -

Parnell collected "pubic hair combings, labia swabs, vaginal swabs, a rectal swab, two perianal swabs, two gumline swabs, the DNA buccal swabs from the inside of her cheeks . . . , and then two swabs of . . . vaginal pool." Ms. Parnell additionally collected blood from E.L.

E.L. testified that in June 2013, she was a rising senior at Vanderbilt University and lived at the Village at Vanderbilt with her roommate, Ms. Miller. E.L. met Defendant approximately two weeks prior to the offenses at issue. On the afternoon of June 22, 2013, E.L. spent some time with friends at her apartment. She had one mixed drink before she and her friends took a cab to Tin Roof around midnight. When she arrived at Tin Roof, she "took some pictures with some friends and said hi to people." She saw Defendant when she arrived; she was happy to see him, and Defendant "seemed happy, socializing, [and] normal." E.L. drank a gin and tonic mixed drink and stood with a group of people socializing. E.L. drank a second drink—a Red Bull and vodka mixed drink that Defendant took from a bartender and poured into her cup. E.L. drank a third drink, a shot of whiskey that Defendant took from a bartender and gave her. E.L.'s fourth drink was "blue and in a clear cup." E.L. explained that she did not see the bartender pour this drink but that Defendant brought her the drink. Defendant told E.L. that the blue drink was the California version of a Long Island Iced Tea and that E.L. needed to try it. Defendant gave E.L. another shot, but she "had taken a sip or two of the blue drink and [she] was starting to feel a little intoxicated, so [she] gave that shot to somebody else." E.L. could not remember if she finished the blue drink.

E.L.'s next memory was "waking up in an unfamiliar room around 8 a.m. the next morning" on June 23. E.L. stated that she was clothed and lying in a bed; she was alone in the room. E.L. stated that she felt "off and confused and scared." She noticed that her keys and phone were sitting on top of a dresser near the bed, but she could not find her shoes. She exited the room and realized that she was in Gillette Hall, so she knocked on Jake Bernstein's door across the hall from the room that she woke up in. Mr. Bernstein did not immediately answer the door, so E.L. called him and he let her into his room. E.L. also texted Defendant to "figure out what was going on." E.L. left Gillette Hall between 11 a.m. and noon; her vehicle was parked in front of Gillette Hall when she exited the dorm. She "had no idea" how her vehicle had gotten there. As E.L. drove her vehicle back to her apartment, she noticed "blood smeared across the glove box in front of the passenger seat." E.L. "notice[d] how [she] was in a lot of pain everywhere, and particularly [her] left shoulder hurt and also [her] left wrist, and [she] had a wound on [her] right knee that was actively bleeding." When E.L. arrived at her apartment, her roommate, Ms. Miller, was worried for her. E.L. "quickly changed and just quickly rinsed off"; she noticed that her hair had gotten wet and dried overnight. After changing, E.L. went to eat with Ms. Miller.

E.L. conversed with Defendant throughout the day of June 23. Defendant told her that she "had gotten sick in his room and he had to spend the whole night taking care of [her], it was so horrible for him, and he was not happy about it." Eventually, Defendant asked E.L. to come to his room in Gillette Hall around 5 or 6 p.m. E.L. and Defendant discussed the previous night, and Defendant told her again that she threw up in his room and that he cleaned it up. When E.L. pressed Defendant for more details about the previous night, Defendant said that he did not want to talk about it because "it was horrible." After E.L. and Defendant spoke for a while, Defendant "suddenly started being very nice" and "eventually he kind of suddenly initiated intercourse." Defendant did not wear a condom during the intercourse.

After hearing Defendant's version of the events of the evening of June 22 and early morning of June 23, E.L. learned more information "that was not consistent with what [Defendant] had been telling [her.]" On the morning of June 26, officers from VPD contacted E.L. She stated that her "biggest concern at that time was trying to protect him" so that Defendant would not be removed from the Vanderbilt football team. During her interview with VPD, E.L. saw some still photographs from the video surveillance recorded in Gillette Hall during the offenses. E.L. agreed to undergo a medical-legal exam at Vanderbilt University Medical Center; however, she stated that she "was worried that [Defendant] would be mad at [her] because he would have to give a cheek swab if [she] got the examination."

E.L. stated that she had no memory of her movements in Gillette Hall between 4 a.m. and 8 a.m. on June 23. E.L. did not know Co-defendants McKenzie, Batey, or Banks at the time the offenses occurred. E.L. testified that she did not give Defendant or Co-defendants McKenzie, Banks, and Batey permission to touch her.

On cross-examination, E.L. agreed that she met Defendant in early 2013 when Defendant visited Vanderbilt University on a recruiting trip. She agreed that she "saw" Defendant three or four times in June prior to the current offenses, including earlier in the week of June 22. Regarding the evening of June 22, E.L. recalled that she made her own drink at her apartment and used three ounces of gin. E.L. agreed that she drank more than usual at Tin Roof. She also agreed that she had blacked out previously but stated that she had never passed out from consuming alcohol; she stated that she walked around and spoke to people during the previous blackout.

After the State rested, Defendant moved the trial court to read Ms. Martel's testimony that was proffered outside the presence of the jury into the record. The trial court allowed the testimony to be read to the jury. During the jury-out testimony, Ms. Martel agreed that in July 2013, she told Detective Zocola that E.L. told her that a woman named Angie gave E.L. the blue drink. On cross-examination, Ms. Martel stated that she

"never saw the drink being purchased and [she] never saw it being handed off." Ms. Martel only saw the blue drink in E.L.'s hand.

The State made the following election of offenses for counts one through seven:

Count [o]ne of the [i]ndictment alleges an act of aggravated rape against [E.L.] and refers to the following conduct: [Co-defendant] Banks penetrating the anus of [E.L.] with an object while [E.L.] was unconscious on the floor of the dorm room located in Gillette Hall on Vanderbilt University campus.

Count [t]wo of the [i]ndictment alleges an act of aggravated rape against [E.L.], and refers to the following conduct: the digital penetration of [E.L.]'s vagina by [Co-defendant] Batey while [E.L.] was unconscious on the floor of the dorm room located in Gillette Hall on Vanderbilt University campus.

Count [t]hree of the [i]ndictment alleges an act of aggravated rape against [E.L.], and refers to the following conduct: the digital penetration of [E.L.]'s anus by [Co-defendant] Batey while [E.L.] was unconscious on the floor of the dorm room located in Gillette Hall on Vanderbilt University campus.

Count [f]our of the [i]ndictment alleges an act of aggravated rape against [E.L.], and refers to the following conduct: an act of fellatio upon [E.L.]'s mouth or lips by [Co-defendant] Batey while [E.L.] was unconscious on the floor of the dorm room located in Gillette Hall on Vanderbilt University campus.

Count [f]ive of the [i]ndictment alleges an act of aggravated rape against [E.L.], and refers to the following conduct: the penile penetration of [E.L.]'s vagina by [Co-defendant] Batey while [E.L.] was unconscious on the floor of the dorm room located in Gillette Hall on Vanderbilt University campus.

Count [s]ix of the [i]ndictment alleges an act of aggravated sexual battery against [E.L.], and refers to the following conduct: the touching of the primary genital area of [E.L.] by [Co-defendant] Banks while [E.L.] was unconscious on the floor of the dorm room located in Gillette Hall on Vanderbilt University campus.

Count [s]even of the [i]ndictment alleges an act of aggravated sexual battery against [E.L.], and refers to the following conduct: [Co-defendant] Batey placing his buttocks on [E.L.]'s face while [E.L.] was unconscious on the floor of the dorm room located in Gillette Hall on Vanderbilt University campus.

The jury found Defendant guilty of aggravated rape in counts one through five, of aggravated sexual battery in counts six and seven, and of unlawful photography in count eight.

*Sentencing hearing*

At Defendant's sentencing hearing, the State argued that Defendant was a standard offender. The trial court admitted the presentence report. The trial court considered an audio recording of an interview of Mr. Finley as well as a sworn affidavit from Mr. Finley. During the interview, Mr. Finley stated that he overheard a conversation between Defendant and Mr. Quinzio; Defendant told Mr. Quinzio that he had attempted to give a date rape drug to a female acquaintance, Angelica LaVecchia, but he was unsuccessful because he did not crush the pill up. The trial court entered a victim impact statement from E.L., which stated the following:

> I had intended to give a detailed Victim Impact Statement at today's sentencing hearing specific to the effects of [Defendant]'s actions. As a result of the last sentencing hearing in this case, that is no longer something I'm able to do. I ask that my prior statement be referenced. Also, two professionals who have helped me through this and witnessed the impact on me have submitted letters to you describing what they have seen; and I ask that you consider those.

> Please do not use my absence as an excuse for leniency as it in no way diminishes the profound and insidious impact of [Defendant] on me and my life. I still ask that he receive the full sentence allowed under the law for orchestrating a sustained thirty-minute gang rape against me, a defenseless woman who trusted him. The minimum sentence is not enough for what this man did to me.

E.L.'s prior victim impact statement set out the following:

> It's hard for me to stand here on display and speak to you today about the impact this has had on my life. The thought of sharing any more

- 29 -

of myself that hasn't already been taken from me seems unbearable, and it goes against every instinct that I have.

I was fearful of giving a victim impact statement at all because I know that after three years and everything that has happened, I can never do it justice, and I'm scared of that failure. It will never be possible for anyone to put into words how this has affected me. You will never understand what this has done to me if you aren't standing in my shoes. The humiliation, the pain, the isolation, being reduced to nothing but a piece of flesh right before your eyes, it does something to you that is truly impossible to describe.

I also know that it's hard to encapsulate the impact this has had because it is still ongoing. The attack on me didn't end that day because I relive it in every proceeding and experience additional attacks every time I am in court.

When I let myself think of this[,] I become so angry and feel so powerless, even today, that speaking coherently about it at all is a challenge.

There are no words to describe the horror of those images from that night and how it feels to watch yourself be dehumanized.

A detective showed me some of those photos and videos that you and forty-two jurors have now seen so many times, and what I saw was image after image of my genitalia covering the entire frame on the screen. These stark, alien-looking fingers all over the flesh were moving from frame to frame, with multiple hands reaching in. Videos played, and I heard the laughing. I heard the degrading, taunting voices.

My memory of the images I was shown then starts to flash in and out. The realization of all the different ways that they raped me, that people can see these close up pictures of my body, the unknown of what was done to me in those thirty minutes that wasn't recorded-it was incomprehensible. I wanted to run away and never stop running.

At one point[,] I saw what I first thought was a dead woman's face. I was suddenly overwhelmed by my memory of a family member's corpse, and then I realized that it's me. They had taken a picture of my face during

the attack. I was lifeless and my face was covered in something shiny. I didn't recognize myself.

Something permanent snapped that day. I felt myself detach from my body. Now, I feel like I'm walking around in the shell of someone else. A part of me went numb, a sense of being a whole person with hopes and dreams about what's possible in the world was now gone.

I was twenty-one years old when this happened. I'm twenty-four today. Since the horror of that night, all I have wanted is for this to be behind me, to be left alone and try to live my life in peace, but the process to get justice has been a never-ending, constant misery that has twisted itself so into my life that I can't even remember what it was like in a time when this wasn't happening. Everything . . . [D]efendant has done in this case and the media circus surrounding it have been a continuous disruption repeatedly dragging me back every step I try to take forward. I can only feel that . . . [D]efendant has intentionally wanted this to be as tortuous for me as possible.

What happened to me that night has been compounded by the live-streaming, tweeting, and international dissemination of every detail of how I was degraded and humiliated for all posterity. In this age of technology, anyone I ever meet in my personal or professional life can learn I am a rape victim and the details of the case before I've even fully introduced myself to them. There is no way for me to even know if any given person I interact with has done so. This is something I now have to expect for the rest of my life.

Again, the attack on me didn't end that day because I have to relive it in every proceeding and am constantly experiencing additional attacks. The fact that I even had to breathe the same air as the men who did this to me ever again . . . is unthinkable. But, I have endured all of this because the details of the rape are so horrific, and there is so much irrefutable evidence, I knew that they had to be stopped and held accountable.

This is a serious violent crime, and it must receive the enhanced punishment it deserves. Any victim should know they would have justice if they went through the process.

Additionally, the trial court admitted letters from two mental health professionals who worked with E.L. that discussed the impact of the offenses on E.L. E.L. received

therapy during the summer of 2015. Dr. Nancy Cook stated that "[i]n spite of significant effort on her part, [E.L.] reported persistent and recurrent distressing recollections of the images and sounds, a sense of powerlessness and hopelessness, irritability, difficulty concentrating and hypervigilance." Dr. Cook diagnosed E.L. with Post-Traumatic Stress Disorder ("PTSD"). Dr. Cook explained that because E.L. had to attend multiple trials and proceedings related to the offenses, she relived the trauma of the offenses, which "continually disrupt[ed] her academic planning and her emotional sense of wholeness." Additionally, Dr. Cook stated that the offenses "caused serious, long-term identifiable emotional impacts and significant neurological changes in [E.L.'s] body." Dr. Cook stated that E.L. would need to continue therapy because of the significant trauma. Wanda Swan, Director of The Respect Program at Emory University, stated in her letter that she assisted E.L. as her on-campus crisis counselor. Ms. Swan stated that E.L.'s former friends, dance team members, and coaches "harass[ed] and bull[ied] her, minimize[d] her trauma, encourage[d] her to 'just be normal,' blame[d] her for the assault, and question[ed] her judgment." Additionally, Ms. Swan stated that "[t]here are pieces, definitive properties of [E.L.'s] personality, character, mental and emotional capacity that she will never be able to reunite with."

The trial court also entered a letter from Reverend Kevin Riggs, who worked with Defendant in the Jobs for Life program while Defendant was incarcerated. Reverend Riggs stated that Defendant successfully completed the Jobs for Life class while incarcerated. Additionally, the trial court entered a statement of Ms. LaVecchia and a police report on the alleged incident between Defendant and Ms. LaVecchia. Ms. LaVecchia stated that she was unaware of allegations that Defendant put a date rape drug in her drink. The State and Defendant stipulated that Mr. Quinzio stated in an interview that he did not remember Defendant mentioning incidents involving date rape drugs.

Defendant called Pernilla Linner, who testified that she lived in LaQuinta, California, and knew Defendant because she had been friends with Defendant's mother for over twenty years. Ms. Linner stated that, in her interactions with Defendant, he was always "very, very polite[,]" "very respectful[,]" and "[v]ery kind." Ms. Linner also testified that Defendant was respectful when playing sports with her children. Additionally, she stated that Defendant was "kind of like a father figure" to his brothers; she described Defendant as "a perfect sibling." On cross-examination, Ms. Linner stated that she was not aware that Defendant used illegal steroids and cocaine and consumed alcohol while under the age of twenty-one. However, she stated that this knowledge did not change her opinion of Defendant.

Frank Gill testified that he met Defendant three years prior to the sentencing hearing when Mr. Gill volunteered in a prison ministry. Mr. Gill did not believe that

Defendant would be a danger to the community after serving his sentence. Mr. Gill also testified that Defendant had "tremendous potential" for rehabilitation.

Shannon Fix testified that she lived in Palm Desert, California, and that Defendant was "like a nephew to [her]." She explained that she had known Defendant for approximately seven years because Defendant's brothers were friends with her son. Ms. Fix testified that Defendant watched over her three children and that she was comfortable leaving Defendant alone with her children. She stated that Defendant transferred from the University of San Diego to a local community college when one of his brothers was diagnosed with retinitis pigmentosa; Defendant volunteered to coach his brothers' football team, drove his brothers to medical appointments and school, and helped them with homework. Ms. Fix stated that Defendant regularly attended religious services with his family and described Defendant as "endearingly naive, very cerebral, [and] very bright." On cross-examination, Ms. Fix testified that Defendant expressed remorse that he had not done more to help E.L. and stop the offenses.

Defendant gave an allocution and expressed his remorse for his involvement in the offenses. He apologized to E.L. and stated that he was "ashamed of [him]self and that [he] was so irresponsible with alcohol, which le[d] to something tragic."

The trial court stated that it had considered "the evidence that was presented at trial, all of the motions that were heard, the sentencing hearing, Presentence Report, the evidence at the sentencing hearing, Principles of Sentencing, arguments of counsel, the nature of the criminal conduct involved here, as well as the enhancement and mitigating factors." The trial court found that "the victim was particularly vulnerable because of her physical incapacity[,]" "the victim suffered psychological injuries as a result of this incident[,]" and that Defendant abused a position of private trust because he "formally or informally stood in a relationship to the victim that promoted confidence, reliability and faith[.]" The trial court also found that Defendant was a leader in the commission of the offenses because "he [wa]s the one that could have stopped this incident."

The trial court additionally found that Defendant "did not have any prior criminal convictions[,]" that Defendant had "a lot of family and community support," and that Defendant "may be remorseful, seemed remorseful at least." The trial court concluded that "the enhancement factors outweigh[ed] the mitigating factors in this particular case." The trial court sentenced Defendant, as a Range I standard offender, to serve seventeen years each for counts one through five, aggravated rape, nine years each for counts six and seven, aggravated sexual battery, and two years for count eight, unlawful photography. The trial court ordered all the sentences to run concurrently for a total effective sentence of seventeen years in the Tennessee Department of Correction.

Defendant filed a timely motion for new trial.  He argued, in pertinent part, that (1) the evidence was insufficient; (2) the trial court erred in denying his motions to dismiss the superseding indictment; (3) the trial court erred in excluding the testimony of Dr. J. Sidney Alexander; (4) the trial court erred in denying Defendant's motion to strike the venire during voir dire or to grant additional peremptory strikes; (5) the trial court erred by failing to admonish the prospective jurors at the beginning of voir dire; (6) the trial court erred by instructing the jury on "presence and companionship" regarding criminal responsibility; (7) the trial court erred in excluding evidence of the prior bad acts of Co-defendants Batey, Banks, and McKenzie; (8) the trial court erred in excluding Defendant's voicemail that he left on Mr. Quinzio's phone; and (9) the trial court erred in denying Defendant's motion to suppress his statement from June 27, 2013.  The trial court denied Defendant's motion for new trial.  Defendant now timely appeals.

## II. Analysis

### (1) Denial of motion to dismiss superseding indictment

Defendant argues that the trial court violated "his rights to due process and protection against double jeopardy under the Tennessee Constitution, Art. 1, § 10, and the Fifth Amendment of the United States Constitution" by denying his motion to dismiss the superseding indictment.  He asserts that the trial court should have dismissed the superseding indictment because jeopardy attached to the original indictment when the trial court swore in the jury at Defendant's first trial.  Defendant argues that the original indictment failed to charge aggravated rape and aggravated sexual battery and contends that the State was "prohibited from adding offenses to the superseding indictment when it failed to include them in the original indictment."  Additionally, he asserts that none of the exceptions to the mandatory joinder rule apply in this case, so the State should have joined the charges of aggravated rape and aggravated sexual battery to the charges of assault in the original indictment.  Further, he argues that the State engaged in prosecutorial vindictiveness by seeking a superseding indictment.  In his reply brief, Defendant argues that he should have been retried on the original indictment because jeopardy attached to the original indictment at the first trial, and therefore, the State was prohibited by Tennessee Rule of Criminal Procedure 7(b) from amending the indictment without Defendant's consent.

The State responds that Defendant's second trial did not violate double jeopardy principles because double jeopardy does not preclude the retrial of Defendant.  The State argues that the jeopardy from Defendant's first trial did not terminate when the trial court granted Defendant's motion for a new trial; essentially, the jeopardy from the first trial

- 34 -

"continued" to the superseding indictment.[9]  Additionally, the State contends that the issuance of the superseding indictment did not violate double jeopardy principles because "the superseding indictment was issued well before the second trial, giving . . . [D]efendant ample notice of the charges."  Further, the State asserts that Defendant received adequate notice of the charges in the superseding indictment because it charged the same offenses as the initial indictment except for the omission of the destruction of evidence charge.  The State argues that it properly exercised its discretion by obtaining a superseding indictment that clarified "that the aggravated rape and aggravated sexual battery charges were based on the incapacity of the victim."

On August 9, 2013, the Davidson County Grand Jury returned an eight-count indictment against Defendant and Co-defendants Banks, Batey, and McKenzie.  Counts one through five alleged aggravated rape and used the following language:

> THE GRAND JURORS of Davidson County, Tennessee, duly impaneled and sworn, upon their oath, present that:
>
> BRANDON E. BANKS, CORY LAMONT BATEY, [Defendant], and JABORIAN DASHON MCKENZIE between the 22nd day of June, 2013, and the 23rd day of June, 2013, in Davidson County, Tennessee and before the finding of this indictment, did intentionally, knowingly, or recklessly engage in unlawful sexual penetration of [E.L.] and Brandon E. Banks, Cory Lamont Batey, [Defendant], and Jaborian Dashon McKenzie were aided or abetted by one or more other persons, in violation of Tennessee Code Annotated § 39-13-502, and against the peace and dignity of the State of Tennessee.

Counts six and seven alleged aggravated sexual battery using the following language:

> THE GRAND JURORS of Davidson County, Tennessee, duly impaneled and sworn, upon their oath, present that:
>
> BRANDON E. BANKS, CORY LAMONT BATEY, [Defendant], and JABORIAN DASHON MCKENZIE between the 22nd day of June,

---

[9] We note that Justice Holmes' concept of "continuing jeopardy" set out in *Kepner v. United States*, 195 U.S. 100, 134 (1904) (Holmes, J., dissenting), has been cited disapprovingly in numerous decisions of the United States Supreme Court.  *Swisher v. Brady*, 438 U.S. 204, 225 (1978); *United States v. Scott*, 437 U.S. 82, 90 n.6 (1978); *Breed v. Jones*, 421 U.S. 519, 534-35 (1975); *United States v. Jenkins*, 420 U.S. 358, 369 (1975); *Green v. United States*, 355 U.S. 184, 189, 192 (1957); *Seiber v. State*, 542 S.W.2d 381, 385 (Tenn. Crim. App. 1976) (citing *Breed*, 421 U.S. at 533).

2013, and the 23rd day of June, 2013, in Davidson County, Tennessee and before the finding of this indictment, did intentionally engage in unlawful sexual contact with [E.L.], and Brandon E. Banks, Cory Lamont Batey, [Defendant], and Jaborian Dashon McKenzie were aided or abetted by one or more other persons, in violation of Tennessee Code Annotated § 39-13-504, and against the peace and dignity of the State of Tennessee.

The record on appeal includes a document entitled Defendant's "Memorandum of Law Regarding Counts 1 Through 7 of Indictment[.]"[10]  In this memorandum, Defendant argued that "[c]areful examination of Counts 1 through 7 of the instant indictment shows that the only criminal offense as to which every element is alleged is assault in violation of Tennessee Code Annotated § 39-13-101(a)(3)[.]"  Thus, Defendant asserted that the language of counts one through five in the indictment failed to allege "force, coercion, a weapon or any other article."  Defendant also noted that the indictment of counts one through five failed to allege bodily injury or that "any defendant knew or had reason to know that the victim was mentally defective, mentally incapacitated or physically helpless."  Defendant alleged that the indictment for counts six and seven similarly failed to allege aggravated sexual battery under Tennessee Code Annotated section 39-13-504(a)(3).  In its response, the State argued that "[a]n indictment which references the statute defining the offense is sufficient and satisfies the constitutional and statutory requirements of [*State v. Hill*, 954 S.W.2d 725 (Tenn. 1997)], giving the accused sufficient notice of the charged offense."

During a jury-out hearing in Defendant's first trial, Defendant alleged that "the facts found by the Grand Jury only make out a misdemeanor offense of assault." Defendant asked the trial court to instruct the jury only on assault.  The trial court noted that the State charged alternative theories in the aggravated rape and aggravated sexual battery counts and elected to proceed on the allegation that E.L. was mentally incapacitated during the offenses.  The trial court found that the Davidson County Grand Jury indicted Defendant and Co-defendants Banks, Batey, and McKenzie with aggravated rape and aggravated sexual battery.  The trial court concluded that "the parties ha[d] been given sufficient notice[.]"  The jury found Defendant guilty of four counts of aggravated

_____

[10] This memorandum of law was not accompanied by a motion in the record.  In a later filing, Defendant stated that he was "not intending to move the Court for any relief but rather submitting authority for why the Court shouldn't charge more than what has been indicted."  Further, this filing, titled "DEFENDANTS' REPLY TO THE STATE'S 'RESPONSE' REGARDING COUNTS 1-7 OF THE INDICTMENT" (hereinafter "Reply"), states that Defendant "has never claimed that any count of the indictment is defective, and . . . Defendant does not seek relief based on any alleged defect."  Instead, Defendant "ask[ed] the Court to instruct the jury on the sole offense that the facts found by the grand jury makes out and to decline to instruct on any other or greater offense."

rape, one count of attempted aggravated rape, two counts of aggravated sexual battery, one count of tampering with evidence, and one count of unlawful photography..

On June 15, 2015, 139 days after the jury found him guilty, Defendant filed a motion for mistrial or, in the alternative, a motion to set aside the verdict on the basis that the jury foreperson made a material misrepresentation during voir dire. At the motion hearing on the same day,[11] the jury foreperson gave testimony that "was inconsistent with the answers provided during voir dire." On June 23, 2015, the trial court granted Defendant's motion; the trial court's order notes that Defendant "did not request a new trial pursuant to Rule 33 out of concern that [he] may waive any appellate issues." The trial court stated that, "as a practical matter, a new trial, if granted, would have to be pursuant to Rule 33 of the Tennessee Rules of Criminal Procedure." The trial court stated that "[a] mistrial is granted prior to the verdict in a trial" and that a defendant could challenge juror misconduct in a motion for new trial. The trial court cited to *State v. Akins*, 867 S.W.2d 350, 355 (Tenn. Crim. App. 1993), for the conclusion that "[w]hen conduct becomes apparent after the jury has rendered a verdict, a new trial is the appropriate remedy." The trial court concluded that the jury foreperson committed misconduct when he failed to disclose during voir dire that he was the named victim in a twenty-three count indictment in a statutory rape case and granted Defendant's motion.

On July 7, 2015, the Davidson County Grand Jury returned a superseding indictment charging Defendant and Co-defendants Banks, Batey, and McKenzie with five counts of aggravated rape, two counts of aggravated sexual battery, and one count of unlawful photography. The aggravated rape counts alleged the following:

THE GRAND JURORS of Davidson County, Tennessee, duly impaneled and sworn, upon their oath, present that:

BRANDON E. BANKS, CORY LAMONT BATEY, [Defendant], and JABORIAN DASHON MCKENZIE on the 23rd day of June, 2013, in Davidson County, Tennessee and before the finding of this indictment, did intentionally, knowingly, or recklessly engage in unlawful sexual

---

[11] The motion for mistrial was not included in the record on appeal. A transcript of this motion hearing was also not included in the record on appeal. As we have previously noted, Defendant bears the burden of preparing an adequate record on appeal. *See Ballard*, 855 S.W.2d at 560. Defendant's burden of preparing an adequate record on appeal includes the duty to "have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). This court is precluded from considering an issue presented for review when the record is incomplete and does not contain a transcript of the proceedings relevant to the issue, or portions of the record upon which the appellant relies. *Ballard*, 855 S.W.2d at 560-61 (citing *State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988).

penetration of [E.L.] and Brandon E. Banks, Cory Lamont Batey, [Defendant], and Jaborian Dashon McKenzie did aid or abet each other in the commission of the offense and Brandon E. Banks, Cory Lamont Batey, [Defendant], and Jaborian Dashon McKenzie knew or had reason to know that [E.L.] was mentally incapacitated or physically helpless, in violation of Tennessee Code Annotated § 39-13-502, and against the peace and dignity of the State of Tennessee.

The aggravated sexual battery counts alleged the following:

THE GRAND JURORS of Davidson County, Tennessee, duly impaneled and sworn, upon their oath, present that:

BRANDON E. BANKS, CORY LAMONT BATEY, [Defendant], and JABORIAN DASHON MCKENZIE on the 23rd day of June, 2013, in Davidson County, Tennessee and before the finding of this indictment, did intentionally engage in unlawful sexual contact with [E.L.], and Brandon E. Banks, Cory Lamont Batey, [Defendant], and Jaborian Dashon McKenzie did aid or abet each other in the commission of the offense and Brandon E. Banks, Cory Lamont Batey, [Defendant], and Jaborian Dashon McKenzie knew or had reason to know that [E.L.] was mentally incapacitated or physically helpless, in violation of Tennessee Code Annotated § 39-13-504, and against the peace and dignity of the State of Tennessee.

On September 11, 2015, Defendant filed a "Motion to Dismiss Superseding Indictment," which argued that "[t]he superseding indictment allege[d] an additional element in Counts 1-7 that was not alleged in the original indictment, specifically that the defendants 'knew or had reason to know that [the alleged victim] was mentally incapacitated or physically helpless' in the counts alleging aggravated rape and aggravated sexual battery."[12]  Defendant contended that the inclusion of additional or different elements violated his protection against double jeopardy.  He also asserted that the jeopardy that attached to the original indictment continued due to the mistrial, and therefore, the State should proceed under the original indictment.

The State responded that it could properly proceed on the superseding indictment because the trial court's grant of a new trial "returned . . . Defendant to the same position he was in prior to the first trial[.]"  At a hearing on the motion on October 19, 2015, the trial court found that "there [were] no new charges that [were] brought with the superseding indictment, only an additional element."  The trial court stated that the grant

---

[12] Second alteration in the original text.

of a new trial "place[d] the defendants back in the same position that they were initially and, as such, . . . a superseding indictment can be brought[.]"  On October 20, 2015, the trial court filed an order denying Defendant's motion to dismiss the superseding indictment.  The trial court found "that the indictment [wa]s appropriate and the charges therein should not be dismissed."

On June 13, 2016, the first day of Defendant's second trial, Defendant again filed a motion to dismiss the superseding indictment and argued that the indictment violated the prohibition against double jeopardy.  The court minutes from that day reflect that the trial court denied this motion.  The trial court entered a written order denying the motion on June 22, 2016, and again concluded that "[t]he superseding indictment which was filed after the mistrial was not amended with additional charges nor does it require joinder."

After the trial court swore in the jury, the State read the indictments, and Defendant pled not guilty, Defendant filed a motion to dismiss the indictments.  Defendant argued that because jeopardy attached during the first trial and continued to the second trial, he was placed in jeopardy twice for the same offenses once the jury was sworn in the second trial.  Defendant asserted that jeopardy continued from the first trial because the trial court declared a mistrial.  Defendant also argued that the State should have proceeded on the original indictment because the State cannot obtain a superseding indictment while jeopardy continues from a previous indictment.  The State argued that it had properly obtained a superseding indictment.  The trial court denied the motion, and the trial proceeded.

Initially, we must determine whether the trial court granted a motion for mistrial or a motion for new trial after the conclusion of Defendant's first trial.  Although Defendant apparently filed a motion for mistrial, the trial court concluded that a new trial was the appropriate remedy to address the juror misconduct that came to light after the jury rendered its verdict and Defendant's first trial concluded.  "A mistrial is granted in a case in which the jury is discharged without a verdict; a motion for new trial is made after a judgment has been rendered." *State v. Terry Sanders*, No. M2011-00426-CCA-R3-CD, 2012 WL 5948885, at *4 (Tenn. Crim. App. Nov. 15, 2012) (quoting *Howell v. Davis*, 299 S.E.2d 336, 337 (S.C. 1983)) (internal quotation marks omitted), *perm. app. denied* (Tenn. Mar. 5, 2013).  Because Defendant filed his motion after the jury rendered its verdict and because the trial court essentially treated the motion as a motion for new trial, we will interpret Defendant's motion as a motion for new trial.

*(A) Double jeopardy*

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, states, "No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Similarly, the Tennessee Constitution guarantees "[t]hat no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. I, § 10. Both clauses provide three distinct protections: "(1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." *State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012).

A defendant acquitted of criminal charges may not be subjected to retrial on those same charges. *State v. Harris*, 919 S.W.2d 323, 327 (Tenn. 1996); *see also Ball v. United States*, 163 U.S. 662, 671 (1896). Additionally, "when a conviction has been set aside because of insufficiency of the evidence, double jeopardy forbids giving the prosecution 'another opportunity to supply evidence which it failed to muster in the first proceeding.'" *Harris*, 919 S.W.2d at 327 (quoting *Burks v. United States*, 437 U.S. 1, 11 (1978)). However, a retrial of a defendant who has successfully appealed an issue other than sufficiency of the evidence does not subject the defendant to double jeopardy. *Id.* (citing *Burks*, 437 U.S. at 11; *Ball*, 163 U.S. at 672; *State v. Campbell*, 641 S.W.2d 890, 893 (Tenn. 1982)); *see also Lockhart v. Nelson*, 488 U.S. 33, 38 (1988) *Jeffers v. United States*, 432 U.S. 137, 152 (1977); *Price v. Georgia*, 398 U.S. 323, 326 (1970); *Green v. United States*, 355 U.S. 184, 189, 192 (1957). Further, "upon appellate reversal of a conviction[,] the Government is not limited at a new trial to evidence presented at the first trial, but is free to strengthen its case in any way it can by the introduction of new evidence." *United States v. Shotwell Mfg. Co.*, 355 U.S. 233, 243 (1957). This is more commonly known as the "clean slate" rule. *See State v. Kacy Dewayne Cannon*, No. E2011-02624-CCA-R3-CD, 2012 WL 6049639, at *8 (Tenn. Crim. App. Dec. 5, 2012), *perm. app. denied* (Tenn. Apr. 10, 2013). Thus, the mere fact that Defendant's case was retried after the trial court granted a new trial on the basis of juror misconduct did not place Defendant under jeopardy twice for the same criminal conduct.

The Tennessee Supreme Court stated the following regarding the State's power to seek superseding indictments:

> The power to seek a superseding indictment lies within th[e] broad discretion of the State. A superseding indictment is an indictment obtained without the dismissal of a prior indictment. Where there has been no jeopardy on the first indictment, a grand jury may return a new indictment against an accused even though another indictment is pending. Although

the State may not bring a superseding indictment to harass or intimidate the accused, a legitimate decision to bring a superseding indictment is uniquely within the State's authority. Thus, the State may obtain a superseding indictment at any time prior to trial without dismissing the pending indictment and may then select the indictment under which to proceed at trial.

*State v. Harris*, 33 S.W.3d 767, 771 (Tenn. 2000) (internal citations and footnote omitted).

When the trial court granted Defendant's motion, the judgments from the first trial were vacated, and Defendant returned to the pretrial stage of the criminal proceeding, with the exception of the jury's acquittal of aggravated rape in count four. Essentially, it was as if Defendant's first trial never happened. Thus, because Defendant's case had not proceeded to trial, the State had the discretion to seek a superseding indictment. *See id.*

In any event, excluding count four, which we will discuss in depth later in this opinion, the original and superseding indictments charged the same offenses. The Tennessee Supreme Court has previously held that "specific reference to a statute within the indictment may be sufficient to place the accused on notice of the charged offense." *State v. Sledge*, 15 S.W.3d 93, 95 (Tenn. 2000); *see also State v. Carter*, 988 S.W.2d 145, 149 (Tenn. 1999), *Ruff v. State*, 978 S.W.2d 95, 100 (Tenn. 1998). Here, the original indictment did not list the aggravating factor of the aggravated rape and aggravated sexual battery counts, but the indictment did refer to the appropriate section of Tennessee Code Annotated for those offenses. Thus, the original indictment was still sufficient to put Defendant on notice of the offenses for which he was charged. Additionally, because the original and the superseding indictment both charged Defendant with committing aggravated rape and aggravated sexual battery, the State did not improperly amend the offenses by obtaining a superseding indictment.

Because the State had the discretion to seek a superseding indictment after the trial court ordered a new trial and because the original and superseding indictment both charged Defendant with aggravated rape and aggravated sexual battery, the State did not place Defendant in jeopardy twice for the same offense by seeking the superseding indictment.

*(B) Mandatory joinder of offenses*

Under Tennessee Rule of Criminal Procedure 8(a), "[t]wo or more offenses shall be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or the offenses consolidated pursuant to Rule 13," if the offenses are

"based on the same conduct or arise from the same criminal episode"; are "within the jurisdiction of a single court"; and are "known to the appropriate prosecuting official at the time of the return of the indictment(s), presentment(s), or information(s)." Tenn. R. Crim. P. 8(a)(1). "A defendant shall not be subject to separate trials for multiple offenses falling within Rule 8(a)(1) unless they are severed pursuant to Rule 14." Tenn. R. Crim. P. 8(a)(2). All three of the criteria listed in Rule 8(a)(1) must exist before multiple offenses are required to be joined.

The findings of fact made by a trial court on the mandatory joinder of offenses "are binding upon this court unless the evidence contained in the record preponderates against them." *State v. Baird*, 88 S.W.3d 617, 620 (Tenn. Crim. App. 2001) (citing *State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000)). "However, this court is not bound by the trial court's conclusions of law." *Id.* (citing *State v. Simpson*, 968 S.W.2d 776, 779 (Tenn. 1998)). The application of the law to the facts is a question of law that this court reviews de novo. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000).

We have previously concluded that the original indictment and the superseding indictment charged Defendant with the same offenses: aggravated rape, aggravated sexual battery, and unlawful photography. Because the indictments charged the same offenses, the State did not "save back" any offenses that arose from the same conduct or the same criminal episode. *See* Tenn. R. Crim. P. 8(a), Advisory Comm'n Cmts. Thus, we conclude that Rule 8 is not implicated in Defendant's case. Additionally, because Defendant sought and received a new trial, the State's superseding indictment did not cause Defendant to endure unnecessary court proceedings. The trial court properly concluded that the State was not required to join the offenses alleged in the superseding indictment with the offenses alleged in the original indictment.

### (C) Plain error in the superseding indictment

In our review of this case, we note that the jury acquitted Defendant of aggravated rape and convicted Defendant of attempted aggravated rape in count four at the conclusion of the first trial. Once a jury acquits a defendant of a charge, the State may not pursue a conviction for that offense after the trial court has ordered a new trial. Thus, the State should not have sought a superseding indictment for aggravated rape in count five. Instead, the State should have sought a superseding indictment for attempted aggravated rape. Because Defendant was subjected to jeopardy for aggravated rape in count four during the original trial and the jury acquitted him of that offense, the prosecution for aggravated rape in count five in the second trial was plain error. Thus, we vacate Defendant's conviction for aggravated rape in count five. Because the original jury found Defendant guilty of the lesser included offense of attempted aggravated rape and the second jury found Defendant guilty of the greater offense of aggravated rape, we

conclude that the trial court should modify Defendant's conviction in count five to attempted aggravated rape. We will address the sufficiency of this conviction later in this opinion. Additionally, on remand, the trial court should enter an amended judgment reflecting the imposition of the minimum sentence within the applicable range for count five.

## *(2) Prosecutorial vindictiveness*

Defendant asserts that "[t]he State's election to file a superseding indictment and include charges in the second indictment that it failed to include on the original indictment creates a 'realistic likelihood' of prosecutorial retaliation." Defendant argues that because the original indictment only charged him with assault and the superseding indictment charged him with aggravated rape and aggravated sexual battery, the superseding indictment greatly increased his punishment exposure, creating a rebuttable presumption of prosecutorial vindictiveness. The State does not specifically address this argument. Because Defendant raises this issue for the first time on appeal, we conclude that he has waived plenary review of this issue and we will review only for plain error.

Rule 36(a) of the Tennessee Rules of Appellate Procedure states that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). "The failure to make a contemporaneous objection constituted waiver of the issue on appeal." *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008). However, "[w]hen necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010).

Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Adkisson*, 899 S.W.2d at 641-42 (quoting Tenn. R. App. P. 36(b)); *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283.

The defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

It is a violation of basic due process to punish a person for choosing to exercise his or her constitutional rights. *North Carolina v. Pearce*, 395 U.S. 711, 724-25 (1969). The Tennessee Supreme Court has held that, even in the absence of proof of actual bad faith or malice, there is a rebuttable presumption of prosecutorial vindictiveness that may arise if the circumstances pose a "realistic likelihood" of prosecutorial retaliation. *State v. Phipps*, 959 S.W.2d 538, 546 (Tenn. 1997). Our supreme court established the following criteria for assessing whether a "realistic likelihood" of prosecutorial retaliation exists: (1) "[w]hether the right asserted by the defendant would result in duplicable expenditures of prosecutorial resources"; (2) "whether the prosecution would be required to do over again what it thought it had already done correctly once"; (3) "whether the prosecutor has a personal stake or an interest in self vindication"; (4) "whether institutional biases militated against retrial of a decided question"; and (5) "whether the prosecutorial decision to increase the charge or sentence was made after the initial trial was completed rather than in a pre-trial context." *Id.* If the circumstances in a particular case "give rise to a realistic likelihood of prosecutorial retaliation[,]" the State must establish, by clear and convincing evidence, that a legitimate purpose motivated the challenged decision. *Id.*

If proven, allegations of prosecutorial vindictiveness or selective prosecution in the institution of a prosecution may warrant dismissal of the indictment based on constitutional concerns. *State v. Skidmore*, 15 S.W.3d 502, 508 (Tenn. Crim. App. 1999) (citing *Blackledge v. Perry*, 417 U.S. 21, 27 (1974)). However, if a prosecutor has probable cause to believe the accused committed the underlying offense, the decision to prosecute the accused rests entirely within the prosecutor's discretion, subject to certain constitutional limitations. *Id.* (citing *State v. Superior Oil, Inc.*, 875 S.W.2d 658, 660 (Tenn. 1994); *Quillen v. Crockett*, 928 S.W.2d 47, 51 (Tenn. Crim. App. 1995)).

Here, we conclude that the facts before us do not create a rebuttable presumption of prosecutorial vindictiveness because there is no "reasonable likelihood" of prosecutorial retaliation. *See Phipps*, 959 S.W.2d at 546. Defendant has not presented any evidence that the prosecutors involved in his trials had "a personal stake or an interest in self[-]vindication[.]" *See id*. The State has consistently asserted that it sought a superseding indictment to "clarify" that it intended to prosecute Defendant for aggravated rape and aggravated sexual battery on the theory that the victim, E.L., was mentally incapacitated during the offenses. Further, there is no evidence that any "institutional biases militate[] against retrial" because the trial court ordered a new trial prior to when the State sought a superseding indictment. *See State v. Frank Michael Vukelich*, No. M1999-00618-CCA-R3-CD, 2001 WL 1044617, at *8 (Tenn. Crim. App.

Sept. 11, 2001) (concluding that "no institutional biases militated against retrial of a decided question, because the Defendant was to be tried again anyway"), *perm. app. denied* (Tenn. Apr. 1, 2002).

Further, Defendant has not established that the State acted with actual malice when it sought a superseding indictment prior to Defendant's second trial. *See United States v. Goodwin*, 457 U.S. 368, 384 (1982). As we have previously concluded, the original indictment and the superseding indictment both charged Defendant with aggravated rape, aggravated sexual battery, and unlawful photography. Because Defendant has not established a presumption of prosecutorial vindictiveness or the presence of actual vindictiveness, we conclude that no substantial right was affected by the State's decision to obtain a superseding indictment. Therefore, Defendant is not entitled to plain error relief on this ground.

### (3) Exclusion of Defendant's intoxication expert

Defendant contends that the trial court erred in excluding the testimony of a defense witness, Dr. Sidney Alexander. He asserts that a major part of his trial strategy was arguing that "he was so intoxicated from alcohol at the time of the alleged offenses that he did not have the capacity to form the intent necessary to be criminally responsible for the offenses committed by his co-defendants." Defendant argues that the trial court's decision prejudiced him and violated his right to due process and a fair trial. The State responds that "the trial court acted within its discretion in excluding the testimony based on the defendant's untimely notice and the expert's lack of qualifications."

On September 15, 2014, prior to his first trial, Defendant filed a notice of intent to offer expert testimony on his mental state. The notice stated that Defendant intended to call Dr. Stephanie Stolinsky at trial. The record reveals that the State received Dr. Stolinsky's report on October 13, 2014. On October 17, 2014, the State filed a motion to exclude Dr. Stolinsky's testimony on the ground that her testimony would not be admissible under Tennessee Rules of Evidence 401 and 702. Dr. Stolinsky's report was not included in the record on appeal as an exhibit, but it was attached to the State's motion. Dr. Stolinsky did not testify at Defendant's first trial.

On September 25, 2015, Defendant filed a "Motion for Leave of Court to Tender Motion on Experts[.]" The Motion stated that, on September 11, 2015, the trial court held a scheduling conference and set a date for filing of notice of experts. Defendant asked for an extension of thirty days to file a notice of expert testimony. Defendant attached an email to this motion from the Criminal Court Clerk to all prosecutors and defense attorneys involved in the case. The email referred to a meeting in the trial judge's chambers that was held that morning and stated that September 25, 2015, was the

deadline for filing motions on experts. The trial court granted this motion on September 25, 2015, according to a minute entry from that date. On October 12, 2015, Defendant filed a "Motion for Leave of Court to File Pretrial Motions[.]" This motion stated that Defendant had "identified and retained particular experts" and asked the trial court to extend its original deadline for the filing of pretrial motions on October 9, 2015. At a motion hearing on October 19, 2015, the trial court set a deadline of December 1, 2015, for Defendant to file a notice of expert testimony.

On May 6, 2016, the State filed a motion to exclude Defendant's experts, Jim Kempvanee and Dr. Alexander. The State noted that, at the October 19, 2015 motion hearing, the trial court set December 1, 2015, as the deadline for Defendant to file a notice of expert witnesses. The State's motion also alleged that Defendant had failed to provide any reports from his experts. On May 10, 2016, Defendant filed a reply to the State's motion, in which he asserted that, on October 9, 2015, he filed a motion to renew all motions previously filed in the first trial, which included motions "related to the use of expert testimony[.]" The reply also noted that Defendant gave the State notice on April 28, 2016, that he intended to call Dr. Alexander at trial to testify regarding Defendant's mental condition and Mr. Kempvanee to testify on "digital forensic analysis and technology." Defendant argued that the State would not suffer any prejudice by the testimony of these two experts at trial because the State had been aware since the first trial that Defendant might introduce expert testimony. Defendant also argued that Dr. Alexander and Mr. Kempvanee were defense rebuttal witnesses and, therefore, not subject to disclosure under Tennessee Rule of Criminal Procedure 16(b)(1)(B)(i)-(iii).

The trial court granted the State's motion to exclude the testimony of Dr. Alexander and denied the State's motion to exclude the testimony of Mr. Kempvanee on May 18, 2016. The order stated that the trial court "specifically set a deadline for the defense to give notice of an expert and provide a report of that expert's findings and that was not done." On May 31, 2016, Defendant filed a motion asking the trial court to reconsider its grant of the State's motion to exclude the testimony of Dr. Alexander. The motion to reconsider reiterated many of Defendant's previous arguments regarding the admission of Dr. Alexander's testimony. Notably, Defendant attached Dr. Alexander's report, dated May 27, 2016, to the motion to reconsider.

On May 31, 2016, Defendant filed an "Application for Rule 10 Extraordinary Appeal and Stay of the Trial Proceedings" with this court.[13] Defendant asserted in the application that "[t]he actions of the trial court in precluding the defense from presenting

---

[13] Defendant's application and this court's order denying the application were not included in the record on appeal. To assist in resolution of Defendant's case, we take judicial notice of these prior proceedings. *See* Tenn. R. App. P 13(c); *State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009); *State ex rel Wilkerson v. Bomar*, 376 S.W.2d 451, 453 (Tenn. 1964).

evidence regarding [Defendant]'s mental condition bearing on the issue of guilt has so far departed from the accepted and usual course of judicial proceedings as to require immediate review[.]" Defendant argued that the trial court's decision to exclude Dr. Alexander's testimony violated his right to present a defense and was an abuse of discretion because the State would not be actually prejudiced if Dr. Alexander testified.

On June 1, 2016, this court denied Defendant's Rule 10 appeal. This court concluded that Defendant did "not satisf[y] the 'narrowly circumscribed' requirements for an extraordinary appeal." This court determined that "[t]he trial court's order reflects that the trial court followed the accepted and usual course of judicial proceedings prior to ruling on the four motions at issue."

On June 7, 2016, the trial court ruled that it would hold a jury-out hearing to determine whether the testimony of Dr. Alexander was admissible. The court minutes from June 13, 2016, reflect that the trial court denied Defendant's motion to reconsider. In a written order filed on June 14, the trial court set out its reasoning for denying Defendant's motion after the hearing. The trial court found that,

> 1) although each party has had ample time to conduct an evaluation of [D]efendant . . . , neither party has secured an evaluation of the defendant; (2) although Dr. J. Sid Alexander testified regarding his psychiatric expertise, Dr. Alexander did not demonstrate any specialized expert opinion knowledge or training regarding toxicology; and (3) Dr. Alexander relied on information supplied via email by defense counsel and did not base any opinion on data, documentation or scientific evidence. Further, the Court finds that the underlying facts indicate a lack of trustworthiness of Dr. Alexander's testimony.

On June 10, 2016, prior to the commencement of the second day of voir dire, the trial court held a hearing on Defendant's motion to allow Dr. Alexander to testify regarding Defendant's mental state and intoxication during the offenses. The trial court heard arguments from both Defendant and the State and asked to hear from Dr. Alexander on the first day of trial. On June 13, 2016, the trial court held a jury-out hearing on the admissibility of Dr. Alexander's testimony. The State and Defendant stipulated that Dr. Alexander was a board-certified psychiatrist. Dr. Alexander testified that, to prepare the letter that Defendant submitted to the trial court, he examined data given to him by defense counsel. This data was Defendant's "best recollection" of the alcohol that he consumed prior to the offenses. Dr. Alexander explained that he was retained by Defendant to calculate Defendant's blood alcohol content ("BAC") during the offenses. He looked at "many different tables" and "many different sources of information" but focused on a formula for calculating BAC based on "Widmark's

principle[.]"[14] Dr. Alexander noted that the number of drinks that he used to calculate Defendant's BAC was "the most conservative number" because Defendant stated that he consumed more alcoholic drinks than he could specifically remember. Dr. Alexander also calculated how Defendant's body metabolized alcohol by multiplying the fourteen hours during which Defendant consumed alcohol with 0.015; this number represented "the blood alcohol that was metabolized and no longer present." Finally, Dr. Alexander subtracted the first blood alcohol figure from the second to arrive at "what the blood alcohol level most likely was at 2 a.m." Dr. Alexander testified that the most reliable estimate of Defendant's BAC during the offenses was 0.22. He estimated that Defendant's BAC was between 0.25 and 0.27 immediately after Defendant left Tin Roof.

Dr. Alexander stated the following about his professional experience with the effect of alcohol on individuals:

> Alcohol use is very widespread in our country, and alcohol abuse is also widespread. And, with that, the interface with psychiatry and alcohol occurs in every phase of practice that I've ever had. So whether it's an outpatient private practice, outpatient in a drug and alcohol clinic, which I've worked there. I've worked in patient drug and alcohol units. For twelve years, I was the medical director of a very large state psychiatric hospital. We had many, many people that were admitted to the hospital with different levels of intoxication. And I also served as the night call physician one night a week for a number of years. So, I would see the people as they were brought in by the police and see the effects directly of what level of alcohol.

> Also, in the last ten or eleven years, I've worked in two different general hospitals. So, we don't have any psychiatric unit, but we see people that overdose on alcohol or get ill enough medically to come in for alcohol withdrawal. And we see people with blood alcohol levels at just about any range, but even as high as .5, .6.

Dr. Alexander stated that he had treated "many thousands" of patients whose cases "involve[d] alcohol and the effects of all alcohol[.]"

---

[14] Dr. Alexander explained that Widmark's principle "involves forming the volume of alcohol that is taken . . . in grams" and then "plug[ging] those numbers into the equation, convert[ing] it to milliliters and then multiply[ing] it by .789, which is the specific gravity of alcohol." Next, Dr. Alexander divided the specific gravity of alcohol by Defendant's weight in kilograms and multiplied the result by "a standard conversion factor of 0.68." The result "represents a male individual's distribution of alcohol in their body[.]" Dr. Alexander next converted the number to liters to obtain the BAC.

Dr. Alexander also learned that Defendant had sustained concussions in high school as well as his freshman year of college. Additionally, Defendant suffered another possible concussion shortly before the offenses during a motor vehicle accident. Dr. Alexander testified that, although he did not have any of Defendant's medical records on these concussions, head injuries were "a factor that would have to be considered in this situation." He explained that the symptoms of alcohol consumption would be "exacerbated or worsened" in a person with a previous head injury. Further, Dr. Alexander stated that Defendant was "a new drinker" who would have likely displayed the following symptoms at a BAC of 0.22: "being uncoordinated, unbalanced, slurred speech, difficulty making decisions, difficulty perceiving the environment, difficulty assessing situations, [and] basically dysfunction of the brain." Dr. Alexander testified that, in his professional opinion and to a reasonable degree of medical certainty, the Defendant's decision-making ability was impaired at the time of the offenses. More specifically, Dr. Alexander explained that Defendant "would not have been cognizant enough to be able to form intent or to have more than first order thinking."

On cross-examination, Dr. Alexander stated that Defendant retained his services in early- to mid-April 2016. Dr. Alexander testified that he was not board-certified in toxicology or neuropharmacology. He could not specifically describe any training he had received in toxicology after medical school. He stated that he did not normally prepare reports like the one he prepared for Defendant. Dr. Alexander agreed that he based his opinion and report on information given to him by defense counsel, namely, an email with "a series of questions" and Defendant's answers to the questions; he did not interview Defendant. Dr. Alexander testified that he did not have enough information to determine whether Defendant was malingering. He also stated that he did not review video surveillance of Defendant's actions on the night of the offenses prior to composing his report.

The trial court noted that the State did not have an opportunity to retain an expert to rebut Dr. Alexander's findings. The trial court also noted that neither the State nor the defense asked an expert to evaluate Defendant. Further, the trial court found that Dr. Alexander was an expert in psychiatry and "did not demonstrate any particular expertise in the field of toxicology," which the trial court found to be "extremely important." Additionally, the trial court found that Dr. Alexander's "conclusions and opinions were based upon information supplied by defense counsel as admitted in the form of an e-mail and not based upon any scientific information or documented information or any particular evaluation that he had provided." Therefore, the trial court concluded that "the underlying facts indicate[d] a lack of trustworthiness in this particular case[,]" and the trial court held that Dr. Alexander's testimony should be excluded.

*(A) Tennessee Rules of Evidence 702 and 703*

"In Tennessee the qualifications, admissibility, relevancy and competency of expert testimony are matters which largely rest within the sound discretion of the trial court." *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702.

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703.

In *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997), the Tennessee Supreme Court adopted the following non-exclusive list of factors to assist courts in determining whether scientific evidence is reliable: (1) "whether scientific evidence has been tested and the methodology with which it has been tested"; (2) "whether the evidence has been subjected to peer review or publication"; (3) "whether a potential rate of error is known"; (4) "whether, as formerly required by [*Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)], the evidence is generally accepted in the scientific community"; and (5) "whether the expert's research in the field has been conducted independent of litigation." Additionally, the supreme court has considered "the expert's qualifications for testifying on the subject at issue[,]" *see Brown v. Crown Equipment Corp.*, 181 S.W.3d 268, 274 (Tenn. 2005), which particularly applies "where the expert's personal experience is essential to the methodology or analysis underlying his or her opinion." *Id.* Another factor to consider is "the connection between the expert's knowledge and the basis for the expert's opinion[,]" which particularly applies when "the expert's opinions are based upon experience or observations as these areas are not easily verifiable." *Id.* at 275. Consideration of this factor "ensure[s] that an 'analytical gap' does not exist between the data relied upon and the opinion offered." *Id.*

As noted above, the trial court excluded Dr. Alexander's testimony because "the underlying facts indicate[d] a lack of trustworthiness in this particular case[.]" Additionally, the trial court found that Dr. Alexander did not examine Defendant, "did not demonstrate any specialized expert opinion knowledge or training regarding toxicology[,]" and "relied on information supplied via email by defense counsel and did not base any opinion on data, documentation or scientific evidence." The trial court's findings are supported by Dr. Alexander's testimony that, to prepare the letter that Defendant submitted to the trial court, he examined data given to him by defense counsel. This data was Defendant's "best recollection" of the amount of alcohol that he consumed prior to the offenses. Dr. Alexander was not board-certified in toxicology or neuropharmacology, did not receive specific training in toxicology after medical school, and did not normally prepare reports such as the one that he prepared for Defendant.

We conclude that the trial court properly exercised its discretion by excluding Dr. Alexander's testimony. *See State v. Lowe*, 552 S.W.3d 842, 865-66 (Tenn. 2018) (concluding that an expert's testimony would not have substantially assisted the trial court in determining whether the defendant's statement to police was voluntary because the expert did not review the interview between the defendant and police); *see also State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994) (affirming the trial court's exclusion of expert testimony as "not sufficiently trustworthy" because the expert did not review the complete interrogation).

### (B) Right to present a defense

A defendant's right to present his own witnesses to establish a defense constitutes a fundamental element of due process and is protected by the Compulsory Process Clause of the Sixth Amendment. *Washington v. Texas*, 388 U.S. 14, 19 (1967). ". . . *Washington v. Texas* clearly established that, under the Sixth Amendment, a state may not arbitrarily deny a defendant the right to call a witness whose testimony is relevant and material to the defense." *Davis v. Straub*, 430 F.3d 281, 290 (6th Cir. 2005) (citing *Washington*, 388 U.S. at 23). Government conduct that rises to the level of "substantial interference" with a witness's "free and unhampered determination to testify" violates this right. *United States v. Foster*, 128 F.3d 949, 953 (6th Cir. 1997); *see, e.g.*, *Webb v. Texas*, 409 U.S. 95, 98 (1972) (per curiam) (reversing the defendant's conviction when the trial court severely admonished the sole witness proffered by the defense who declined to testify as a result); *United States v. Thomas*, 488 F.2d 334, 336 (6th Cir. 1973) (reversing a conviction obtained after a Secret Service agent, in an ex parte communication, advised a defense witness of possible prosecution if he testified). Even when such interference occurs, however, a violation of a defendant's right to call witnesses in his defense is subject to harmless error analysis. *United States v. Emuegbunam*, 268 F.3d 377, 400 (6th Cir. 2001); *Foster*, 128 F.3d at 953 & n. 4.

However, a defendant's right to present witnesses is not absolute:

> In appropriate cases, the right must yield to other legitimate interests in the criminal trial process. Specifically, [i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. However, these procedural and evidentiary rules of exclusion may not be applied mechanistically to defeat the ends of justice. Such rules do not abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve.

*State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000) (internal citations and quotation marks omitted) (alteration in original). In determining whether a defendant's right to present a defense has been violated by the exclusion of evidence, courts should consider whether "(1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important." *Id.* at 433-34 (citing *Chambers v. Mississippi*, 410 U.S. 284, 298-301 (1973)).

The United States Supreme Court has recognized that an exclusion of evidence is unconstitutional when it "significantly undermine[s] fundamental elements of the accused's defense." *United States v. Scheffer*, 523 U.S. 303, 315 (1998). The question of whether excluded evidence is critical to a defense is a fact-specific inquiry. *See Chambers*, 410 U.S. at 303.

## 1. Evidence critical to the defense

In this case, Dr. Alexander's testimony on Defendant's approximate BAC at the time of the offenses would have assisted in establishing Defendant's theory of the case—that his high level of intoxication prevented him from knowingly participating in the offenses and thus being criminally responsible. Dr. Alexander testified that, in his professional opinion and to a reasonable degree of medical certainty, the Defendant's decision-making ability was impaired at the time of the offenses. More specifically, Dr. Alexander explained that Defendant "would not have been cognizant enough to be able to form intent or to have more than first order thinking." Thus, we conclude that Dr. Alexander's testimony was critical to Defendant's trial strategy. However, even though Dr. Alexander's testimony was critical to the defense, we must examine the other factors relevant to the consideration of whether the exclusion of Dr. Alexander's testimony violated Defendant's right to present a defense.

## 2. Sufficient indicia of reliability

As stated previously in this opinion, the trial court excluded Dr. Alexander's testimony because "the underlying facts indicate[d] a lack of trustworthiness" and because Dr. Alexander did not examine Defendant, "did not demonstrate any specialized expert opinion[,] knowledge[,] or training regarding toxicology[,]" "relied on information supplied via email by defense counsel[,]" and "did not base any opinion on data, documentation or scientific evidence." Dr. Alexander relied on self-serving and uncorroborated statements from Defendant to calculate Defendant's approximate BAC during the offenses. Thus, we agree with the trial court that Dr. Alexander's proposed testimony and conclusions were unreliable, and we give this factor considerable weight.

## 3. Interest supporting exclusion

In this case, the interests supporting exclusion are the interests behind Tennessee Rule of Evidence 703, which was discussed previously in this opinion. Further, we have previously determined that the trial court properly exercised its discretion under Rule 703 to exclude Dr. Alexander's testimony. Thus, the interests behind Rule 703 support the exclusion of Dr. Alexander's testimony. Because we have previously concluded that Dr. Alexander's testimony was unreliable, we also conclude that Defendant has not established that the trial court's exclusion of Dr. Alexander's testimony violated his Sixth Amendment right to present witnesses. *See State v. Joshua Hunter Bargery*, No. W2016-00893-CCA-R3-CD, 2017 WL 4466559, at *42-44 (Tenn. Crim. App. Oct. 6, 2017), *no perm. app. filed*.

### (4) Jury selection

Defendant asserts that the trial court violated Tennessee Rule of Criminal Procedure 24(b)(2) by denying Defendant's request to question prospective jurors about other college rape cases that had recently occurred in the United States. He argues that he was unable to "effectively challenge for cause or to peremptorily challenge jurors based on their attitudes about those cases." Defendant also contends that the trial court failed to timely give the prospective jurors the admonitions required by Tennessee Rule of Criminal Procedure 24(g). He asserts that the trial court's failure to admonish the prospective jurors at the beginning of jury selection made it virtually impossible to select a fair and impartial jury, preventing him from receiving a fair trial.

The State argues that the trial court properly denied Defendant's motion to strike the venire because Defendant "failed to establish that any of the jurors who served on his trial were prejudiced by any outside influence." More specifically, the State notes that "only [two] of the [twenty-five] prospective jurors mentioned in . . . [D]efendant's brief

ultimately served on the jury[,]" and those two jurors "indicated that they could be fair and impartial." The State also contends that the trial court did not err by waiting to admonish the prospective jurors until the second day of voir dire because "the trial court explained that, due to information that some prospective jurors had obtained extraneous information about the case, they had elected to question them further during individual voir dire."

On June 9, 2016, after the first day of jury selection, Defendant filed a motion to strike the venire or to conduct individual voir dire. In the motion, Defendant asserted that, during individual voir dire, several prospective jurors stated that members of the panel had been discussing the case with each other. Other prospective jurors stated that they had some prior knowledge of the case from hearing about it on local news or from friends or family members. The trial court stated that the "problem can be resolved in the voir dire process." Defense counsel asked the trial court to allow individual voir dire. The trial court stated that it would "ask a couple of questions" of the next group of forty prospective jurors. The trial court also stated that the State and Defendant could discuss sensitive issues with individual jurors. Defense counsel also noted that the trial court did not admonish the venire to refrain from finding extrajudicial information about the case under Tennessee Rule of Criminal Procedure 24(g) and consequently, prospective jurors searched for information on Defendant's case and previous trials on the Internet and discussed it amongst themselves. The trial court stated that voir dire would proceed as planned. As the voir dire process progressed, the trial court asked the prospective jurors if they "have had any discussion about this particular case, or heard someone discuss this particular case[.]" The trial court took jurors who responded affirmatively to the jury deliberation room where the State and Defendant conducted individual voir dire.

J.M.[15] indicated during group voir dire that he heard prospective jurors discussing Defendant's case on June 8. During individual voir dire in the jury deliberation room, J.M. stated that he heard "that it happened three years ago, and one of his [co-]defendants[] . . . had a trial already." He explained that he first heard about Defendant's case on the morning of June 8 and that he did not form an opinion regarding Defendant's guilt or innocence. He affirmed that he could decide the case solely based on the evidence admitted at trial. J.M. was later selected to serve on Defendant's jury.

---

[15] Defendant's primary brief and reply brief discuss the voir dire of several prospective jurors; however, we will only address Defendant's arguments on this issue as they relate to individuals who were selected to serve on Defendant's jury because we must determine whether the jury who deliberated on Defendant's case was fair and impartial. *See State v. Howell*, 868 S.W.2d 238, 248 (Tenn. 1993); *see also State v. Thompson*, 768 S.W.2d 239, 246 (Tenn. 1989). Additionally, we will refer to these jurors by their initials to protect their privacy. No disrespect is intended.

During individual voir dire in the courtroom, M.N. affirmed that, if selected to serve on Defendant's jury, she would decide the case based on the evidence introduced at trial and would be fair and impartial. M.N. stated that one of her daughter's friends had been molested as a child; she stated on the jury questionnaire that this was a "life-lasting experience." M.N. stated that the molestation of her daughter's friend would not have any effect on her ability to deliberate fairly and impartially on Defendant's case. M.N. was later selected to serve on Defendant's jury.

Later in the day of June 9, Defendant renewed his motion to strike the venire. He also requested that the trial court give him two more peremptory challenges. Defendant asserted that he had used two peremptory challenges on prospective jurors who should have been struck for cause. The trial court denied both requests.

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution both guarantee the accused the right to trial "by an impartial jury." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. The Tennessee Constitution has been interpreted to guarantee a jury free from "disqualification on account of some bias or partiality toward one side or the other of the litigation." *Carruthers v. State*, 145 S.W.3d 85, 94 (Tenn. Crim. App. 2003) (quoting *State v. Akins*, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993)). Bias is "a leaning of the mind; propensity or prepossession towards an object or view, not leaving the mind indifferent; a bent; for inclination." *Id.* "The ultimate goal of voir dire is to see that jurors are competent, unbiased, and impartial, and the decision of how to conduct voir dire of prospective jurors rests within the sound discretion of the trial court." *Howell*, 868 S.W.2d at 247 (citing *State v. Harris*, 839 S.W.2d 54, 65 (Tenn. 1992); *State v. Simon*, 635 S.W.2d 498, 508 (Tenn. 1982)).

A trial court's decisions regarding juror qualifications are reviewed for an abuse of discretion. S*tate v. Hugueley*, 185 S.W.3d 356, 378 (Tenn. 2006); *State v. Mickens*, 123 S.W.3d 355, 375 (Tenn. Crim. App. 2003). The trial court's decision will not be reversed absent "manifest error." *Howell*, 868 S.W.2d at 248. On appeal, this court must determine "whether the jury that tried the case was fair and impartial." *State v. Davidson*, 509 S.W.3d 156, 193 (Tenn. 2016).

*(A) Questioning prospective jurors about other rape cases*

Peremptory challenges are intended to exclude jurors "suspected of bias or prejudice," while the challenge for cause should be used to exclude potential jurors "whose bias or prejudice rendered them unfit." *State v. Pamplin*, 138 S.W.3d 283, 285-86 (Tenn. Crim. App. 2003) (quoting *Manning v. State*, 292 S.W. 451, 455 (Tenn. 1927)) (internal quotation marks omitted). Tennessee Rule of Criminal Procedure 24(b)

provides that the trial court "may ask potential jurors appropriate questions regarding their qualifications to serve as jurors in the case" and "shall permit the parties to ask questions for the purpose of discovering bases for challenge for cause and intelligently exercising peremptory challenges." Tenn. R. Crim. P. 24(b)(1). Additionally, "[o]n motion of a party or its own initiative, the court may direct that any portion of the questioning of a prospective juror be conducted out of the presence of the tentatively selected jurors and other prospective jurors." Tenn. R. Crim. P. 24(b)(2).

The Tennessee Rules of Criminal Procedure also set out the following procedure for challenges for cause:

> After examination of any juror, the judge shall excuse that juror from the trial of the case if the court is of the opinion that there are grounds for challenge for cause. After the court has tentatively determined that the jury meets the prescribed qualifications, counsel may conduct further examination and, alternately, may exercise challenges for cause.

Tenn. R. Crim. P. 24(c)(1). "Any party may challenge a prospective juror for cause if: . . . [t]here exists any ground for challenge for cause provided by law" or "[t]he prospective juror's exposure to potentially prejudicial information makes the person unacceptable as a juror." Tenn. R. Crim. P. 24(c)(2)(A)-(B). In determining whether a prospective juror has been exposed to potentially prejudicial information, the trial court "shall consider both the degree of exposure and the prospective juror's testimony as to his or her state of mind." Tenn. R. Crim. P. 24(c)(2)(B). "A prospective juror who states that he or she will be unable to overcome preconceptions is subject to challenge for cause no matter how slight the exposure." *Id.*

> If the prospective juror has seen or heard and remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his or her judgment will be affected, the prospective juror's acceptability depends on whether the court believes the testimony as to impartiality. A prospective juror who admits to having formed an opinion about the case is subject to challenge for cause unless the examination shows unequivocally that the prospective juror can be impartial.

*Id.* "Jurors need not be totally ignorant of the facts of the case on which they sit [and] [e]ven the formation of an opinion on the merits will not disqualify a juror if [he] can lay aside [his] opinion and render a verdict based on the evidence presented in court." *Howell*, 868 S.W.2d at 249 (quoting *State v. Sammons*, 656 S.W.2d 862, 869 (Tenn. Crim. App. 1982)). "An individual examined during voir dire is not required to have a

- 56 -

complete lack of knowledge of the facts and issues to be selected as a juror." *State v. Davidson*, 121 S.W.3d 600, 612 (Tenn. 2003). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961); *see also State v. Mann*, 959 S.W.2d 503, 531 (Tenn. 1997).

We conclude that the trial court properly exercised its discretion in denying Defendant's request to question prospective jurors about other college rape cases that had been discussed recently in the national news. As this opinion has previously noted, the trial court "shall permit the parties to ask questions [of prospective jurors] for the purpose of discovering bases for challenge for cause and intelligently exercising peremptory challenges." Tenn. R. Crim. P. 24(b)(1). "[T]he scope and extent of voir dire is entrusted to the discretion of the trial court, and the trial court's rulings will not be reversed on appeal absent an abuse of discretion." *State v. Schemeiderer*, 319 S.W.3d 607, 626 (Tenn. 2010); *see also State v. Irick*, 762 S.W.2d 121, 125 (Tenn. 1988); *State v. Poe*, 755 S.W.2d 41, 45 (Tenn. 1988). Here, allowing Defendant to question the prospective jurors about their knowledge of or opinions on other criminal cases unrelated to the charges against Defendant would have inappropriately exposed the prospective jurors to facts and issues outside the scope of the trial. Defendant is not entitled to relief on this ground. *See Poe*, 755 S.W.2d at 45 (affirming the trial court's denial of the defendant's request to question jurors regarding their "feelings" about the death penalty); *see also State v. Reid*, 91 S.W.3d 247, 291-92 (Tenn. 2002) (affirming the trial court's limitation on group voir dire regarding questions about mental health issues).

Further, Defendant has not presented any evidence that the jury was not fair and impartial in its deliberations. Juror Morris and Juror Newberry both clearly stated that they could be impartial if they were selected to serve on the jury for Defendant's case. Thus, the trial court properly denied Defendant's motion to strike the venire on the ground that prospective jurors had been exposed to information about Defendant's case. *See State v. Sexton*, 368 S.W.3d 371, 396 (Tenn. 2012); *see also State v. Robert G. Thornton, Jr.*, No. M2015-01895-CCA-R3-CD, 2017 WL 2704123, at *7-9 (Tenn. Crim. App. June 22, 2017) (holding that the trial court did not err by failing to strike a juror for cause who, although a victim of rape as a child, indicated that she would be impartial if she served on the jury for the defendant's trial for rape), *no perm. app. filed*; *State v. Todd Joseph Sweet*, No. E2010-00729-CCA-R3-CD, 2011 WL 6813180, at *9-12 (Tenn. Crim. App. Dec. 22, 2011) (holding that the trial court did not abuse its discretion by failing to excuse a juror for cause who had prior knowledge of the offenses but affirmed that she would be impartial), *perm. app. denied* (Tenn. Apr. 11, 2012); *State v. Alejandro Rivera*, No. E2002-00491-CCA-R3-CD, 2003 WL 22843170, at *14-18 (Tenn. Crim. App. Dec. 1, 2003) (holding that the trial court did not abuse its discretion by failing to excuse two jurors for cause who had previously read about the offenses but stated that

they could be impartial if selected to serve on the jury), *perm. app. denied* (Tenn. Mar. 16, 2009); *State v. David Scarbrough*, No. E1998-00931-CCA-R3-CD, 2001 WL 775603, at *8-10 (Tenn. Crim. App. July 11, 2001) (holding that the trial court did not abuse its discretion by failing to excuse a juror for cause who had previously read about the case but affirmed that she could be impartial), *perm. app. denied* (Tenn. Jan. 7, 2002); *State v. Letivias Prince*, No. M1998-00005-CCA-R3-CD, 2000 WL 1133572, at *3-4 (Tenn. Crim. App. Aug. 10, 2000) (holding that the trial court did not abuse its discretion by approving the jury panel when some jurors had previous knowledge about the case but all confirmed that they could be impartial), *perm. app. denied* (Tenn. Mar. 5, 2001).

### *(B) Trial court's failure to timely admonish prospective jurors*

Tennessee Rule of Criminal Procedure 24(g) states that the trial court "shall give the prospective jurors appropriate admonitions regarding their conduct during the selection process." Tenn. R. Crim. P. 24(g). "After jurors are sworn, the court shall also give them appropriate admonitions regarding their conduct during the case." *Id.* At both times, the trial court shall give the venire or the jurors the following admonitions: (1) "not to communicate with other jurors or anyone else regarding any subject connected with the trial"; (2) "not to form or express any opinion about the case until it is finally submitted to the jury"; (3) "to report promptly to the court[] . . . any incident involving an attempt by any person improperly to influence any jury member" or "a juror's violation of any of the court's admonitions"; (4) "not to read, hear, or view any news reports concerning the case"; and (5) "to decide the case solely on the evidence introduced in the trial." Tenn. R. Crim. P. 24(g)(1)-(5).

The plain language of Rule 24(g) does not clarify when the trial court must admonish the prospective jurors during the voir dire process. While the better practice for the trial court would have been to admonish the prospective jurors when they arrived at the courthouse and jury selection began, as we have previously noted, Defendant has not presented any evidence that any of the jurors who deliberated on his case were biased or unfair. Further, Defendant had the opportunity to conduct individual voir dire of prospective jurors who indicated that they had previous knowledge of the case. Thus, we conclude that the trial court did not abuse its discretion by denying Defendant's motion to strike the venire on this ground. *See State v. Vann*, 976 S.W.2d 93, 115 (Tenn. 1998) (citing *State v. Garland*, 617 S.W.2d 176, 187 (Tenn. Crim. App. 1981); *State v. Kyger*, 787 S.W.2d 13, 18-19 (Tenn. Crim. App. 1989)) (concluding that the trial court did not abuse its discretion by admonishing the jury once, after it was selected and sworn, because the defendant failed to show that "any of the jurors who actually sat on the case were prejudiced by any publicity").

### *(5) Denial of motion to suppress June 27, 2013 interrogation*

Defendant argues that the MNPD performed an unlawful interrogation when they interviewed him at VPD headquarters without informing him of his *Miranda* rights or giving him access to an attorney. He asserts that, based on the totality of the circumstances, he was in police custody during the interview, and the MNPD officers lacked probable cause to detain him. Defendant contends that Mr. Colon and two VPD officers verbally coerced him to participate in the interview, and MNPD officers were armed and blocked the door during the interview, factors which created a custodial environment. Defendant further argues that "the initial possession and inspection of [Defendant]'s cell phone and the subsequent issuance of a search warrant for the same were derived directly from the involuntary statement given by [Defendant] and were each therefore inadmissible." The State contends in response that the trial court properly denied Defendant's motion to suppress because Defendant was not in custody when he gave his statement and because Defendant voluntarily gave a statement to Detective Mayo.

On September 15, 2014, Defendant filed a motion to suppress "any and all items collected by police pursuant to or under color of search warrants issued by the General Sessions Court of Davidson County and executed on June 28, 2013 and/or thereafter and items subsequently collected pursuant to search warrants issued by California courts." He argued that "all the search warrants issued in this matter subsequent to June 27, 2013[,] are the direct or indirect fruits of an unlawful investigative detention without probable cause and/or coerced statement elicited from [Defendant] by police at the [VPD] Headquarters on June 27, 2013."

On October 8, 2014, the trial court held a hearing on Defendant's motion to suppress. Gerald Leroy Black testified that he worked as the Assistant Dean of Students and the Director of the Office of Student Accountability, Community Standards, and Academic Integrity at Vanderbilt University in June 2013. Mr. Black explained that his office "review[ed], investigate[d], and resolve[d] incidents of misconduct that violate[d] [Vanderbilt's] policies and standards." On June 25, 2013, Mr. Black interviewed Defendant "[t]o determine whether any university policies or community standards had been violated[.]" He explained that the Vanderbilt Department of Athletics arranged for Defendant to meet with Mr. Black in the Zerfoss Student Health Center on the Vanderbilt campus. Mr. Black testified that he had no contact with the MNPD prior to the interview. He also stated that he did not know whether a criminal act had been committed when he interviewed Defendant.

On cross-examination, Mr. Black stated that he received an email on the evening of June 25 from a VPD officer and that he met with the officer on June 26. Additionally,

- 59 -

he gave Defendant's statement to VPD on June 26. Mr. Black agreed that some VPD officers are armed, wear uniforms, and drive patrol cars. He explained that the Office of Student Accountability, Community Standards, and Academic Integrity has the authority to expel students who are "charged with and found responsible for violations of university policy." Mr. Black stated that, prior to beginning the interview with Defendant, he informed Defendant that no charges had been brought and that the interview was for a preliminary inquiry.

James Franklin, who worked as the head coach of the Vanderbilt Football Team in 2013, testified that he learned about the offenses while he was on vacation in June 2013. Mr. Franklin informed the football team that "there was a problem." He stated that Defendant and Co-defendants Batey, Banks, and McKenzie came to his office, but he informed them that he could not discuss the case with them. He explained that Defendant was suspended from the football team at the time Defendant came to his office, and Defendant was later dismissed from the team.

Defendant testified that, in 2013, he attended Vanderbilt University on a football scholarship. On the evening of June 25, 2013, Defendant met with Mr. Franklin after Mr. Franklin addressed the football team about the offenses involving E.L. Mr. Franklin met with Defendant individually in his office with the door closed and informed Defendant that he "needed to cooperate with police, answer every one of their questions, or [he] would lose [his] scholarship." On the evening of June 26, 2013, Defendant received a phone call from Kevin Colon, the Associate Director of Athletics at Vanderbilt University. Mr. Colon stated that Defendant "must meet with him the next morning at seven a.m. to talk with the police; and, that if [Defendant] did not meet with him[,] [Defendant] could lose [his] scholarship." On the morning of June 27, Defendant met with Mr. Colon at the Athletic Department building on the Vanderbilt University campus, and Mr. Colon again informed Defendant that he could lose his scholarship if he did not speak with the police. Mr. Colon told Defendant that he had been in constant contact with the police. While Mr. Colon escorted Defendant to the VPD headquarters, he said that Defendant could return to the football team if he answered all of the VPD's questions.

Once they arrived at the VPD headquarters, Mr. Colon left Defendant with a VPD sergeant. The sergeant escorted Defendant through a large room with armed, uniformed police officers. Defendant stated that he felt intimidated by the uniformed, armed officers. The sergeant took Defendant to a smaller room and closed the door, leaving Defendant alone. Later, two armed, uniformed police officers entered the small room and informed Defendant that he needed to speak to two men; the officers told Defendant that he had to answer all the questions asked of him before he could leave and that his scholarship was at risk. Defendant stated that he felt "uncomfortable" and "confined" by

the officers' statements regarding his scholarship. Defendant testified that the VPD officers sat between Defendant and the door of the small room; their body language was "intimidating[,]" "authoritative," and "somewhat aggressive[,]" which scared Defendant.

Defendant walked back through the room with the large group of armed, uniformed VPD officers and met with Detective Mayo and Sergeant Shreeve in another small room. The detectives sat between Defendant and the door to the small room; the detectives were armed, and their police badges were visible on their street clothing. Defendant testified that the detectives' tone of voice was nice, but their body language during the interview was aggressive. He explained that the detectives would move in front of the door or rest their hand on their gun. Detective Mayo informed Defendant that the door was unlocked, that Defendant could decline to answer their questions and leave at any time, and that he was not under arrest. However, Defendant observed that the door appeared to be locked when Detective Mayo attempted to leave to use the restroom during the interview. Neither Detective Mayo nor Sergeant Shreeve informed Defendant of his *Miranda* rights. When Defendant asked about an attorney during the interview, the detectives informed him that they would let him know if he needed one. Defendant did not feel like he could leave the interview.

During the interview, the detectives informed Defendant that they needed his cell phone. Defendant consented to retrieve his phone from his dorm room because he believed that he would lose his scholarship if he did not comply. Detective Mayo and a VPD officer drove Defendant back to his dorm room. The VPD officer accompanied Defendant into Gillette Hall and took possession of Defendant's phone. When Defendant and the VPD officer returned to the vehicle, the officer gave Defendant's phone to Detective Mayo, who accessed the files and data on the phone. Once Defendant, Detective Mayo, and the VPD officer returned to the VPD headquarters, Detective Mayo and Detective Shreeve continued their interview with Defendant. Additionally, the detectives asked for Defendant's consent to search the contents of his phone and for a saliva sample. Defendant stated that he spent approximately five hours at the VPD station, including the trip to retrieve his phone. During this time, he felt like he could not leave the VPD headquarters or decline to answer questions because if he did, he would lose his scholarship.

On cross-examination, Defendant estimated that there were at least twenty police officers in the VPD headquarters. Defendant agreed that he consented to allow Detective Mayo and Sergeant Shreeve to examine the contents of his cell phone, but he asserted that he consented against his will. Defendant also agreed that he gave Detective Mayo the password to unlock his phone during the interview. Defendant agreed that he was never physically restrained with handcuffs.

Sergeant Shreeve testified that he supervised the sex crimes unit at the MNPD. Sergeant Shreeve assisted Detective Mayo with the interview of Defendant on June 27, 2013, at the VPD headquarters. Sergeant Shreeve explained that the investigation into the offenses against E.L. was in an early stage on June 27 because the MNPD first learned of the surveillance video showing E.L. unconscious on the floor of Gillette Hall on June 26 when Major Greg Robinson of the VPD called Sergeant Shreeve. After viewing the surveillance video, the MNPD "determined that [the video] warranted more additional investigation[,]" and the detectives "decided to identify the people that were in that surveillance video and interview them." Sergeant Shreeve explained that the VPD identified E.L. as the unconscious female in the video, and the detectives interviewed E.L. on the evening of June 26. He also stated that he did not have probable cause to arrest Defendant based on the information available to the MNPD on the morning of June 27.

On cross-examination, Sergeant Shreeve testified that, while he was in the VPD headquarters with Detective Mayo and Defendant, there were only two or three uniformed VPD officers in the building. Sergeant Shreeve also testified that the VPD officers did not threaten Defendant verbally or through mannerisms or body language. He stated that, during the interview, he sat to Defendant's left and Detective Mayo sat on Defendant's right. He explained that he and Detective Mayo did not sit between Defendant and the door of the interview room because the officers sat in front of Defendant and to the side. Sergeant Shreeve and Detective Mayo were not in uniform, but they were armed. Sergeant Shreeve explained that, per MNPD policy, he and Detective Mayo kept their weapons covered during the interview because it was a public setting. He denied that he or Detective Mayo made any threatening gestures towards Defendant during the interview. Defendant never asked Sergeant Shreeve or Detective Mayo why VPD officers told him he had to give a statement and answer questions, but Detective Mayo stated that he could decline to answer questions and leave.

Detective Mayo testified that he worked in the sex crimes unit of the MNPD. He explained that the interview with Defendant occurred in Captain Harville's office at the VPD headquarters. He noted that the door was not locked because Sergeant Shreeve had exited and reentered the room during the interview. During the interview, Detective Mayo sat behind the desk in Captain Harville's office, Sergeant Shreeve sat "in the front corner of the room[,]" and Defendant sat "where the door was located." Both Detective Mayo and Sergeant Shreeve identified themselves to Defendant as officers of the MNPD.

On cross-examination, Detective Mayo testified that he was not in uniform during the interview with Defendant. He did not recall seeing any uniformed VPD officers when he arrived at the VPD headquarters. During the interview, Defendant was not physically restrained with handcuffs and "[a]ppeared fine, maybe a little nervous."

Defendant did not appear to be under the influence of any drug or intoxicating substance. Detective Mayo did not instruct any VPD officers to threaten or coerce Defendant into answering questions. Additionally, Detective Mayo did not observe that any VPD officers threatened or coerced Defendant, and Defendant did not inform Detective Mayo that he had been threatened or coerced. Detective Mayo began the interview with the following statements:

> . . . [Defendant], I am Detective Jason Mayo. I work for the Metro Nashville Police Department. Okay? This is my sergeant, Mike Shreeve. Obviously we're here to talk to you. Okay? You need to understand a couple of things before we talk. Okay? Number one, you are not under arrest. Okay? I want to make that perfectly clear. Okay? You are not under arrest and you do not have to speak to me. It is well within your right to tell me I don't want to talk to you, okay, and you'll get up and you'll leave. Okay? You're not being -- you know, the door's closed for privacy only. It's not locked. Okay? Matter of fact, if you want, you can reach over and check it. You don't have to sit here and talk to us. But obviously, we're here to get your side of a situation. And obviously you understand what situation we're talking about. Okay?

> And I've kind of -- I've got some opinions on some things. Okay? And this could or could not be a way to help yourself. Okay? And if you want to cooperate and, you know, talk to us, great. We'll sit here. We'll talk to you all day long if we need to. Okay? I'm in no hurry. He's in no hurry. I'm getting paid. Okay. So, but, obviously there's -- there's two sides to every story. Right? Right now I've got part of one, but I need to fill in a lot of blanks. Make sense? Okay.

> [Defendant], you understand everything I just said, right, that you don't have to sit in here, right? You don't have to talk to me. All right. With all that in mind, you're willing to sit here and kind of talk to us for a little bit?

Defendant agreed to speak with Detective Mayo and Sergeant Shreeve as long as he felt comfortable. Later during the interview, Detective Mayo asked Defendant if he consumed alcohol while at Tin Roof. Defendant stated that he did not "feel comfortable answering that question." Detective Mayo reminded Defendant that he was an MNPD officer and did not work for Vanderbilt. Defendant responded that he did not believe that the question was relevant. Detective Mayo stated that the question could be relevant but that he was "not going to pressure [Defendant] to answer it." Detective Mayo and Sergeant Shreeve spoke in normal tones during the interview with Defendant.

Additionally, neither officer displayed their weapon during the interview. Detective Mayo agreed that Defendant never asked to leave the interview.

Detective Mayo testified that, during the interview, he asked Defendant if he could inspect Defendant's cell phone. Defendant agreed to allow Detective Mayo to access the contents of the phone. Detective Mayo asserted that he did not access the contents of the cell phone before Defendant signed a consent form. He explained that he stayed at the VPD headquarters while Defendant retrieved the phone. On redirect examination, Detective Mayo stated that Defendant never asked for the advice of counsel during the interview. Defendant asked to know if he needed to get a lawyer, and Detective Mayo stated that he would give Defendant a "head's up."

Kevin Colon testified that he worked as the Associate Athletic Director for Vanderbilt University. He stated that on June 25, 2013, he took Defendant and other student athletes to Mr. Black's office. Mr. Colon stated that he made general conversation with the group of students but did not speak individually with Defendant. On June 27, Mr. Colon escorted Defendant to the VPD headquarters at Captain Harville's request. During the trip, Defendant asked Mr. Colon why he needed to go to the VPD headquarters. Mr. Colon stated that he was unsure, but he assumed it was related to "the previous weekend activities." Mr. Colon testified that he did not threaten Defendant with the potential of losing his scholarship, and he did not overhear anyone else threaten Defendant with the loss of his scholarship.

During cross-examination, Mr. Colon testified that he did not have any decision-making authority over athletic scholarships. He explained that, when he asks students to accompany him to Mr. Black's office, students have the option to decline and have done so in the past. He was unaware of any ongoing criminal investigation when he asked Defendant to accompany him to the VPD headquarters, and he did not know that Defendant would be meeting with Detective Mayo and Sergeant Shreeve at the headquarters. He explained that he spoke with a member of the football staff about escorting students to meet with Mr. Black and that the member gathered the students. Mr. Colon waited with the remaining students while the students were interviewed one at a time. Mr. Colon stated that the students "were told to place their phones on top of the desk" in front of each student while they were waiting to be interviewed. Mr. Colon observed Defendant use his phone while waiting to be interviewed. Mr. Colon agreed that the students were told not to speak to one another while waiting to be interviewed.

Captain Harville testified that he worked in the Criminal Investigation Division of the VPD. He stated that he asked Mr. Colon to escort Defendant to the VPD headquarters. After Defendant arrived with Mr. Colon, Captain Harville brought Defendant into the headquarters and into his office to meet with Detective Mayo and

Sergeant Shreeve. Captain Harville testified that there were no uniformed VPD officers that displayed threatening body language towards Defendant. He explained that only detectives and administrative staff work in the VPD headquarters, and he was dressed in street clothes. He additionally stated that, while he carried a weapon, the weapon was concealed under a vest. Captain Harville introduced himself to Defendant and informed Defendant that Detective Mayo and Sergeant Shreeve wanted to speak with Defendant. He did not threaten Defendant with any consequences if Defendant did not speak to Detective Mayo and Sergeant Shreeve. During cross-examination, Captain Harville agreed that there was an ongoing criminal investigation when he escorted Defendant to meet with Detective Mayo and Sergeant Shreeve. However, he stated that Defendant was not a target of the investigation at that point.

On October 20, 2014, the trial court entered an order that denied Defendant's motion to suppress. The trial court found that Defendant "was not in custody [or] under arrest and was not compelled to speak with the detective" when Sergeant Shreeve and Detective Mayo interviewed Defendant at the VPD headquarters. The trial court concluded that Detective Mayo and Sergeant Shreeve were not required to inform Defendant of his *Miranda* rights. Additionally, the trial court found that "a valid search warrant was issued and executed" on Defendant.[16]

The applicable standard of review for suppression issues is well-established. A trial court's findings of fact are binding on this court unless the evidence in the record preponderates against them. *State v. Echols*, 382 S.W.3d 266, 277 (Tenn. 2012) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Id.* The prevailing party is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing and all reasonable and legitimate inferences that may be drawn therefrom. *Id.* The trial court's application of law to the facts is reviewed under a de novo standard with no presumption of correctness. *Id.* (citing *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001)). When reviewing a trial court's ruling on a motion to suppress, this court may consider the entire record, including the proof presented at the suppression hearing as well as at trial. *State v. Thacker*, 164 S.W.3d 208, 248 (Tenn. 2005); *v. Walton*, 41 S.W.3d at 81; *State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998).

---

[16] On December 15, 2014, Defendant filed a motion to reopen the suppression hearing. The motion alleged that Defendant learned of new evidence that he was unable to include in his original motion to suppress. Defendant asserted that the newly discovered evidence contradicted several aspects of Detective Mayo's testimony at the suppression hearing. A minute entry from January 9, 2015, reflects that the trial court took this motion under advisement. On January 13, 2015, the trial court denied the motion from the bench.

Both the United States and Tennessee Constitutions protect against compelled self-incrimination. U.S. Const. amend. V; Tenn. Const. art. I, § 9. In order to protect criminal defendants from self-incrimination, the United States Supreme Court has ruled that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of a defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *Walton*, 41 S.W.3d at 82. As part of those safeguards, police are required to inform persons who are subjected to custodial interrogation: (1) that they have the right to remain silent; (2) that any statement made may be used as evidence against them; (3) that they have the right to the presence of an attorney during questioning; and (4) that if they cannot afford an attorney, one will be appointed for them prior to questioning, if so desired. *See Miranda*, 384 U.S. at 444.

Our supreme court has stated that the test to determine whether a defendant was in custody is "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest." *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996). Our supreme court set out the following non-exclusive factors to assist in this determination:

> the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*Id.* (internal citations omitted). The Supreme Court of the United States has recognized that "*Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).

After reviewing the record on appeal, we conclude that the trial court properly denied Defendant's motion to suppress because a reasonable person would not have felt "deprived of freedom of movement to a degree associated with a formal arrest." *See*

*Anderson*, 937 S.W.2d at 855. Here, Mr. Colon escorted Defendant to meet with Detective Mayo and Sergeant Shreeve on the Vanderbilt campus at the VPD headquarters, which housed non-uniformed detectives and administrative personnel. Mr. Colon did not threaten Defendant that he would lose his scholarship if he did not speak with Detective Mayo and Sergeant Shreeve. When Defendant arrived at the VPD headquarters, he met with Detective Mayo and Sergeant Shreeve in Captain Harville's unlocked office. Detective Mayo began the recorded interview by stating that Defendant could refuse to answer any questions and could leave at any time. The recording reflects that Detective Mayo and Sergeant Shreeve used a normal tone of voice when interviewing Defendant. Further, it is clear that Defendant understood that he could decline to answer questions because he refused to answer Detective Mayo's question about drinking at Tin Roof. During the interview, Detective Mayo asked for access to Defendant's cell phone, and Defendant agreed. Defendant also consented to give a DNA sample to the MNPD officers and to conduct a controlled phone call to Co-defendant Batey. Although the trial court did not make specific credibility findings in its order denying the motion to suppress, the trial court impliedly discredited Defendant's testimony and credited the testimony of Captain Harville, Detective Mayo, Mr. Colon, and Sergeant Shreeve. The evidence does not preponderate against the trial court's findings that Defendant "was not in custody [or] under arrest and was not compelled to speak" during his interview at the VPD headquarters.

When we consider the totality of the circumstances that surrounded Defendant's interview with Detective Mayo and Sergeant Shreeve, we conclude that Defendant was not in custody. *See State v. Eric Foster*, No. E2018-01205-CCA-R3-CD, 2019 WL 1546996, *13-14 (Tenn. Crim. App. Apr. 9, 2019) (concluding that an interview between the defendant and law enforcement were non-custodial when the detective's demeanor was "nonconfrontational[,]" the interviews occurred in locations convenient for the defendant, and the defendant was not restrained in any way), *no perm. app. filed*. Thus, Detective Mayo and Sergeant Shreeve were not required to inform Defendant of his rights under *Miranda* prior to speaking with him. Defendant is not entitled to relief on this ground.

### *(6) Exclusion of Defendant's voicemail*

Defendant argues that the trial court erred in excluding Defendant's voicemail on Mr. Quinzio's cell phone from evidence on the basis that it was self-serving hearsay under *Hall v. State*, 552 S.W.2d 417 (Tenn. Crim. App. 1977). He asserts that the message was not exculpatory and that he sought to introduce the statement to "corroborate [Mr.] Quinzio's interpretation of the message." Thus, he argues that he was not introducing the voicemail to prove the truth of the matter asserted but "to show the basis upon which [Mr.] Quinzio believed [Defendant] was intoxicated." Further,

Defendant contends that the trial court's exclusion of the voicemail violated his right to present a defense.

The State responds that the trial court properly acted within its discretion by excluding Defendant's self-serving hearsay statement because Defendant did not testify and the statement was offered "to show that the defendant was not engaged in the acts against the victim." Additionally, the State argues that, even if the trial court erred in excluding the statement, the error was harmless because of the overwhelming evidence of Defendant's guilt and because "evidence of the defendant's intoxication was admitted at trial[.]"

During Defendant's cross-examination of Mr. Quinzio, defense counsel asked the trial court to play a recording of a voicemail that Defendant left on Mr. Quinzio's phone. The State objected, and the following exchange occurred:

> THE [TRIAL] COURT: Well, you know, statements of a defendant, self-serving statements, unless he testifies, they -- and is under *Hall*. You wanted to come back to say what?

> [DEFENSE COUNSEL]: We don't have any way to play the statement, unfortunately. But Mr. Quinzio testified when this call was made [Defendant] was speaking gibberish, that he can barely understand. This is not a self-serving statement. What [Defendant] says in the statement is --

> [THE STATE]: We're talking about two different statements, then. It's the one that was given, when he called him during the incident. The other one he called him after the incident, according to the timeline.

> . . . .

> [THE STATE]: So, there's two. The one where he's talking gibberish is when he called him the first time.

> You could understand the one you're talking about. It's not gibberish.

> [DEFENSE COUNSEL]: But, at any rate, actually, the one I wanted to play was the voicemail. I apologize if I wasn't --

> THE [TRIAL] COURT: And what's the content of it?

- 68 -

[DEFENSE COUNSEL]: The content of the voicemail -- and, again, I apologize to the ladies that are present -- but, [Defendant] says: "They're pissing on her p[***]y. They're pissing on her p[***]y." He says that, "Joey, please, you've got to call me, I'm in deep s[**]t." And he sounds very intoxicated in that phone call, and that's the purpose of playing the phone call. He's not on there saying: "I didn't do anything, I didn't have anything to do with this." It's not self-serving. It's actually an admission that he was present.

[THE STATE]: It's still a violation of *Hall*.

[DEFENSE COUNSEL]: And it, also, forms a foundation for Mr. Quinzio's opinion that he was drunk. . . .

THE [TRIAL] COURT: Well, it appears to be self-serving to me, if it is a statement demonstrating that . . . somebody else is doing something to her, which is causing me trouble, that is sort of self-serving.

[DEFENSE COUNSEL]: But, Your Honor, in the first trial, the State was allowed to play the last half of that statement, where he says: "Call me I am in deep s[**]t."

[THE STATE]: Yeah, the State has the right to play it any time we want to.

. . . .

[DEFENSE COUNSEL]: The first part of it wasn't played, because it was being tried with [Co-defendant] Batey. My point is, it's not a self-serving statement. It is a statement that Mr. Quinzio heard, can identify his voice, and that is part of what he based his opinion on that he was intoxicated.

[THE STATE]: It makes no difference. The statement by a party opponent can only be put in by us.

THE [TRIAL] COURT: And that is so very, very true.

[THE STATE]: I mean, he can testify he received two calls, and based on those he had an opinion he was drunk, without having to get into what was said.

THE [TRIAL] COURT: That is, also, true.  But, any statements he made -- the State has a right to play it.  You really don't.

On redirect examination, Mr. Quinzio agreed that he could understand the words that Defendant said during the voicemail he left on Mr. Quinzio's phone.  On recross-examination, defense counsel asked Mr. Quinzio if he remembered the words that Defendant stated on the voicemail.  The State objected on the ground that the content of the voicemail was precluded under *Hall*.  The trial court sustained the objection.  A CD of the voicemail recording was later admitted as Exhibit 62 for identification.

The CD recording of the voicemail that Defendant left on Mr. Quinzio's phone contains the following message: "First of all, he was pissing on her p[***]y.  He was pissing on her.  Hold on, hold on.  [muffled noise/unintelligible]  Dude, you gotta call me back bro.  I'm in deep s[**]t.  You gotta call me back.  [muffled noise/unintelligible]"

*(A) Hearsay*

Under the Tennessee Rules of Evidence, "hearsay" is any statement, other than one made by the declarant while testifying at trial or in a hearing, offered into evidence to prove the truth of the matter asserted.  Tenn. R. Evid. 801.  Hearsay statements are not admissible unless they fall within one of the evidentiary exceptions or some other law renders them admissible.  Tenn. R. Evid. 802.

Our supreme court has addressed the standard of review applicable to the review of hearsay statements:

> The standard of review for rulings on hearsay evidence has multiple layers.  Initially, the trial court must determine whether the statement is hearsay.  If the statement is hearsay, then the trial court must then determine whether the hearsay statement fits within one of the exceptions.  To answer these questions, the trial court may need to receive evidence and hear testimony.  When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them.  Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one the exceptions to the hearsay rule—are questions of law subject to de novo review.

*Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015) (internal citations omitted).

- 70 -

In *Hall*, this court stated the following about the admission of self-serving hearsay:

> A declaration made by a defendant in his own favor, unless part of the res gestae or of a confession offered by the prosecution, is not admissible for the defense. A self-serving declaration is excluded because there is nothing to guarantee its testimonial trustworthiness. If such evidence were admissible, the door would be thrown open to obvious abuse: an accused could create evidence for himself by making statements in his favor for subsequent use at his trial to show his innocence.

552 S.W.2d at 418 (quoting Wharton's Criminal Evidence, 13th Edition, § 303); *see also State v. Brooks*, 909 S.W.2d 854, 862-63 (Tenn. Crim. App. 1995) (affirming the exclusion of the defendant's statement as self-serving hearsay); *State v. Turnmire*, 762 S.W.2d 893, 897 (Tenn. Crim. App. 1988) (affirming the exclusion of the defendant's statement as self-serving hearsay); *State v. King*, 694 S.W.2d 941, 945 (Tenn. 1985) (determining that defense counsel was prohibited from reading the defendant's statement into the record). "To determine whether a statement is predominately self-serving or disserving, we look to the totality of the circumstances in which the statement was made." *State v. Dotson*, 254 S.W.3d 378, 393-94 (Tenn. 2008).

As Defendant notes, this court has also previously noted that "no general rule of evidence excludes statements merely because they are self[-]serving. Instead, most self-serving statements are excluded not solely because they are self-serving but instead because they constitute inadmissible hearsay." *Tony A. Phipps v. State*, No. E2008-01784-CCA-R3-PC, 2010 WL 3947496, at *8 (Tenn. Crim. App. Oct. 11, 2010) (internal citations omitted), *no perm. app. filed*. The "self-serving hearsay" rule "simply acknowledges that such statements constitute hearsay if offered to prove the truth of the matter asserted therein and, like other hearsay evidence, are unreliable." *State v. George Glenn Faulkner*, No. M1998-00066-CCA-R3-CD, 2000 WL 711144, at *10 (Tenn. Crim. App. June 2, 2000) (citing Neil P. Cohen, et al., Tennessee Law of Evidence § 803(1.2).2, at 514 (3d ed.1995)), *perm. app denied* (Tenn. Jan. 16, 2001). "Thus, if a defendant's self-serving statement is offered for a purpose other than proving the truth of the matter asserted therein, the statement does not constitute hearsay and will be admissible unless excluded pursuant to some other rule of evidence." *Id.* (citing *State v. John Parker Roe*, No. 02C01-9702-CR-00054, 1998 WL 7107, at *11 (Tenn. Crim. App. Jan. 12, 1998), *perm. app. denied*, (Tenn. Jan. 12, 1998), *cert. denied*, 526 U.S. 1159 (1999)).

At trial, Defendant sought to admit the voicemail to show that he was too intoxicated to be criminally responsible for the conduct of the Co-defendants. Even though the voicemail reinforces Defendant's theory because Defendant slurs his words and sounds intoxicated, the trial court implicitly rejected Defendant's proposed non-

hearsay purpose for admitting the voicemail by concluding that the voicemail was self-serving hearsay. As Defendant notes, the voicemail inculpates him by placing him at the scene while the offenses were being committed. Additionally, it is reasonable to interpret Defendant's statement that he was in "deep s[**]t" as an acknowledgement that he has violated either Vanderbilt's code of student conduct or a criminal law. Defendant never states that he was intoxicated or mentions alcohol or drugs. We conclude that the trial court erred in excluding the voicemail as hearsay because the statements in the voicemail were not offered for the truth of the matter asserted. In any event, based on the overwhelming evidence, the exclusion of the voicemail was harmless error. Defendant is not entitled to relief on this ground.

### (B) Right to present a defense

We additionally conclude that the trial court's exclusion of the voicemail did not violate Defendant's right to present a defense. As noted in our summary of the evidence, Mr. Quinzio testified that Defendant called him early in the morning of June 23 and that, during the phone call, Defendant sounded intoxicated. Mr. Quinzio told Detective Mayo that he had never seen Defendant that intoxicated and that Defendant was not a big consumer of alcohol. He also told Detective Mayo that he knew "what was going on[,]" that it "was wrong[,]" but that Defendant did not. Thus, Defendant clearly presented evidence through Mr. Quinzio's testimony that he was intoxicated during the offenses. Defendant is not entitled to relief on this ground.

### (7) Jury instructions

Defendant argues that the trial court erred in its instruction of the jury on criminal responsibility. The instruction given by the trial court is set out below, with the portions that Defendant challenges in bold font:

> Criminal Responsibility. The defendant is criminally responsible as a party to the offenses of aggravated rape and aggravated sexual battery if the offenses were committed by the defendant's own conduct, by the conduct of another for which the defendant is criminally responsible, or both. Each part[y] to the offense may be charged with the commission of the offense.

> The defendant is criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the defendant solicits, directs, aids or attempts to aid another person to commit the offense.

A defendant who is criminally responsible for an offense may be found guilty not only of that offense, but also for any other offense or offenses committed by another, if you find beyond a reasonable doubt that the other offense or offenses committed were natural and probable consequences of the original offense for which the defendant is found criminally responsible, and that the elements of the other offense or offenses that accompanied the original offense have been proven beyond a reasonable doubt.

In deciding the criminal responsibility of the defendant, the jury may also take into consideration any evidence offered that the defendant attempted to thwart or withdraw from any of the offenses that followed from the original offense.

To find a defendant criminally responsible for the acts of another, it is not necessary that you find the defendant was present or that the defendant took a physical part in the crime; encouragement of the principal offender is sufficient. However, mere presence during the commission of the offense is not sufficient to support a conviction.

**Presence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which one's participation in the crime may be inferred. No particular act need be shown. The requisite criminal intent may be inferred from the defendant's presence, companionship and conduct before and after the offense.**

Before you find the defendant guilty of being criminally responsible for said offenses committed by the conduct of another, you must find that all the essential elements of said offenses have been proven by the State beyond a reasonable doubt.

. . . .

**The required culpable mental state for criminal responsibility for conduct of another for any charged or included offense contained in these instructions is knowingly.**

The United States Constitution and the Tennessee state constitution guarantee criminal defendants the right to trial by jury. U.S. Const. amend. VI; Tenn. Const. art. I,

§ 6 (providing "that the right of trial by jury shall remain inviolate"). This right includes an entitlement to a correct and complete charge of the law. *State v. Page*, 184 S.W.3d 223, 229 (Tenn. 2006) (citing *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990)). Moreover, it is well-established that the right to a correct and complete charge of the law includes the right to jury instructions "on each and every lesser[-]included offense embraced within the charged offense(s) and supported by the proof [.]" *State v. Davis*, 266 S.W.3d 896, 902 (Tenn. 2008) (citing *State v. Ely*, 48 S.W.3d 710, 727 (Tenn. 2001)). "Any omission in the instructions in reference to an element of the offense which might lessen the burden of proof placed upon the state is constitutional error and requires a new trial unless the error is harmless beyond a reasonable doubt." *State v. Hill*, 118 S.W.3d 380, 385 (Tenn. Crim. App. 2002) (citing *State v. Walker*, 29 S.W.3d 885, 893-94 (Tenn. Crim. App. 1999)). "Jury instructions must be reviewed in their entirety." *State v. Rimmer*, 250 S.W.3d 12, 31 (Tenn. 2008) (citing *State v. Guy*, 165 S.W.3d 651, 659 (Tenn. Crim. App. 2004)). Whether the trial court properly instructed the jury on a certain offense is a mixed question of law and fact, which this court reviews de novo with no presumption of correctness. *State v. Howard*, 504 S.W.3d 260, 267 (Tenn. 2016) (citing *State v. Thorpe*, 463 S.W.3d 851, 859 (Tenn. 2015)).

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a) (2013). "A person is criminally responsible for an offense committed by the conduct of another, if[] . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. 39-11-402(2) (2013).

*(A) Instruction on mens rea for criminal responsibility*

Defendant argues that the trial court erred by instructing the jury that the "required culpable mental state for criminal responsibility for conduct of another for any charged or included offense contained in these instructions is 'knowingly.'" He asserts that this language is not included in the Tennessee Pattern Jury Instructions for criminal responsibility and that this instruction "lessened the burden of proof on the State and created constitutional error requiring a new trial." Defendant argues that the trial court should have instructed the jury that the culpable mental state was intentional. Defendant concedes in his appellate brief that he did not lodge a contemporaneous objection when the trial court gave the instruction and did not include the issue in his motion for new trial

and, therefore, is not entitled to plenary review.[17] He argues that this instruction rises to the level of plain error.

The State responds that Defendant is not entitled to plain error relief because he has not established that the instruction breached a clear and unequivocal rule of law. The State contends that the instruction, "when read as a whole, accurately reflected the law" because the criminal responsibility instruction "provides that the defendant must have knowingly and with the intent to promote or assist the commission of the offense, solicited, directed, aided, or attempted to aid another person to commit the offense." The State also argues that Defendant has not established that, if the trial court erred by issuing the instruction, consideration of the error is necessary to do substantial justice because the remainder of the jury instruction was accurate and because "the evidence presented at trial overwhelmingly established that . . . [D]efendant actively promoted and assisted in the offenses in this case."

Defendant is correct that the pattern jury instruction for criminal responsibility does not contain the word "knowing." *See* 7 Comm. on Pattern Jury Instructions (Criminal) of the Tenn. Judicial Conference, *Tennessee Pattern Jury Instructions Criminal* 3.01 (19th ed. 2015). However, the Tennessee Supreme Court previously stated that "the pattern instructions are not mandatory but merely suggestions, and a trial court is not required to use them in instructing a jury." *Harris*, 839 S.W.2d at 74 (citing *State v. Martin*, 702 S.W.2d 560, 564, n.5 (Tenn. 1985)). Additionally, "pattern jury instructions are only suggestions for a trial court because they are 'not officially approved by [the Tennessee Supreme Court] or by the General Assembly and should be used only after careful analysis.'" *Rimmer*, 250 S.W.3d at 30 (quoting *State v. Hodges*, 944 S.W.2d 346, 354 (Tenn. 1997)). "Thus, pattern jury instructions are not entitled to any particular deference on review." *Id.*; *see also State v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014) (pattern jury instructions are not given greater deference than the trial court's actual instructions).

In *State v. Maxey*, the defendant argued that the State failed to establish beyond a reasonable doubt that she intended for the co-defendant to rape the victim. 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994). This court stated the following about the *mens rea* required to establish a defendant's guilt under a theory of criminal responsibility:

---

[17] "An erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, may be raised for the first time in a motion for a new trial and is not waived by the failure to make a contemporaneous objection." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005). Defendant argues that the instruction was erroneous, but this issue is waived because he failed to include it in his motion for new trial.

[Tennessee Code Annotated section] 39-11-402(2) requires proof of intent to promote or assist the commission of the offense. . . . [Tennessee Code Annotated section] 39-11-302(a) (1991) states that a person acts intentionally with respect to the nature of conduct or to a result of conduct when it is a person's conscious objective or desire to engage in the conduct or cause the result. The Sentencing Commission Comments to this definition explain that "[i]ntentional conduct or an intentional result occurs when the defendant wants to do the act or achieve the criminal objective. A defendant acts knowingly, on the other hand, when he or she is aware of the conduct or is practically certain that the conduct will cause the result, irrespective of his or her desire that the conduct or result will occur." The plain terms of [Tennessee Code Annotated section] 39-11-402(2) . . . indicate that proof of negligence or recklessness does not suffice to make a person criminally liable. The intent required by these subsections is demanding. It is necessary that the defendant "in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree." *Hembree v. State*, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976). The defendant must "knowingly, voluntarily and with common intent unite with the principal offenders in the commission of the crime." *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

*Id.; see also State v. Pope*, 427 S.W.3d 363, 369 (Tenn. 2013), *State v. Dorantes*, 331 S.W.3d 370, 386 (Tenn. 2011), *State v. Sherman*, 266 S.W.3d 395, 408 (Tenn. 2008), *State v. Carson*, 950 S.W.2d 951, 954 (Tenn. 1997); *State v. Antonio M. Crockett*, No. M2015-00566-CCA-R3-CD, 2016 WL 769890, at *13 (Tenn. Crim. App. Feb. 20, 2016) (to be convicted under a theory of criminal responsibility, "the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission"), *perm. app. denied* (Tenn. June 23, 2016).

Here, the record clearly establishes what occurred during trial. We conclude that the trial court did not breach "a clear and unequivocal rule of law" by including the definition of "knowing" in the jury instructions. *See Adkisson*, 899 S.W.2d at 641. While section 39-11-402(2) only mentions "intent," our case law surrounding the theory of criminal responsibility requires that a defendant "act with knowledge that an offense is to be committed[] and share in the criminal intent" of the principal. *Hembree*, 546 S.W.2d at 239. Thus, there is no "clear and unequivocal rule of law" that only the *mens rea* of intent is applicable to the theory of criminal responsibility. Additionally, we note that the trial court instructed the jury on the definition of "intentionally" at the beginning of the jury charge. Defendant is not entitled to plain error relief on this ground.

*(B) Instruction on "presence and companionship"*

Defendant also avers that the trial court erred by granting the State's request for a special instruction that the jury could infer participation in offenses based on Defendant's presence and companionship with his co-defendants. He argues that "the addition of the 'presence and companionship' instruction was misleading and confusing to the jury." The State responds that Defendant is limited to the argument he made regarding this instruction at trial—that the instruction was improper because the application of this instruction is limited to "non-target offenses[.]" The State additionally notes that Defendant did not provide any case law supporting this argument in his appellate brief.

This court has previously addressed the application of the "presence and companionship" aspect of criminal responsibility:

> While guilt by association is a doctrine that is thoroughly discredited, *see Uphaus v. Wyman*, 360 U.S. 72, 79[] . . . (1959), this court has noted that, under the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred. *See State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). No particular act need be shown, and the defendant need not have taken a physical part in the crime. *See id.* Mere encouragement of the principal will suffice. *See State v. McBee*, 644 S.W.2d 425, 428 (Tenn. Crim. App. 1982).

*State v. Phillips*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001); *see also State v. Watson*, 227 S.W.3d 622, 639 (Tenn. Crim. App. 2006) (citing *Ball*, 973 S.W.2d at 293).

Defendant argued that the trial court should omit the "presence and companionship" portion of the criminal responsibility instruction on the basis that the phrase only applies to "non-target offenses." The State correctly notes that Defendant is limited to the argument that he raised at trial. *See State v. Dobbins*, 754 S.W.2d 637, 641 (Tenn. 1988); *see also State v. Alder*, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001). We conclude that the trial court properly instructed the jury that it could infer Defendant's participation in the offenses against E.L. by his presence at the scene and companionship with Co-defendants Banks, Batey, and McKenzie. It is well-settled that "presence and companionship" with the principle offenders is a circumstance that the jury can consider in determining whether the defendant is criminally responsible for the acts of another. *See, e.g, Phillips*, 76 S.W.3d at 9. Here, "presence and companionship" between Defendant and the Co-defendants was fairly raised by the proof; all four played on the Vanderbilt football team, they were all present in Defendant's dorm room during the

offenses, and they spent time together after the offenses to discuss what they should disclose to authorities. Additionally, after the Vanderbilt University Student Conduct officials questioned Defendant and Co-defendants McKenzie, Batey, and Banks, the four men met at a Popeye's restaurant and discussed what each had told the Student Conduct officials about the offenses. Thus, the trial court properly instructed the jury that it could consider Defendant's presence and companionship with the Co-defendants.

### (8) Improper prosecutorial argument

Closing argument "is a valuable privilege that should not be unduly restricted." *State v. Smith*, 527 S.W.2d 737, 739 (Tenn. 1975). Attorneys are given wide latitude when arguing before the jury, and the trial court has broad discretion in controlling their arguments, which will be reversed only upon an abuse of discretion. *State v. Thomas*, 158 S.W.3d 361, 412-13 (Tenn. 2005). "However, closing argument must be temperate, must be predicated on evidence introduced during the trial of the case[,] and must be pertinent to the issues being tried." *Id.* at 413. This court has recognized five general areas of improper prosecutorial argument in closing argument: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or as to the defendant's guilt; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting broader issues other than guilt or innocence of the defendant; and (5) arguing or referring to facts outside the record unless such facts are matters of common public knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

Improper argument constitutes reversible error if "the conduct was so improper or the argument so inflammatory that it affected the verdict to the [defendant's] detriment." *Id.* at 5. To determine the prejudicial impact of any improper prosecutorial argument, this court should consider: (1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case. *Id.* at 5-6 (citing *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

### (A) Improper argument that defense counsel was misleading the jury

Defendant argues that in the following statements, the State "engaged in improper argument by denigrating defense counsel and arguing that defense counsel was attempting to mislead the jury[.]" The State responds that Defendant has waived plenary review of these comments because he failed to lodge a contemporaneous objection during closing arguments. Further, the State argues that Defendant is not entitled to plain error relief because he has not established that the comments breached a clear and unequivocal

rule of law. We have set out large quoted portions of the closing arguments for context, but the statements that Defendant specifically objects to are shown in bold font:

And then [Detective Gish] talks about this preliminary report he did for [the State], that the times are wrong, and he explained that to you. That there was a bug in the software from Oxygen that caused the times to be off an hour. And it was fixed. They got new software. That was a preliminary report. And what does it show? It shows what you know from the evidence. From her receipt on her Gold Card. She got there right at midnight. You hear all the witnesses say she got there right at midnight. So what does that have to do with the case? Nothing. **Another red herring to throw out there to attack the police.**

And he kept talking about all the photos weren't date stamped. Well, you heard Det. Gish say yes, I can show from the computer when this photograph was taken. And he did. Because we heard so much from [defense counsel] about the computer being in the room when the police searched it. You saw photographs. And then you saw the photograph when it was recovered the next day. That was shown to you. **So don't be misle[d].**

Another thing was a big photo sequence that we had to go through an hour on that one photograph was moved before it went to the server. And he showed you what the photograph was. It was a picture of the front of Gillette Hall, which they moved up to the front of the photographs. That's great police misconduct, wasn't it? **Another total red herring to distract you from the evidence.**

. . . .

And then let's attack the victim. Let's attack her. You know. She gets up and does menial things like go to the restroom and get a drink. Doesn't commit crimes. Do a lot of things. Things you might be able to do in a confused state from whatever was in her body at the time. She didn't commit a crime. And he talks about her smiling when she walked out at noon, by the way. Several hours later. And she was looking at her phone. Just because she didn't feel good, she felt horrible, doesn't mean you can't see something on your phone that might be funny.

And he talked about the blue drink, whatever this was, this transcript today about Miss Martel trying to recall and said oh, yeah, I said that, but

then right after it I said I'm not sure that's what was said. And when I questioned her, she said yeah, she could've said that she bought me a drink, she could've said it was another drink, I don't know, I really don't know. Does that impeach [E.L.]? And did she say he was buying her drinks like they said? No. She said another woman was buying drinks and [Defendant] was bringing them to me. She didn't say that.

Yes, let's attack the victim. And then let's attack Det. Mayo. What did he not do? You know, all he had done when he talked to [Defendant] was look at a few still shots. So, he listened to [Defendant]. He did what police do. Tried to befriend him, tried to get him to keep talking. And he kept saying well, he believed him, he believed him. Maybe he did at that time. He didn't know anything. He hadn't seen those videos. He hadn't even seen the surveillance video. He hadn't found out about the destruction of evidence. They didn't ask him on that witness stand do you believe [Defendant] today. No. **Another red herring.**

. . . .

**Nitpick the police. Don't worry about the evidence.** Let's talk about the police. Said [Defendant] cooperated with the police. He lied to Vanderbilt. He lied to the police initially until he started sweating. And he said I don't trust those other guys, they're liable to say something bad about me. And then he told the police part of the truth. Only part. He didn't tell them about it was his condoms. He didn't tell them about the porno. He didn't tell them about deleting everything. He didn't tell them about a lot of things. He gave them his phone. Yeah. That's true, after it was deleted, though. And even after calling the police, that's when he went to California and destroyed the cell phones, tried to destroy hard drives.

. . . .

And they want to say the police didn't investigate [Mr. Prioleau's] bedding. Well, they heard from [Defendant]. He didn't say he did anything. You heard from [Co-defendant] McKenzie. He said he didn't do anything. You heard from Mr. Prioleau. He said he didn't do anything. And do you really think that they were going to come in and say hey, let's throw this victim up in the top bunk, that'll be a good place, let's all get up there on the top bunk. Does that make any sense? No. **It's just another red herring thrown out there for you to consider.**

The record reflects that Defendant did not object during the above quoted portions of the State's closing argument. Thus, he is not entitled to plenary review of this issue, and we will review only for plain error. "The prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial." *State v. Annette Reynolds*, No. M2003-02991-CCA-R3-CD, 2005 WL 468318, at *6 (Tenn. Crim. App. Feb. 28, 2005) (citing *Dupree v. State*, 410 S.W.2d 890 (Tenn. 1967); *Moore v. State*, 17 S.W.2d 30 (Tenn. 1929); *Watkins v. State*, 203 S.W. 344 (Tenn. 1918); *McCracken v. State*, 489 S.W.2d 48 (Tenn. Crim. App. 1972)), *no perm. app. filed*. Tennessee courts have previously concluded that the State committed harmless error by stating in closing argument that defense counsel was "blowing smoke in the face of the jury[,]" *see State v. West*, 767 S.W.2d 387, 394-95 (Tenn. 1989), that the defense used "smoke screens" to "divert" the jury's attention away from "ugly facts" that pointed to the defendant's guilt, *see State v. Leland Ray Reeves*, No. 01C01-9711-CR-00515, 1999 WL 155926, at *13-14 (Tenn. Crim. App. Mar. 23, 1999), *perm. app denied* (Tenn. Oct. 25, 1999), *pet. for rehearing denied* (Tenn. Crim. App. Mar. 6, 2000), *overruled on other grounds by State v. Collier*, 411 S.W.3d 886, 899-900 (Tenn. 2013), or that defense counsel was "trying to muddy the waters[,]" *see State v. Edward Lee Mooney, Sr.*, No. 02C01-9508-CC-00216, 1998 WL 906477, at *5-6 (Tenn. Crim. App. Dec. 30, 1998).

In contrast, in *State v. Lance Burton*, this court concluded that the State did not err when, in its rebuttal closing argument, it "characterized defense counsel's closing argument that the needle was not a deadly weapon as 'defense attorney tricks, defense attorney strategy.'" No. W2009-01875-CCA-R3-CD, 2010 WL 3244949, at *5 (Tenn. Crim. App. Aug. 17, 2010), *perm. app. denied* (Tenn. Jan. 13, 2011). This court further noted that, "in response to defense counsel's argument that the victim's credibility was questionable because she did not appear to be hysterical during the incident, the prosecutor further argued that 'it's offensive that [defense counsel] suggests that because she's a woman she should be hysterical, falling out.'" *Id.* (alteration in original). This court concluded that the defendant failed to establish that the State's comments breached a clear and unequivocal rule of law because the statements "were in direct response to defense counsel's arguments concerning the credibility of the victim and the application of the law to the facts of this case." *Id.*

Here, the previously quoted portions of the State's closing argument occurred during the State's rebuttal argument. During Defendant's closing argument, defense counsel specifically argued that Detective Gish's testimony was not credible and discussed the time-stamp on the surveillance videos from Gillette Hall; that the surveillance video showed E.L. moving around the second floor even though she testified that she could not remember anything until she woke up around 8 a.m.; that Detective Mayo told E.L. that he believed Defendant's statement was truthful; and that Defendant

assisted with the MNPD's investigation. Defense counsel also discussed that Detective Mayo "did not have Mr. Prioleau's bedding taken by the CSI lab[.]" We conclude that the State's references to "red herrings" were not improper because the State was responding to Defendant's closing argument. *See Lance Burton*, 2010 WL 3244949, at *5. Thus, Defendant has not shown that the State breached a clear and unequivocal rule of law, *see Adkisson*, 899 S.W.2d at 642, and Defendant is not entitled to plain error relief.

*(B) Statements calculated to inflame the passions or prejudices of the jury*

Defendant argues that the State made the following remarks during closing argument to intentionally inflame the passions or prejudices of the jury. The State again responds that Defendant has waived plenary review of these comments because he failed to lodge a contemporaneous objection during closing arguments. Further, the State argues that Defendant has not established that the comments below breached a clear and unequivocal rule of law because the statements were accurate references to or inferences based on the evidence introduced at trial.

> Now, that's [E.L.] a little after midnight, June 23rd, 2013. And that's her after meeting . . . [Defendant], the man she trusted, a few hours later. **Dumped out there like throw away food.** Dumped out in a public hallway where anybody can walk in and see her. **Like a piece of trash.** Experience she'll have to carry with her the rest of her life.

> **Here's [Defendant] over at East Hall at four o'clock in the morning. Watch him. He's having a good time. He's laughing. Look at him. He's really concerned about her, isn't he? Laying over there unconscious. They're having a big time.**

> That's the evidence in this case, ladies and gentlemen. [E.L.] had the courage to come in here and ask for justice for what was done do her that night. **She had the courage to come in here and face [Defendant], the person she trusted.**

> **I'm just asking you to have the same courage, follow your oath, and apply the law to the evidence as [the trial court] tells you.** And if you do that, follow your heart and your mind, you know what a just verdict is. If you do that, justice will be served.

At trial, Defendant argued that the previously-quoted statements violated the trial court's order to exclude references to date rape drugs.[18]  As we have previously noted, Defendant cannot alter his grounds for objecting between trial and appeal.  *See Dobbins*, 754 S.W.2d at 641; *see also Alder*, 71 S.W.3d at 303.  We conclude that Defendant has waived plenary review of this issue because he did not object to this portion of the State's rebuttal argument on the ground that the State intentionally sought to inflame the passions or prejudices of the jury.

We further conclude that Defendant has not established that the State's comments breached a clear and unequivocal rule of law.  *See Adkisson*, 899 S.W.2d at 641.  Here, the comments that Defendant now objects to are inferences fairly based on evidence that was introduced at trial.  The State introduced surveillance video footage from the second floor of Gillette Hall during the offenses, as well as video clips of the offenses that were recovered from cell phones.  These pieces of evidence depicted E.L. lying on the floor of the hallway and the floor of Defendant's dorm room unconscious.  The State's comment that E.L. looked like a piece of trash or food that had been dumped was an argument based on the previously discussed evidence.  While the video surveillance footage of East Hall does not appear to depict Defendant laughing, we conclude that the State's comment about Defendant's jovial demeanor was an unintentional misstatement.  A reasonable observer could conclude that Defendant was laughing or joking with Co-defendants Banks, Batey, and McKenzie while they were carrying E.L. into Gillette Hall and up to the second floor.  Additionally, Defendant can be heard laughing on the video recordings of the offenses.  Lastly, Ms. Miller, E.L.'s roommate, stated that she was not concerned that E.L. stayed at Tin Roof with Defendant because "they had been hanging out for a while, so [E.L. and Ms. Miller] trusted him."  Thus, the above quoted portions of the State's closing argument were arguments based on evidence introduced at trial.  Defendant has not established that he is entitled to plain error relief on this ground.

*(C) Intentionally misleading the jury*

Defendant contends that the State intentionally mentioned evidence in closing argument that the trial court excluded; specifically, Defendant alleges that the State commented on evidence relating to date rape drugs and evidence of the alleged sexual assault on "Jane Doe."[19]  Additionally, Defendant argues that the State improperly

---

[18] The record reflects that defense counsel waited until the State completed its rebuttal argument and then asked for a bench conference in the trial court's chambers.  Then, defense counsel alleged that the State "argued that the alleged victim was blacked out from whatever was in her body at the time."  Defense counsel asserted that this statement "violated this Court's order not to infer in any way to the fact or any allegations a date rape drug was used in this case."

[19] Defendant sought to introduce evidence that Co-defendants McKenzie, Banks, and Batey sexually assaulted a minor victim the day before the immediate offenses occurred.  No charges were

- 83 -

suggested that Defendant testified at trial and that the trial court admitted a statement from Defendant acknowledging that E.L. was unconscious during the offenses.

The State again responds that Defendant has waived plenary review of these comments because he failed to lodge a contemporaneous objection during closing arguments. The State argues that Defendant is not entitled to plain error review because he has not established that the comments breached a clear and unequivocal rule of law because the comments did not specifically reference a date rape drug. The State also contends that the comments appropriately referenced evidence introduced at trial. Again, we have emphasized the specific quotes that Defendant argues were improper with bold font:

> The evidence, and I submit to you that everything that you have seen is that she was completely unconscious. Every person that testified said that she was unconscious. You heard it from [Co-defendant] McKenzie, who is one of the people charged in the case. You heard it from Mr. Prioleau. You heard it from Dillon van der Wal. You heard it from every single person. **Even [Defendant] admits that.**

> Again, Count One, Aggravated Rape, it's the anal penetration with an object. [Defendant] is criminally responsible for [Co-defendant] Banks'[s] conduct. He directed him. First of all, he's already provided with criminal responsibility because he is the one that got [E.L.] there for these strangers to do this to her. **[Co-defendant] Banks, [Co-defendant] Batey, [Co-defendant] McKenzie, they would have never gotten to her. They weren't with her. I guess they could've gone out and tried to seek her out. But I think it's fair to say that that's not something they would've done.** It was [Defendant] that brought her unconscious. He provided the victim and then he provided the room. It was gotta [sic] get her up to my room.

Additionally, Defendant contends the following quote from the State's rebuttal argument was improper:

> And then let's attack the victim. Let's attack her. You know. She gets up and does menial things like go to the restroom and get a drink. Doesn't commit crimes. Do a lot of things. **Things you might be able to**

---

brought against any Co-defendant and the trial court excluded this evidence. The portion of the record concerning the alleged minor victim was sealed by the trial court. We will discuss the exclusion of the evidence later in this opinion in "(13) Exclusion of evidence of prior bad acts." We will refer to the alleged minor victim as "Jane Doe."

**do in a confused state from whatever was in her body at the time.** She didn't commit a crime. And he talks about her smiling when she walked out at noon, by the way. Several hours later. And she was looking at her phone. Just because she didn't feel good, she felt horrible, doesn't mean you can't see something on your phone that might be funny.

**And he talked about the blue drink, whatever this was, this transcript today about Miss Martel trying to recall and said oh, yeah, I said that, but then right after it I said I'm not sure that's what was said.** And when I questioned her, she said yeah, she could've said that she bought me a drink, she could've said it was another drink, I don't know, I really don't know. Does that impeach [E.L.]? And did she say he was buying her drinks like they said? No. She said another woman was buying drinks and [Defendant] was bringing them to me. She didn't say that.

The record reflects that Defendant did not object to the quoted portion of the State's initial closing argument or the portion of the State's rebuttal closing argument. Therefore, Defendant is not entitled to plenary review of this issue. We conclude that Defendant has not established that the State's comments breached a clear and unequivocal rule of law. *See Adkisson*, 899 S.W.2d at 641. The comments quoted above were fair inferences based on the evidence introduced at trial. Regarding the blue drink, Ms. Martel testified that, prior to leaving Tin Roof, she spoke with E.L. and noticed that E.L. was holding "a blue drink[.]" E.L. testified that her fourth drink was "blue and in a clear cup." E.L. stated that Defendant gave her the drink, that she felt intoxicated after drinking a sip or two of the blue drink, and that she could not remember if she finished the blue drink. Neither Ms. Martel nor E.L. mentioned the presence of any date rape drug while discussing the blue drink, and the State did not discuss the presence of a date rape drug in the blue drink in its closing arguments.

Regarding the State's argument that Co-defendants Banks, Batey, and McKenzie would not have gone and sought out E.L. and thus would not have been involved in the offenses without Defendant's involvement, we conclude that this comment was not a reference to the alleged offenses involving "Jane Doe," evidence of which the trial court excluded from this trial. The State did not mention any specific facts about the "Jane Doe" allegations in its closing argument. This portion of the State's closing argument was not misleading to the jury.

Regarding Defendant's admission of E.L.'s unconscious state, as previously mentioned, the surveillance video from Gillette Hall depicts Defendant carrying E.L.'s limp body into the building, onto the elevator, and onto the second floor. In the videos that Detective Gish found, E.L. lies on the floor of the hallway and in Defendant's dorm

room without moving. Co-defendant McKenzie testified that E.L. was "passed out" and did not make any sounds while she was in Defendant's room. When Mr. Black interviewed Defendant, Defendant stated that both he and E.L. were intoxicated and that E.L. was not very coherent but had not passed out during the drive from E.L.'s apartment to Gillette Hall. However, later in the interview, Defendant explained that he covered up the security camera on the second floor of Gillette Hall because he "wasn't thinking clearly" and "there was a girl passed out in [his] room." Thus, the State based its argument on evidence introduced at trial.

Additionally, we conclude that the State's comments in its rebuttal closing argument were a response to evidence discussed in Defendant's closing argument. We note that during defense closing argument, defense counsel twice referenced Ms. Martel's testimony that E.L. told her that a woman "gave her the blue drink" and also referred to E.L.'s testimony that Defendant "gave her the blue drink." Thus, the State did not intentionally seek to mislead the jury during its closing arguments by mentioning E.L.'s unconscious state or the blue drink. Defendant is not entitled to relief on this ground.

*(D) Improper vouching for Co-defendant McKenzie's credibility*

Defendant argues that the State improperly vouched for Co-defendant McKenzie's credibility and bolstered his testimony in the following statement:

> Let's talk about [Co-defendant] McKenzie. Here's [Co-defendant] McKenzie. Young man eighteen years old. Been out drinking with his two buds, his roommate. Little buzzed, comes back, gets in the middle of this. He doesn't deserve any medals, that's for sure. He's not going to get any. But what did he really do? We know he didn't touch her. At least there's no testimony, no video, no photographs of him touching her. We didn't hear his voice encouraging anybody to do anything. And he admits he took pictures with [Co-defendant] Batey's phone, not his own phone. He didn't use his own phone to take pictures for his own gratification or whatever it was. He took pictures for [Co-defendant] Batey. And he left the room a couple of times to look at his phone, to go to the bathroom. He was a lot less interested than the others, I submit. But what he did was not right. He was there laughing. He was there photographing. And he lied to cover it up. **But you do have to give him some credit that he finally came forward to tell the truth.** Yeah. He gave a first statement. He told us I lied.

Defendant lodged a contemporaneous objection to this portion of the State's closing argument.

The State asserts that "the challenged comment in this case did not suggest any personal belief by the prosecutor." The State further contends that, even if this comment was error, the error was harmless due to the overwhelming evidence of Defendant's guilt.

In *State v. Jason Allen Cobb*, this court stated the following about improper vouching by the State during closing argument:

> "Expressions by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment which should separate a lawyer from the cause for which he argues." *Goltz*, 111 S.W.3d at 6-7 (citation omitted). During closing arguments, prosecutors must not interject their personal beliefs or opinions, however, whether a prosecutor's doing so qualifies as misconduct is often dependent upon the specific terminology used. [*State v.*] *Gann*, 251 S.W.3d [446,] 460 [(Tenn. Crim. App. 2007)]. "For example, argument predicated by the words "I think" or "I submit" does not necessarily indicate an expression of personal opinion." *Id.* (citing *United States v. Stulga*, 584 F.2d 142, 147 (6th Cir. 1978)).

No. W2011-02437-CCA-R3-CD, 2013 WL 1223386, at *20 (Tenn. Crim. App. Mar. 26, 2013), *perm. app. denied* (Tenn. Oct. 16, 2013). In *Jason Allen Cobb*, the court concluded that "the prosecutor did not insert his personal beliefs or vouch for the credibility of the witnesses during closing argument" by "attempt[ing] to discredit the defense witnesses and expose inconsistencies in their testimonies[.]" *Id.*

In *State v. Tavares Dewayne Buchanan, aka Tavarea Dewayne Buchanan*, the defendant objected to the following portion of the State's closing argument:

> [T]he most important part of this case, other than the elements, . . . is whether or not you believe [the victim], because if you believe [the victim], you must return verdicts of guilty because everything she testified to satisfies the elements of this crime. At the end of the day this all comes down to whether or not you believe [the victim], and she gave you no reason not to believe her. She's assumed to be telling the truth. She has no reason to lie. There's no motive here for her to come in here after this long process and lie. This is not a fun experience to sit there with [your] face buried in [your] hands while fourteen strangers watch videos of you naked and crying and humiliated, that's not fun. She has no reason to put herself through this.

No. M2017-02268-CCA-R3-CD, 2019 WL 852192, at *6 (Tenn. Crim. App. Feb. 21, 2019), *perm. app. denied* (Tenn. Apr. 11, 2019). This court concluded that the prosecutor's comments were not improper vouching because "[t]he prosecutor did not express a personal belief or opinion as to the truth of the victim's statements or her credibility." *Id.* at *7. The court stated that, when "[v]iewed in context of the surrounding argument, it is clear that the prosecutor was explaining why the jury should accredit the victim's testimony, not 'vouching' for the victim based on personal belief in her testimony." *Id.*

At trial, Co-defendant McKenzie admitted that he lied to the Student Conduct officials when he spoke with the MNPD on June 27, 2013. He also admitted that, at his first meeting with the MNPD and the District Attorney's Office, his statement contained some truthful information and some false information. He further testified that he was truthful in his interview with the District Attorney's Office after he was charged for the current offenses.

The prosecutor argued: "But you do have to give him some credit that he finally came forward to tell the truth." The part of the State's comment that Co-defendant McKenzie "finally came forward to tell the truth" was based on Co-defendant McKenzie's testimony at trial. The portion of the comment "[b]ut you do have to give him some credit" was not and improperly expressed the personal opinion of the prosecutor.

In order to prevail on a claim of prosecutorial error, "[t]he general test to be applied is whether the improper conduct could have affected the verdict to the prejudice of the defendant." *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965); *see also State v. Richardson*, 995 S.W.2d 119, 127 (Tenn. Crim. App. 1998). In determining whether the improper conduct could have affected the verdict, one factor this court should consider is the relative strength or weakness of the case. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). Accordingly, in light of overwhelming evidence in this case, we conclude that any error in the prosecutor's closing argument was harmless beyond a reasonable doubt and Defendant is not entitled to relief.

### (9) Sufficiency of the evidence

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and the weight of the

- 88 -

evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

### (A) Criminal responsibility for aggravated rape, attempted aggravated rape, and aggravated sexual battery

Defendant argues that the evidence was insufficient for a rational juror to have found him guilty of aggravated rape and aggravated sexual battery under the theory of criminal responsibility beyond a reasonable doubt because he did not have "the requisite intent necessary for criminal responsibility." Defendant notes that he did not know Co-defendants Batey, Banks, or McKenzie prior to the offenses at issue; thus, the State did not establish that Defendant had "presence and companionship" with his co-defendants. He further contends that he "was highly intoxicated at the time of these offenses" such that he could not form the requisite intent. The State responds that the evidence was sufficient to support a finding that Defendant had the requisite mental state when the sexual offenses were committed because Defendant "actively encouraged and assisted in the offenses."

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a) (2013). As pertinent here, a person is criminally responsible for the conduct of another when, **"[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense**, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2) (2013) (emphasis added). Criminal responsibility is not a separate crime but instead a theory by which the State may prove the defendant's guilt based upon another person's conduct. *State v. Osborne*, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing *State v. Mickens*, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)).

As discussed previously in this opinion, "under the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred." *Phillips*, 76 S.W.3d at 9. In order to be convicted of the crime, the evidence must establish that **the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission**. *Maxey*, 898 S.W.2d at 757; *see also State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

Defendant contends that the State failed to establish the requisite *mens rea* to be convicted of aggravated rape and aggravated sexual battery under a theory of criminal responsibility. He does not, however, dispute that his co-defendants committed these crimes. In fact, the State presented photographic, video, and testimonial evidence from which a rational juror could find that Co-defendants Batey, Banks, and McKenzie committed these crimes against the victim. Based on the foregoing analysis, and viewing the evidence viewed in the light most favorable to the State, we conclude that the evidence is sufficient to support a jury finding that Defendant acted "with intent to promote or assist the commission of" aggravated rape and aggravated sexual battery.

### (1) Aggravated rape

The Tennessee Code Annotated defines aggravated rape, as applicable here, as "unlawful sexual penetration of a victim by the defendant or the defendant by a victim" when "[t]he defendant is aided or abetted by one (1) or more other persons" and "[t]he defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless." Tenn. Code Ann. § 39-13-502(a)(3)(B) (2013). "'Physically helpless' means that a person is unconscious, asleep or for any other reason physically or verbally unable to communicate unwillingness to do an act[.]" Tenn. Code Ann. § 39-13-501(5) (2013). "'Sexual penetration'" means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body[.]" Tenn. Code Ann. § 39-13-501(7) (2013).

In count one, the State elected to proceed under the allegation that Co-defendant Banks penetrated E.L.'s anus with an object. At trial, Detective Gish testified that he found photographs and video files depicting Co-defendant Banks penetrating the victim's anus with a bottle. In count two, the State elected to proceed under the allegation that Co-defendant Batey digitally penetrated E.L.'s vagina; Detective Gish additionally found thumbnail photographs of Co-defendant Batey digitally penetrating the victim's vagina. In count three, the State elected to proceed under the allegation that Co-defendant Batey digitally penetrated E.L.'s anus. Detective Gish testified regarding the thumbnail

photographs he retrieved that depicted Co-defendant Batey digitally penetrating the victim's anus.  Further, Co-defendant McKenzie testified that he recalled each of the acts alleged by the State in counts one, two, and three.  Relevant to count four, in which the State alleged that Co-defendant Batey forced E.L. to perform fellatio on him with her mouth or lips, Co-defendant McKenzie testified that Co-defendant Batey inserted his penis into the victim's mouth.  Because each of these acts constitutes sexual penetration under the statute, a reasonable juror could infer from this evidence that Co-defendants Banks and Batey sexually penetrated the victim.  Each of these acts, therefore, satisfies the first element of the offense for each count of aggravated rape.

The second element requires that the commission was aided and abetted by one or more other persons.  Tenn. Code Ann. § 39-13-502(a)(3) (2013).  Here, Defendant took photographs and videos of Co-defendant Banks and Batey performing these acts, and Defendant and the Co-defendants can be heard on the video evidence laughing and encouraging each other in the commission of these acts.  Thus, a rational juror could have determined beyond a reasonable doubt that Co-defendant Banks and Batey were aided by Defendant.

Finally, the victim must have been "mentally deficient, mentally incapacitated or physically helpless" for the crime to be aggravated.  Tenn. Code Ann. § 39-13-502(a)(3)(B) (2013).  If the victim was unconscious during these acts, the statute considers her physically helpless.  *See* Tenn. Code Ann. § 39-13-501(5) (2013).  The State submitted copious evidence to support a finding that E.L. was unconscious during the offenses.  The victim herself testified that she did not remember anything that occurred between taking a drink at the Tin Roof and waking up the next morning.  Surveillance footage from Gillette Hall depicted Defendant carrying the unconscious victim from her vehicle into the dorm, onto the elevator, and then dropping her on the floor of the second-floor hallway.  Further, Co-defendant McKenzie observed that E.L. was "passed out" when Defendant brought E.L. to Gillette Hall and that she did not make any sounds while she was in Defendant's dorm room.  Captain Harville testified that Defendant appeared to struggle to carry E.L.  In each video retrieved, E.L. is lying still, being carried, or being dragged.  One video depicts E.L. mumbling incoherently on the floor, although she is silent in the other videos.  Co-defendant McKenzie also testified that, when the group arrived at the dorm room, Co-defendant Batey slapped E.L five or more times.  She did not wake up.  The only time E.L. is seen moving independently is on surveillance footage from Gillette Hall beginning at 4:52 a.m., nearly two hours after the offenses occurred.  Based on this evidence, a reasonable juror could have inferred that the victim was unconscious during the offenses, thereby satisfying the final element of aggravated rape as charged in counts one through four.

## (2) Attempted aggravated rape

We have previously concluded in this opinion that Defendant's conviction for aggravated rape in count five must be vacated because a jury previously acquitted Defendant of this offense and Defendant cannot be placed under jeopardy twice for the same offense. However, we concluded that the conviction should be modified to attempted aggravated rape because the first jury found Defendant guilty of this lesser included offense and the second jury found Defendant guilty of the greater offense of aggravated rape. Thus, we will address whether the evidence was sufficient for a rational juror to have found Defendant guilty of attempted aggravated rape in count five.

We have previously set out the statutory definition of aggravated rape. "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense" "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Annotated section 39-12-101(a)(3) (2013).

In count five, the State elected to proceed under the theory that Co-defendant Batey penetrated E.L.'s vagina with his penis. Here, Detective Gish recovered video files that depicted Co-defendant Batey kneeling next to E.L.'s body with his pants and underwear pulled down. Based on the files, a rational juror could have found beyond a reasonable doubt that Co-defendant Batey attempted to penetrate E.L.'s vagina with his penis. As we have previously noted, Defendant took photographs and videos of Co-defendant Banks and Batey performing these acts, and Defendant and the co-defendants can be heard on the video evidence laughing and encouraging each other in the commission of these acts. Thus, a rational juror could have determined beyond a reasonable doubt that Co-defendant Banks and Batey were aided by Defendant in count five. Finally, we have previously concluded that the surveillance footage was sufficient for a rational juror to have found that E.L. was unconscious during the offenses. Defendant is not entitled to relief on this ground.

## (3) Aggravated sexual battery

"Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim" when "[t]he defendant is aided or abetted by one (1) or more other persons" and "[t]he defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless[.]" Tenn. Code Ann. § 39-13-504(a)(3)(B) (2013). Sexual contact is defined as "the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the

defendant's, or any other person's intimate parts"; the statute requires that the intentional touching "be reasonably construed as being for the purpose of sexual arousal or gratification[.]" Tenn. Code Ann. § 39-13-501(6) (2013). "Intimate parts" includes "the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" Tenn. Code Ann. § 39-13-501(2) (2013).

As to the aggravated sexual battery convictions, the State submitted sufficient evidence from which a rational juror could infer the criminal elements. The first element, sexual contact, includes intentional touching of intimate parts for the purpose of sexual gratification. Tenn. Code Ann. § 39-13-501(6) (2013). In count six of the indictment, the State elected to proceed under the allegation that Co-defendant Banks touched E.L.'s genitals. Detective Gish testified that several of the thumbnail photographs he recovered depicted Co-defendant Banks spreading open the victim's labia to take photographs of her vagina. Detective Gish also testified that he recovered close-up photographs from Co-defendant Banks's phone of E.L.'s genitals and anus. In aggravated sexual battery cases, the criminal actor need not actually become aroused for a jury to find that his actions "can be reasonably construed as being for the purpose of sexual arousal or gratification." *See* Tenn. Code Ann. § 39-13-501(6) (2013); *see also State v. Roy Chisenhall*, No. M2003-00956-CCA-R3-CD, 2004 WL 1217118, at *3 (Tenn. Crim. App. June 3, 2004) ("The statute also does not require that the appellant become sexually aroused or gratified by the sexual contact."), *no perm. app. filed*. Further, the jury may use their common knowledge to infer an actor's intent. *State v. Mahlon Johnson*, No. W2011-01786-CCA-R3-CD, 2013 WL 501779, at *10 (Tenn. Crim. App. Feb. 7, 2013), *perm. app. denied* (Tenn. Aug. 14, 2013). In this case, Co-defendant Banks took a condom from Defendant when they arrived at the dorm room. The photos on Co-defendant Banks's phone of E.L.'s genitals were later deleted, indicating that he had no alternative intention for taking them other than for sexual gratification. Based on these facts, a rational juror could rely on common knowledge to infer that Co-defendant Banks's conduct could "be reasonably construed as being for the purpose of sexual arousal or gratification." *See* Tenn. Code Ann. § 39-13-501(6) (2013).

Relevant to count seven, the State alleged that Co-defendant Batey placed his buttocks on E.L.'s face. Co-defendant McKenzie testified that Co-defendant Batey sat on the victim's face with his genitals exposed. Co-defendant McKenzie recalled that, prior to sitting on E.L.'s face, Co-defendant Batey stated that "he had never had his a[**] ate before," which indicates that he intended to receive sexual gratification from the act. The record therefore includes sufficient evidence to satisfy the first element of each count of aggravated sexual battery.

The second and third elements require that the defendant be aided and abetted by at least one other person and that the victim be mentally defective, mentally incapacitated

or physically helpless. Tenn. Code Ann. § 39-13-504(a)(3)(B) (2013). As we have previously discussed, the State provided sufficient evidence to establish that Defendant aided and abetted Co-defendants Banks and Batey in the commission of the offenses by filming the offenses and by laughing and encouraging his co-defendants. Additionally, a rational juror could have inferred from the evidence presented by the State that E.L. was unconscious during the offenses based on the photographs and videos of her unmoving body and witness testimony that she did not speak or move during the offenses. Thus, the State's evidence here supports that a rational juror could find each element of this crime.

## (4) Criminal responsibility

Defendant further contends that the State failed to establish criminal responsibility because Defendant was too intoxicated during the commission of the crimes to form the requisite specific intent. More specifically, Defendant argues that he did not have the "conscious objective or desire to engage in the conduct[,]" *see* Tenn. Code Ann. § 39-11-302(a) (2013), and that "proof of negligence or recklessness does not suffice to make a person criminally liable." The evidence supports that Defendant was intoxicated on the night in question. Co-defendant McKenzie described Defendant as "kind of" drunk. Mr. Quinzio told Detective Mayo that he had never seen Defendant as intoxicated as he was that night, and he agreed on cross-examination that, because of this, Defendant could not cognize "what was going on" or that his conduct "was wrong[.]" Co-defendant McKenzie also testified that Defendant was not able to achieve an erection on the night of the occurrences because "he had done to[o] much coke."

There is also sufficient evidence, however, that supports the jury's finding that Defendant was not too intoxicated to form the requisite intent. Co-defendant McKenzie testified that Defendant was able to communicate and walk without assistance, despite his intoxication. Mr. van der Wal corroborated this, observing that Defendant was "intoxicated, but no more intoxicated than any other night." Mr. van der Wal also stated that he had conversed with Defendant, and that Defendant was walking and talking without assistance. Moreover, Defendant was not too intoxicated to carry the victim to his room, and he was cognizant enough to tell Mr. Quinzio and Mr. Finley to delete text messages referring to rape. Because these accounts pose a question of fact, the jury was charged with assessing the credibility of the claims and impliedly determined that Defendant's intoxication did not prevent him from forming the requisite intent. In reviewing the evidence in the light most favorable to the State, we conclude that there is sufficient evidence to support the jury's finding.

Under the theory of criminal responsibility, however, Defendant also must have "solicit[ed], direct[ed], aid[ed], or attempt[ed] to aid another person to commit the offense[.]" *See* Tenn. Code Ann. § 39-11-402(2) (2013). Here, Co-defendant McKenzie

testified that Defendant brought E.L. to Gillette Hall and solicited Co-defendant McKenzie, Banks, and Batey's aid in carrying her upstairs. Co-defendant McKenzie further testified that when they arrived at Defendant's dorm room, Defendant passed around a box of condoms and announced, "We have this b[***]h here," and "We're going to f[**]k her." Defendant also accessed pornography on his laptop during the commission of the offenses in an attempt to achieve an erection and join his co-defendants in the commission of the offenses.

Viewing these facts in a light most favorable to the State, and without reweighing the evidence, the evidence was sufficient for a rational juror to find beyond a reasonable doubt that Defendant "[a]ct[ed] with intent to promote or assist the commission of the offense" and "solicit[ed], direct[ed], aid[ed], or attempt[ed] to aid another person to commit the offense[.]" *See* Tenn. Code Ann. § 39-11-402(2) (2013).

Defendant further contends that, because he did not know his Co-defendants before the night of the occurrences and because he did not have sex with the victim, he did not participate in the crime and cannot be held criminally responsible for the actions of his co-defendants. While Defendant informed MNPD officers that he did not know Co-defendants Batey, Banks, or McKenzie prior to meeting them in front of Gillette Hall on the night of the crimes, this fact alone does not eliminate the possibility that he shared their intent to commit the crimes in question. The State presented evidence that Defendant told Mr. Quinzio prior to the offenses that he would "make sure" that he had sex that night. Despite Defendant's assertion that he did not know his Co-defendants, he made the initial contact with Co-defendants Banks, Batey, and McKenzie. Co-defendant McKenzie testified that Defendant informed him outside Gillette Hall that "he had this young lady in the car, and he needed [their] help to get her to his room."

Additionally, the video evidence presented by the State depicts Defendant actively encouraging and participating in the offenses. Co-defendant McKenzie testified that Defendant took a dominant role in the offenses and acted "amped," "aggressive," and "bossy." Co-defendant McKenzie also stated that when he, Defendant, and their Co-defendants arrived at Defendant's room with the victim, Defendant announced, "We have this b[***]h here," and "We're going to f[**]k her." Defendant then "grabbed condoms out of the dresser drawer and passed the box around." Co-defendant McKenzie also identified Defendant as the videographer of some of the videos taken and testified that Defendant slapped E.L. to assure him that she would not wake up. Defendant can be heard laughing in the videos, commenting on what is happening, and encouraging his co-defendants to continue. While a water bottle was penetrating the victim's anus, Defendant repeatedly told Co-defendant Batey to "squeeze that s[**]t." He sent these videos to friends and later asked Mr. Quinzio to send them back to him.

After the offenses, Defendant flushed condom wrappers down a toilet, asked Co-defendants McKenzie and Banks to help him carry E.L. back to her vehicle, and placed a towel on the hallway surveillance camera in an attempt to move E.L. without being seen. The following day, Defendant met with Co-defendants McKenzie, Batey, and Banks and discussed what had occurred the night before. Defendant agreed to invite the victim back to his room, and later that day, he engaged in unprotected sex with the victim. Defendant and Co-defendants McKenzie, Batey, and Banks later met to discuss what each of them had told officials.

The State need not show that the Defendant physically committed aggravated rape and aggravated sexual battery against the victim to prove Defendant's guilt of those crimes under a criminal responsibility theory. *See State v. Sherman*, 266 S.W.3d 395 (Tenn. 2008) ("It is not . . . necessary for one to take a physical part in the crime; encouragement of the principal is sufficient."). As long as the evidence is sufficient to establish that Defendant shared a criminal intent with the perpetrators and promoted the commission of the offenses, Defendant can be convicted of the offenses. Taking the above evidence in the light most favorable to the State, a rational juror could find beyond a reasonable doubt that Defendant intended to participate in and promote the offenses when he attempted to achieve an erection, filmed the criminal acts, provided condoms to his Co-defendants, verbally encouraged his Co-defendants, and attempted to cover up the offenses by flushing condom wrappers, covering the surveillance camera, and having unprotected sex with E.L. Defendant is not entitled to relief on this ground.

### (B) Unlawful photography

Defendant argues that a rational juror could not have found him guilty of unlawful photography beyond a reasonable doubt because E.L. "could not have had any reasonable expectation of privacy in any of the locations where photographs were taken." The State responds that the evidence was sufficient for a rational juror to have found Defendant guilty of unlawful photography because E.L. had "a reasonable expectation of privacy regarding the photography of [her] intimate parts."

"It is an offense for a person to knowingly photograph, or cause to be photographed an individual, when the individual has a reasonable expectation of privacy, without the prior effective consent of the individual" if the photograph "[w]ould offend or embarrass an ordinary person if such person appeared in the photograph" and the photograph "[w]as taken for the purpose of sexual arousal or gratification of the defendant." Tenn. Code Ann. § 39-13-605(a)(1)-(2) (2013). Under this statute, "'photograph' means any photograph or photographic reproduction, still or moving, or any videotape." Tenn. Code Ann. § 39-13-605(b) (2013). "'Effective consent' means assent in fact, whether express or apparent," and consent is not effective when "given by

- 96 -

a person who, by reason of . . . intoxication[] is known by the defendant to be unable to make reasonable decisions regarding the subject matter[.]" Tenn. Code Ann. § 39-11-106 (2013). Further, "[i]f the defendant disseminates or permits the dissemination of the photograph to any other person," the offense is a Class E felony. Tenn. Code Ann. § 39-13-605(d)(2) (2013). The jury convicted Defendant of a Class E felony in count eight, unlawful photography.

Detective Gish found evidence that Defendant's phone had contained photographs or videos related to the offenses, although they had been deleted after the offenses took place. Examining a thumbnail database on Defendant's phone, Detective Gish recovered nine images depicting the victim on the night of the offenses. All of these images depict the victim lying on the floor unconscious. Six images depict her with her skirt pulled up and her underwear removed, and two of them depict her with her legs "spread apart." The images also depicted Co-defendant Batey in various positions next to the victim, touching his genitals and digitally penetrating her. One of the images depicted the victim lying on the floor with her skirt and top pulled up, exposing her lower body and her breasts, and one image depicted a bottle penetrating the victim's anus.

A video recovered from Mr. Quinzio's laptop computer depicted the victim lying in the hallway of Gillette Hall with her skirt pulled up. This video had been recorded at 2:35 in the morning of the offenses, and the label corresponded to a file that had been deleted from Defendant's phone. Detective Gish noted that the angle of the video and the timeframe matched Defendant's actions seen on the surveillance video from Gillette Hall. Another video on Mr. Quinzio's laptop was recorded five minutes later in Defendant's dorm room and depicted Co-defendant Batey digitally penetrating E.L.'s anus while Defendant laughed from behind the camera. This file also corresponded to a file that had been deleted from Defendant's phone. A third video sent to Mr. Quinzio from the same time depicted Co-defendant Banks penetrating the victim's anus with a plastic bottle. In this video, Defendant pointed the camera downward, and his outfit, which is visible, matched the outfit that he was wearing in the surveillance video. Based on these photographs and videos, a rational juror could have found beyond a reasonable doubt that Defendant had knowingly photographed E.L. without her prior effective consent due to her intoxication and that the photographs would embarrass an ordinary person.

Moreover, the jury may use their common knowledge to infer that Defendant took these photographs for the purpose of his sexual arousal or gratification. *Cf. Mahlon Johnson*, 2013 WL 501779, at *10 (explaining that a jury may draw upon their common knowledge to infer that an accused forced intimate contact for the purpose of sexual arousal or gratification). In this case, Defendant continued to photograph E.L. throughout the commission of other sexual offenses, watched pornographic videos during the sexual offenses, and attempted to achieve an erection. A rational juror, therefore, could find

beyond a reasonable doubt that Defendant took photographs of her for the purpose of his own sexual arousal or gratification.

Defendant contends that the State provided insufficient evidence to convict him of unlawful photography because the victim "could not have had a reasonable expectation of privacy" in a co-ed dorm. The location where the photographs were taken, however, is not dispositive. Instead, the statute simply prohibits nonconsensual photography of an individual as long as that individual has "a reasonable expectation of privacy." Tenn. Code Ann. § 39-13-605(a) (2013). In each of these photos, E.L. is lying unconscious in an unnatural state; her clothing had been removed or moved to reveal her naked body. Some of the photos depict the co-defendants touching and penetrating E.L. with their own body parts or other objects while she is unconscious. Based on the circumstances in which these photos were taken and the subject matter depicted in the photos, a rational juror could find that an individual has a reasonable expectation of privacy against someone taking photographs of her naked body and genitals while she is unconscious.

Finally, because the jury convicted Defendant of a Class E felony under count eight, the jury must have found that Defendant disseminated or permitted the dissemination of the photographs in question to another person. *See* Tenn. Code Ann. § 39-13-605(d)(2) (2013). In this case, Detective Gish recovered two videos of the unconscious victim from Mr. Quinzio's laptop which corresponded to files that had been deleted from Defendant's phone.[20] This circumstantial evidence indicates that Defendant had transferred the videos from his phone to Mr. Quinzio. Detective Gish also recovered a text message exchange between Defendant and Mr. Quinzio from three days after the offenses occurred, asking Mr. Quinzio to "[s]end" "[a]ll 3[.]" Mr. Quinzio responded by sending Defendant the three video files that Defendant had taken during the offenses. Thus, a rational juror could have reasonably found that Defendant not only disseminated videos of E.L. to Mr. Quinzio but also permitted the dissemination of the videos. In sum, the State presented sufficient evidence to satisfy the elements of Class E felony unlawful photography and to uphold the jury's conviction.

### (10) Constitutionality of Tennessee Code Annotated section 39-13-605

Defendant contends that Tennessee Code Annotated section 39-13-605 is unconstitutionally void for vagueness. He argues that the statute's standard for "reasonable expectation of privacy" is not sufficiently defined. The State responds that Defendant waived plenary consideration of this issue by failing to "challenge the statute

---

[20] Detective Gish found a third video on Mr. Quinzio's laptop which had been filmed by Defendant, but it is unclear from the facts whether Detective Gish cross-referenced the file labels to determine that Defendant was the sender. The existence of this third video does not affect the outcome of the analysis.

in the trial court, either during trial or in his motion for new trial." Further, the State argues that Defendant has not established that conviction under this statute was a breach of a clear and unequivocal rule of law because "the contested statutory provision provides fair notice and does not lend itself to arbitrary and discriminatory treatment." The State asserts that, "[w]hile the phrase 'reasonable expectation of privacy' was not defined in the statute at the time of the offense, its meaning can be reasonably ascertained from the context and the common understanding of those words." Although Defendant did not raise this issue in his motion for new trial, we will address this issue on the merits because of the gravity of constitutional issues.

"When reviewing the constitutionality of a statute, we begin "with the presumption that an act of the General Assembly is constitutional" and "must indulge every presumption and resolve every doubt in favor of constitutionality." *Riggs v. Burson,* 941 S.W.2d 44, 51 (Tenn. 1997).

### (A) Unconstitutionally vague

"The primary purpose of the vagueness doctrine is to ensure that our statutes provide fair warning as to the nature of forbidden conduct so that individuals are not 'held criminally responsible for conduct which [they] could not reasonably understand to be proscribed.'" *State v. Crank*, 468 S.W.3d 15, 22-23 (Tenn. 2015) (alteration in original) (quoting *United States v. Hariss*, 347 U.S. 612, 617 (1954)). Where there is ambiguity in a statute, the rule of lenity requires the ambiguity to be resolved in favor of a defendant. *State v. Smith*, 436 S.W.3d 751, 768 (Tenn. 2014). The rule of lenity is "rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his or her conduct is prohibited." *State v. Marshall*, 319 S.W.3d 558, 563 (Tenn. 2010) (internal quotation marks omitted) (quoting *Dunn v. United States*, 442 U.S. 100, 112 (1979)). A statute is ambiguous if the language "is susceptible [to] more than one reasonable interpretation[.]" *Memphis Hous. Auth. v. Thompson*, 38 S.W.3d 504, 512 (Tenn. 2001). Nonetheless, a vague or ambiguous statute may still provide fair warning of the prohibited conduct and not render the statute unconstitutionally vague. *See Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 527 (Tenn. 2010). "The vagueness doctrine does not invalidate every statute which a reviewing court believes could have been drafted with greater precision, especially in light of the inherent vagueness of many English words." *State v. Lyons*, 802 S.W.2d 590, 592 (Tenn. 1990). "It is only when the wording of a statute is 'so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application,' that the statute is unconstitutional." *Estrin v. Moss*, 430 S.W.2d 345, 351-52 (Tenn. 1968) (quoting *Connally v. General Construction Co.*, 269 U.S. 385 (1925)).

The United States Supreme Court has established a two-part test for vagueness challenges. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982). The court must first determine whether the statute in question implicates constitutionally protected conduct. *Id*. If it does not, the court "should uphold the challenge only if the enactment is impermissibly vague in all of its applications." *Id.* at 494-95. "[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Mazurie*, 419 U.S. 544, 550 (1975). Stricter standards of permissible statutory vagueness may be applied to a statute if it has the potential to inhibit an individual's First Amendment rights. *Village of Hoffman Estates*, 455 U.S. at 499; *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972); *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964); *Cramp v. Board of Public Instruction*, 368 U.S. 278, 287 (1961); *Smith v. California*, 361 U.S. 147, 151 (1959). Moreover, "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Village of Hoffman Estates*, 455 U.S. at 495.

### (B) Fair Warning

The principles of vagueness and fair warning are interrelated. A "vague statute is vulnerable to a constitutional challenge because it (1) fails to provide fair notice that certain activities are unlawful; and (2) fails to establish reasonably clear guidelines for law enforcement officials and courts, which, in turn, invites arbitrary and discriminatory enforcement." *State v. Pickett,* 211 S.W.3d 696, 702 (Tenn. 2007). In regards to the former, "[d]ue process requires that a statute provide 'fair warning' and prohibits holding an individual criminally liable for conduct that a person of common intelligence would not have understood to be proscribed." *State v. Burkhart,* 58 S.W.3d 694, 697 (Tenn. 2001) (citing *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972)). To avoid constitutional infirmity, a criminal statute must be "sufficiently precise to put an individual on notice of prohibited activities." *Id.* (quoting *State v. Wilkins,* 655 S.W.2d 914, 915 (Tenn. 1983)).

The United States Supreme Court characterized the fair warning principle as follows:

> The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.

*Harriss*, 347 U.S. at 617.

At the time of Defendant's offense in 2013, "reasonable expectation of privacy" was not defined in the unlawful photography statute or anywhere in Title 39 of the Tennessee Code Annotated.[21] Prior to Defendant's offense, section 39-13-605 prohibited photography of an individual "when the individual **is in a place where** there is a reasonable expectation of privacy, without the prior effective consent of the individual." Tenn. Code Ann. § 39-13-605 (2010) (emphasis added). Tennessee courts concluded that the statute's meaning was clear: whether an individual has an expectation of privacy depends on his or her location at the time of the photography, and an expectation of privacy is not typically reasonable in public places. *See, e.g.*, *State v. Jesse B. Gilliland*, No. M2008-02767-CCA-R3-CD, 2010 WL 2432014, at *4 (Tenn. Crim. App. June 17, 2010) (finding that although the defendant photographed underneath a woman's skirt without her consent, the victim did not have a reasonable expectation of privacy because she was in a public shopping mall), *no perm. app. filed*; *State v. Richard Alexander Herrera*, No. W2010-00937-CCA-R3-CD, 2011 WL 4432895, at *3 (Tenn. Crim. App. Sept. 23, 2011) (finding that a woman did not have a reasonable expectation of privacy in a shopping aisle at Walmart), *no perm. app. filed*. In 2010, the statute was amended to eliminate the reference to location. It prohibited photography of an individual without their consent "when the individual has a reasonable expectation of privacy." Tenn. Code Ann. § 39-13-605 (2013). This language applied when Defendant committed the offenses in the current case.

The first part of the vagueness test requires this court to determine whether the statute implicates constitutionally protected conduct. In *Village of Hoffman Estates*, the Village enacted an ordinance which required a business to obtain a license if it sold any items that are "designed or marketed for use with illegal cannabis or drugs." *Village of Hoffman Estates*, 455 U.S. at 491 (quoting Village of Hoffman Estates Ordinance No. 969-1978). A local store, The Flipside, Hoffman Estates, Inc. (Flipside), which sold a variety of merchandise including smoking accessories, challenged the ordinance in the district court as being unconstitutionally vague and overbroad. *Id*. On review, the Supreme Court first examined whether the ordinance infringed upon Flipside's First

---

[21] In 2018, the statute was amended to include a definition of "reasonable expectation of privacy":

> As used in this section, an individual has a reasonable expectation of privacy, regardless of the location where a photograph is taken, if: (A) the photograph is taken in a manner that would offend or embarrass a reasonable person; and (B) The photograph depicts areas of the individual's body, clothed or unclothed, that would not be visible to ordinary observation but for the offensive or embarrassing manner of photography.

Tenn. Code Ann. § 39-13-605 (2018).

Amendment Rights. *Id.* at 496. The Court decided that it did not, because the ordinance simply regulated business behavior. *Id.*

Here, the statute in question prohibits the photography of un-consenting subjects when they have a reasonable expectation of privacy and for the purpose of sexual gratification of the defendant. Tenn. Code Ann. § 39-13-605 (2013). Although Defendant did not argue this on appeal, photographs are generally protected as artistic expression under the First Amendment. As the Supreme Court has repeatedly noted, however, there are certain classes of expression which may be controlled by statute without offending the values of the First Amendment. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 571 (1942).

> These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit may be derived from them is clearly outweighed by the social interest in order and morality.

*Id*. at 572. The Tennessee Court of Appeals held in *Purifoy v. Mafa* that repeated videos and social media postings of the defendant's therapist were "clearly meant to harass, degrade, intimidate, threaten, and humiliate" the subject of the photographs and were therefore not protected speech. 556 S.W.3d 170, 192 (Tenn. Ct. App. 2017). Similarly, here, Defendant took photos and videos of the victim while she was unconscious, in a state of undress, and being raped and sexually battered. These photos and videos are analogous to the postings in *Purifoy* and the language in *Chaplinsky* in that they degraded, harassed, threatened, and humiliated the victim, and any benefit that Defendant may have derived from them is clearly outweighed by the "social interest in order and morality." *Chaplinsky*, 315 U.S. 568 at 571. Defendant's photographs and videos of the victim are therefore not constitutionally protected by the First Amendment.

"A law that does not reach constitutionally protected conduct . . . may nevertheless be challenged on its face as unduly vague, in violation of due process."[22] *Village of Hoffman Estates*, 455 U.S. at 497. To succeed with this claim, Defendant must demonstrate that the law is impermissibly vague in all of its applications. *Id.*; *Burkhart*, 58 S.W.3d at 699. Further, "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Village of Hoffman Estates*, 455 U.S. at 495; *Burkhart*, 58 S.W.3d at 699. This court must therefore examine Defendant's conduct before analyzing hypothetical applications of the law. *Burkhart*, 58 S.W.3d at 699.

---

[22] This is the basis for Defendant's challenge.

In *Burkhart*, the defendant was charged with possession of a gambling device in violation of Tennessee Code Annotated section 39-17-505 (1989). *Id.* at 696. She moved to dismiss the charges on the grounds that "gambling devices" as used in the statute was unconstitutionally vague. *Id.* The Tennessee Supreme Court held that the statute was not unconstitutionally vague as applied to Ms. Burkhart because she had engaged in conduct that is clearly proscribed by the statute. *Id.* at 698. The Tennessee Supreme Court explained that a slot machine, which Burkhart was charged with possessing, is designed for use in gambling and normally intended for use in gambling. *Id.* The Tennessee Supreme Court followed *Boyce Motor Lines v. United States* in concluding that "it is not 'unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.'" *Burkhart*, 58 S.W.3d at 698 (quoting *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952)).

Here, Defendant's conduct in violation of Tennessee Code Annotated section 39-13-605 includes the photography of an unconscious victim in a state of undress while being raped and sexually battered. As the State correctly notes, "[t]here can be no doubt that the defendant should have been aware that taking videos [and photos] of the victim while undressed, passed out, and being sexually assaulted was prohibited by law. In other words, a person of common intelligence would have reasonably understood that such conduct was proscribed."

Like Ms. Burkhart, Defendant perilously approached the line of proscribed conduct and eventually crossed it. *See id.* Regardless of whether "reasonable expectation of privacy" is defined in the Tennessee Code, a person of "common intelligence" would understand that a person who is unconscious, undressed, and being sexually assaulted has a reasonable expectation of privacy not to be photographed during the assault and rape. *See Estrin*, 430 S.W.2d at 351-52. Defendant's photography of the victim, therefore, was "clearly proscribed" by section 39-13-605 (2013). *See Village of Hoffman Estates*, 455 U.S. at 495. Because the statute is not vague as applied to Defendant, he cannot successfully challenge the statute as facially vague. *See Burkhart*, 58 S.W.3d at 699.

Further, this court can look to other sources that define "reasonable expectation of privacy," namely, the Fourth Amendment of the United States Constitution and case law interpreting it. "The touchstone of unreasonable search and seizure analysis is whether a person has a constitutionally protected reasonable expectation of privacy." *State v. Bowling*, 867 S.W.2d 338, 341 (Tenn. Crim. App. 1993) (quoting *California v. Ciraolo*, 476 U.S. 207, 211 (1986)) (internal quotation marks omitted). The United States Supreme Court in *United States v. Katz* developed a two-prong test for determining whether an individual has a reasonable expectation of privacy, *see* 389 U.S. 347, 361

- 103 -

(1967) (Harlan, J., concurring). Courts must first analyze whether the victim had "exhibited an actual (subjective) expectation of privacy," and second, "whether that expectation be one that society is prepared to recognize as 'reasonable.'" *Id.* The United States Supreme Court and Tennessee courts have applied these two questions repeatedly to Fourth Amendment issues. *See Ciraolo*, 476 U.S. at 211; *Smith v. Maryland*, 442 U.S. 735, 740 (1979); *Bowling*, 867 S.W.2d at 341; *State v. Roode*, 643 S.W.2d 651, 652-53 (Tenn. 1982). Tennessee later applied this approach while accounting for the totality of the circumstances. *See State v. Talley*, 307 S.W.3d 723, 734 (Tenn. 2010) (deciding that the defendant did not have a reasonable expectation of privacy from searches and seizures in a common hallway of his condominium complex because "each of the residents . . . had the right to permit entry without restrictions. Neither the [d]efendant nor any other residents could unilaterally exclude others rightfully within the hallway.").

The Sixth Circuit has since applied the totality of the circumstances test from *Talley* to privacy questions dealing with Tennessee's unlawful photography statute. *See Savoy v. United States*, 604 F.3d 929, 935 (6th Cir. 2010) (explaining that whether an individual had a reasonable expectation of privacy is a fact-intensive, totality-of-the-circumstances inquiry). In *Savoy*, the defendant appealed the denial of his motion to retrieve videotapes seized by police officers. *Id.* at 932. His motion was denied in part because the videos were deemed unlawful. *Id.* Defendant argued that they were not unlawful because the subjects of the videos (patrons at his bar engaging in sexual acts) did not have a reasonable expectation of privacy in his bar. *Id.* The Sixth Circuit remanded the issue, instructing the lower court to examine the totality of the circumstances surrounding the videos to determine if the subjects of the videos had a reasonable expectation of privacy. *Id.* at 937. They elaborated that the relevant factors to consider are (1) whether the premises were open to the public for business purposes at the time of the photography; (2) whether the specific locations were hidden from public view; (3) and whether any steps were taken in an attempt to maintain the privacy of the activities that occurred in each video. *Id.* at 937-38.

We conclude that section 39-13-605 is not unconstitutionally vague because the statute is not vague as applied to Defendant and because the phrase "reasonable expectation of privacy" has been defined in other areas of criminal case law. Defendant is not entitled to relief on this ground.

### (11) Excessive sentence

Defendant avers that his sentence of seventeen years in the Tennessee Department of Correction is "not in compliance with the 'purposes and principles' of the sentencing statutes[.]" He contends that the trial court erred in applying several enhancement factors to his case. He also argues that the disparity between his sentence and the fifteen-year

sentences that Co-defendants Banks and Batey received is contrary to the Sentencing Act. The State responds that Defendant is not entitled to relief on this ground because "the trial court considered the relevant factors and imposed a sentence consistent with the purposes and principles of the Sentencing Act[.]"

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made on the defendant's own behalf about sentencing. *See* Tenn. Code Ann. § 40-35-210 (2016); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103(5) (2016).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2016); *Bise*, 380 S.W.3d at 706. However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." *Bise*, 380 S.W.3d at 705-06. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2016), Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the

minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2016).

Although the trial court should also consider enhancement and mitigating factors, such factors are advisory only. *See* Tenn. Code Ann. § 40-35-114 (2016); *see also Bise*, 380 S.W.3d at 698 n. 33, 704; *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

The trial court ordered Defendant to serve seventeen years each for counts one through five, aggravated rape, a Class A felony. *See* Tenn. Code Ann. § 39-13-502(b) (2013). A Range I sentence for a Class A felony is between fifteen to twenty years. Tenn. Code Ann. § 40-35-112(a)(1) (2016). The trial court ordered Defendant to serve nine years each for counts six and seven, aggravated sexual battery, a Class B felony. *See* Tenn. Code Ann. § 39-13-504(b) (2013). A Range I sentence for a Class B felony is between eight to twelve years. Tenn. Code Ann. § 40-35-112(a)(2) (2016). Lastly, the trial court ordered Defendant to serve two years for count eight, unlawful photography, a Class E felony when the defendant "disseminates or permits the dissemination of the photograph to any other person[.]" *See* Tenn. Code Ann. § 39-13-605(d)(2) (2013). A Range I sentence for a Class E felony is between one to two years. Tenn. Code Ann. § 40-35-112(a)(5) (2016). Thus, the trial court ordered Defendant to serve within-range sentences and the sentence was consistent with the purposes and principles of the Sentencing Act. We, therefore, presume that the trial court's decisions on sentence length are reasonable, and we will not reverse absent an abuse of discretion. *See Bise*, 380 S.W.3d at 707.

Here, the trial court found that several enhancement factors applied: that "the victim was particularly vulnerable because of her physical incapacity[,]" "the victim suffered psychological injuries as a result of this incident[,]" Defendant abused a position of private trust because he "formally or informally stood in a relationship to the victim that promoted confidence, reliability and faith[,]" and that Defendant was a leader in the commission of the offenses because "he [wa]s the one that could have stopped this incident." The trial court found that several mitigating factors applied to Defendant's convictions, namely that Defendant "did not have any prior criminal convictions[,]" that Defendant had "a lot of family and community support," and that Defendant appeared remorseful. The trial court concluded that "the enhancement factors outweigh[ed] the mitigating factors in this particular case."

Defendant argues that the trial court erred in finding that Defendant was a leader in the commission of the offenses under section 40-35-114(2) because the trial court's finding "was not based on planning or actual commission of an offense[.]" Defendant argues that there was insufficient proof that he took some leadership action during the offenses, citing *State v. Buckmeir*, 902 S.W.2d 418 (Tenn. Crim. App. 1995), and *State v. Freeman*, 943 S.W.2d 25, 31 (Tenn. Crim. App. 1996). The State contends that the trial court properly found that this factor applied because during the commission of the offenses, Defendant "brought the passed[-]out victim back to his dorm, invited fellow teammates into his room, and then encouraged the sexual assaults of the victim by those teammates." The evidence introduced at trial supports the trial court's consideration of this enhancement factor. Defendant left Tin Roof with E.L. in a cab and they unsuccessfully attempted to enter E.L.'s apartment. After Defendant was unable to carry E.L. into Gillette Hall by himself, he enlisted Co-defendants Banks, Batey, and McKenzie to help him carry E.L. onto the elevator, up to the second floor, and into his dorm room. Based on the digital files that Detective Gish found, Defendant took photographic and video recordings of the offenses. Additionally, Co-defendant McKenzie stated that Defendant was "bossy" and "in control" during the offenses because Defendant pushed Co-defendants McKenzie and Batey off the elevator, handed out condoms, and covered the camera. Thus, the trial court properly exercised its discretion by applying this enhancement factor.

Further, Defendant contends that the trial court erred in finding that "the victim suffered psychological injuries as a result of this incident" because the trial court did not specifically find that E.L.'s psychological injuries were "particularly great[,]" as required by section 40-35-114(6). The State responds that the trial court properly applied this factor because E.L. "suffered serious and long-term psychological injury as a result of the defendant's actions and the resulting criminal proceedings."

- 107 -

The Tennessee Supreme Court stated the following about this enhancement factor in *State v. Kissinger*:

> Every rape or sexual battery offense is physically and mentally injurious to the victim. Undoubtedly, the legislature considered the traumatizing nature of the offenses when it placed them in the two highest felony classifications. Before a court can enhance the otherwise applicable sentence, however, the record must support a finding that the personal injur[i]es were particularly great.

922 S.W.2d 482, 487-77 (Tenn. 1996).

This court has previously "construed the legislative intent in the term 'personal injuries' as broad enough to include not only physical harm, but also severe emotional injuries and psychological scarring." *State v. Williams*, 920 SW 2d 247, 259 (Tenn. Crim. App. 1995) (citing *State v. Smith*, 891 S.W.2d 922, 930 (Tenn. Crim. App. 1994)). Additionally, this court has previously affirmed the trial court's application of this factor "in rape cases in which the victims suffered depression, anxiety, and other emotional problems in addition to their physical injuries." *Id.* (citing *Smith*, 891 S.W.2d at 930); *see also State v. Richard Cole, III*, No. W2002-02826-CCA-R3-CD, 2003 WL 22309491, at *4 (Tenn. Crim. App. Oct. 8, 2003) (rape victim's psychological injuries were great because she received counseling, was absent from work, lived in fear of contracting a sexually transmitted disease, and could not return to the scene of the offense), *perm. app. denied* (Tenn. Mar. 8, 2004); and *State v. Arnett*, 49 S.W.3d 250, 261 (Tenn. 2001) (concluding that there was specific evidence of the victim's psychological injury from the rape because the victim received extensive counseling and took anti-depressant medication), *overruled on other grounds by State v. Winfield*, 23 S.W.3d 279, 283 n.5 (Tenn. 2000). In *Williams*, as a consequence of her rape, the victim "experienced periods of depression[,]" "suffered from low self-esteem[,]" "was often unable to work[,]" and "missed five weeks of college[.]" *Williams*, 920 S.W. 2d at 259. Additionally, "her schoolwork suffered[] and her scholarships were jeopardized." *Id.* at 259-60. The victim sought counseling and noted that "[h]er ability to maintain personal relationships has been impaired." *Id.* This court affirmed the application of the "particularly great" injury enhancement factor to the defendant's sentence in *Williams*. *Id.*

In E.L.'s initial victim impact statement, she stated that it was hard to describe "[]the humiliation, the pain, [and] the isolation [of] being reduced to nothing but a piece of flesh right before your eyes[.]" E.L. stated that the offenses had an ongoing impact on her because she relives the trauma of the offenses and "experience[s] additional attacks" each time she attends a court proceeding related to this case. She noted that "[w]hat happened to [her] that night has been compounded by the live-streaming, tweeting, and

international dissemination of every detail of how [she] was degraded and humiliated for all posterity." Additionally, Dr. Cook stated that even after undergoing therapy, E.L. "reported persistent and recurrent distressing recollections of the images and sounds, a sense of powerlessness and hopelessness, irritability, difficulty concentrating and hypervigilance." Dr. Cook diagnosed E.L. with PTSD and explained that reliving the trauma of the offenses "continually disrupt[ed] her academic planning and her emotional sense of wholeness." Based on this evidence, we conclude that the trial court properly found that E.L. sustained "particularly great" psychological injuries from Defendant's criminal conduct. *See* Tenn. Code Ann. § 40-35-114(6) (2016); *see State v. Jonathan D. Rosenbalm*, No. E2002-00324-CCA-R3-CD, 2002 WL 31746708, at *9 (Tenn. Crim. App. Dec. 9, 2002) (rape victim suffered particularly great psychological injury from the offense because she "became suicidal after the offense, experienced a dramatic weight loss, and performed poorly in school"), *perm. app. denied* (Tenn. May 27, 2003).

Defendant also argues that the trial court erred in finding that he abused a position of private trust under section 40-35-114(14) because there is "extensive precedent for not applying this factor to adults in a social/dating relationship." The State asserts that the trial court properly applied this factor because Defendant and E.L. were dating at the time of the offenses and, in E.L.'s statement admitted at sentencing, she explained that she trusted Defendant.

Tennessee Code Annotated section 40-35-114(14) states that a trial court may enhance a defendant's sentence if the trial court finds that the defendant "abused a position of . . . private trust . . . in a manner that significantly facilitated the commission or fulfillment of the offense[.]" Tenn. Code Ann. § 40-35-114(14) (2016). The Tennessee Supreme Court previously concluded that "[t]he position of parent, step-parent, babysitter, teacher, coach are but a few obvious examples" of positions of public or private trust. *Kissinger*, 922 S.W.2d at 488. The Tennessee Supreme Court further stated:

> The determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship. Thus, the court should look to see whether the offender formally or informally stood in a relationship to the victim that promoted confidence, reliability, or faith. If the evidence supports that finding, then the court must determine whether the position occupied was abused by the commission of the offense.

*Id.* Additionally, the Tennessee Supreme Court previously observed that "adult victims are generally held to have reasonable judgment and, unlike minors, can generally function reasonably independently." *State v. Gutierrez*, 5. S.W.3d 641, 645 (Tenn.

1999). Thus, "to use the mere sharing of a household or the existence of a relationship to determine whether a position of private trust exists between competent adults can result in an overly-broad application of the enhancement factor." *Id.*

In *State v. Jackson*, 946 SW 2d 329, 334-35 (Tenn. Crim. App. 1996), this court affirmed the trial court's application of this enhancement factor when "[t]he defendant made up his mind to kill the victim and then took advantage of his intimate relationship with her to gain the opportunity to attack while she was alone in his home and acutely vulnerable." Prior to the offenses, the defendant and victim in *Jackson* were in an exclusive romantic relationship. *Id.* at 330. The defendant in *Jackson* attacked the victim with a knife after they spent the night together at his home. *Id.* at 330-31.

It is unclear from the evidence admitted at trial and at the sentencing hearing whether Defendant and E.L. were in a romantic relationship prior to the offenses. Ms. Miller, E.L.'s roommate, stated that she was not concerned that E.L. stayed at Tin Roof with Defendant because "they had been hanging out for a while, so [E.L. and Ms. Miller] trusted him." Additionally, in her second victim impact statement, E.L. described Defendant's conduct as "orchestrating a sustained thirty-minute gang rape against [E.L.], a defenseless woman who trusted him." However, this evidence does not rise to the level of an exclusive dating relationship or marriage. *See id.* at 330-31. Regardless, even if the trial court improperly applied this enhancement factor, Defendant is not entitled to relief on this ground because the application of enhancement or mitigating factors is advisory only, the trial court properly applied other enhancement factors, and there is no evidence that the trial court "wholly departed" from the Sentencing Act. *See Carter*, 254 S.W.3d at 345; *see also Bise*, 380 S.W.3d at 706.

Defendant additionally argues that the trial court erred in finding that "the victim was particularly vulnerable because of her physical incapacity" under Tennessee Code Annotated section 40-35-114(4) because the enhancement factor is subsumed into Defendant's convictions as an essential element of aggravated rape and aggravated sexual battery. The State concedes that the trial court erred in applying this factor to Defendant's sentence because vulnerability is essentially an element of aggravated rape and aggravated sexual battery as charged in this case. *See* Tenn. Code Ann. § 39-13-502(a)(3)(B) (2013); § 39-13-504(a)(3)(B) (2013). We agree that the trial court improperly applied this factor to Defendant's sentences for his convictions of aggravated rape and aggravated sexual battery. Again, Defendant is not entitled to relief on this ground because the application of enhancement or mitigating factors is advisory only, the trial court properly applied other enhancement factors, and there is no evidence that the trial court "wholly departed" from the Sentencing Act. *See Carter*, 254 S.W.3d at 345; *see also Bise*, 380 S.W.3d at 706.

- 110 -

Lastly, Defendant asserts that the disparity between his total effective sentence of seventeen years and the fifteen-year sentences that Co-defendant Batey and Banks received is contrary to the purposes and principles of the Sentencing Act. As noted above, the trial court determined that the enhancement factors outweighed the mitigating factors in Defendant's case and ordered Defendant to serve mid-range sentences. Additionally, the trial court ordered all the sentences to run concurrently for a total effective sentence of seventeen years. Because the trial court ordered within-range sentences and properly exercised its discretion to apply several enhancement factors, we conclude that the trial court did not abuse its discretion by ordering Defendant to serve a total effective sentence of seventeen years.

### (12) Denial of motion to recuse

Defendant contends that the trial court erred in denying his motion to recuse based on the trial court's ex parte communications with the State "regarding video streaming of court proceedings for viewing by E.L. as well as sequestration of witnesses." Additionally, Defendant refers to "other occasions" of ex parte communications and cites to a motion that Defendant filed on June 27, 2014, to vacate the trial court's ex parte order filed on June 24, 2014. Defendant also argues that the possible criminal investigation of the trial court's bailiff created an appearance of impropriety in the first trial. To support this allegation, Defendant cites to a document appended to his primary brief.

Regarding Defendant's first ground for recusal, the State asserts that it is waived because Defendant did not include it in his motion for new trial. Regarding Defendant's second ground for recusal, the State responds that Defendant waived plenary review of this issue by failing to raise the issue in his motion for new trial or motion to recuse. Additionally, the State argues that Defendant is not entitled to plain error relief on either ground. A review of Defendant's motion for new trial and amendments reflects that Defendant did not discuss recusal in his motion for new trial. Defendant, as the appellant, has the burden of preparing an adequate record for this court's review. *See Ballard*, 855 S.W.2d at 560. "When the record is incomplete, or does not contain the proceedings relevant to an issue, this [c]ourt is precluded from considering the issue." *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987). Likewise, "this [c]ourt must conclusively presume that the ruling of the trial court was correct in all particulars." *Id.* (citing *State v. Jones*, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981); *State v. Baron*, 659 S.W.2d 811, 815 (Tenn. Crim. App. 1983); *State v. Taylor*, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983)). Thus, Defendant has waived plenary review of this issue, and we will review only for plain error.

A trial judge should recuse him or herself whenever the judge "has any doubt as to his ability to preside impartially in a criminal case or whenever his impartiality can reasonably be questioned." *Pannel v. State*, 71 S.W.3d 720, 725 (Tenn. Crim. App. 2001) (citing *State v. Hines*, 919 S.W.2d 573, 578 (Tenn. 1995)). Additionally, recusal is appropriate "when a person of ordinary prudence in the judge's position would find a reasonable basis for questioning the judge's impartiality." *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994). The judge generally need not recuse him or herself if the bias or perceived bias is "based upon actual observance of witnesses and evidence during trial." *Id.* However, if the judge's bias is "so pervasive that it is sufficient to deny the litigant a fair trial, it need not be extrajudicial." *Id.* Whether to grant a motion to recuse rests within the discretion of the trial court, and this court will not reverse the trial judge's decision absent an abuse of discretion. *Hines*, 919 S.W.2d at 578. A trial court abuses its discretion "only when the trial court has applied an incorrect legal standard, or has reached a decision which is illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)).

*(A) Ex parte communications*

Tennessee Supreme Court Rule 2.9 states that "[a] judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending or impending matter," except "[w]hen circumstances require it, ex parte communication for scheduling, administrative, or emergency purposes, which does not address substantive matters, is permitted." Tenn. Sup. Court Rule. 2.9(A)(1). This exception only applies when "the judge reasonably believes that no party will gain procedural, substantive, or tactical advantage as a result of the ex parte communication" and "the judge makes provision promptly to notify all other parties of the substance of the ex parte communication, and gives the parties an opportunity to respond." Tenn. Sup. Court Rule. 2.9(A)(1)(a)-(b).

On October 28, 2014, Defendant filed a motion for the trial court to recuse. The motion asserted that, at a motion hearing on October 24, the trial court "disclosed having 'often' entertained *ex parte* communications in this matter." A transcript of this hearing was not included in the record on appeal. Defendant argued that the trial court failed to follow the procedures on ex parte communications set out in Tennessee Supreme Court Rule 10. Defendant attached an affidavit of one of his defense counsel to the motion; in the affidavit, defense counsel asserted that the trial court electronically streamed evidentiary hearings on October 8 and 9 to the District Attorney's Office for E.L.'s viewing. Defense counsel argued that the streaming of the hearing violated the rule of sequestration, which was invoked by Defendant, as well as procedures for ex parte

communication because Defendant had no knowledge of the streaming prior to October 14, 2014.

On October 30, 2014, the trial court denied Defendant's motion to recuse in a written order. The trial court found that "the communication regarding video streaming of court proceedings for the alleged victim viewing was an administrative decision from which 'no party would gain a procedural or tactical advantage.'" The trial court also found that E.L., as the victim of the current offenses, "had a right to view the proceedings." The trial court concluded that it could "be fair and impartial and that a reasonable person of ordinary prudence in the judge's position knowing all the facts known would find no impartiality."

We conclude that plain error relief is not appropriate here because the record does not clearly establish what occurred in the trial court. *See Adkisson*, 899 S.W.2d at 641. The technical record includes a minute entry from October 29, 2014, that reflects that the trial court held a hearing on Defendant's motion to recuse. Because a transcript from this hearing was not included in the appellate record, it is unclear if the trial court heard witness testimony or only entertained arguments from the parties. Further, the transcript of the motion hearing on October 24, 2014, where the trial court allegedly "disclosed having 'often' entertained *ex parte* communications in this matter[,]" was not included in the record on appeal. Thus, Defendant is not entitled to plain error relief on this issue.

### *(B) The trial court's bailiff*

On January 16, 2015, during Defendant's first trial, the trial court held a conference in chambers after the jury and the parties returned from lunch. The following exchange occurred:

> [CO-DEFENDANT BATEY'S COUNSEL]: [The State] indicated to you that [District Attorney] Glenn Funk had received a phone call about [the trial court's bailiff] being in a bar and talking about the case. And he said that, I believe, he -- or, I don't recall if it was exactly him -- but there were two other calls. And he mentioned that he hadn't decided if they were going to open an investigation or not.

> [THE STATE]: We said we hadn't -- we weren't going to. We didn't -- thought it rose to any level of anything like that.

> [CO-DEFENDANT BATEY'S COUNSEL]: Okay.

- 113 -

[THE STATE]: We just thought the Court ought to have notice that there were people talking about it.

[CO-DEFENDANT BATEY'S COUNSEL]: Which was a concerning comment to me. We're in the middle of a trial and had comments made about one of your staff, and how Your Honor would take that and accept that moving forward; and, what, if any, impact that might have on you. I received an e-mail from somebody, I don't know even -- it's supposed to be a video taken of [the trial court's bailiff] sitting at a table, looks like at a bar. I was trying to pull up the video on my phone, but it is just a picture, and --

[DEFENSE COUNSEL]: Really, Judge, our concern -- we discussed this at lunch -- our concern is: Does this have any impact on the jury; have there been any influences from outside the jury room on the jury; and, do we need to ask for a mistrial, based on it, is what we're concerned about.

The [TRIAL] COURT: None that I have heard anything about. I spoke with [the trial court's bailiff] about what I was told. She said that she was at the hospital yesterday. She may have gone to a bar at some point, but she was at the hospital because her father had surgery. He was in surgery, virtually, all day yesterday.

Now -- and I expressed to her, I said, "Whatever you do, do not say anything about any jurors anywhere." And she assured me that she would not do such. But, I don't -- I mean, how has it affected any jurors in any way?

[DEFENSE COUNSEL]: I don't know. That's what I am asking. I mean, and I -- you know, somebody -- I mean, this is a setup. Who in the world would go to a bar with a recorder and record fifteen minutes of [the trial court's bailiff] at a bar? Who would even have a motive to do that? So, what is going on?

I would like to hear more about what was communicated to [District Attorney] Funk exactly, if [the State] knows.

[THE STATE]: The only thing advised to me was that she was at a bar and she was making inappropriate comments. It might have included comments about jurors, or somebody on the jury, you know, or someone -- I don't know what she observed. You know, obviously, she observes

everything in court. So, it may have just been comments on what she observed in open court.

Like I said, as far as I know, we have no information that there was any criminal misconduct, or anything like that. I think it was just her drinking and, probably, talking about stuff she shouldn't have been talking about.

THE [TRIAL] COURT: Right.

[THE STATE]: That's the only information -- like I said, we don't know of anything that would be criminal in nature, or anything of her trying to influence the case. We just thought we ought to bring this to the Court's attention and make sure --

The [TRIAL] COURT: Yes. You did the right thing. And that is why I spoke with her. And if there is anything that comes out of it, I am sure it would come back to me. And, then, I would put it on the record, and we could go from there. But, I don't know if there is any kind of impact at all. You know --

. . . .

[CO-DEFENDANT BATEY'S COUNSEL]: Your Honor, I guess, I was, also, curious: If the State was contacted and we were contacted, I didn't know if anybody tried to reach out to this office.

THE [TRIAL] COURT: No. No one has.

. . . .

THE [TRIAL] COURT: Well, I can see if I can find out a little bit more. That's --

[CO-DEFENDANT BATEY'S COUNSEL]: Well, I don't know that we need to. I guess, I just wanted to verify on the record that Your Honor didn't feel any influence from any of this, one way or the other, or if there was, there is -- we don't know of any issues with the jury.

- 115 -

THE [TRIAL] COURT: And, as I said before, I didn't accuse her of anything. I told her what I was relayed; and, for her not to make any comments, whatsoever, about anything regarding this trial or the jury.

[DEFENSE COUNSEL]: Well, I am just glad to get cleared, about the prosecutorial decisions, because I don't want to try the rest of this case in a courtroom where there is an impending decision on whether there is going to be a criminal investigation into the Judge's staff. That wouldn't be appropriate, and it might impact impartiality. So, didn't want to do that. So, I wanted to clear up on the record that there is no impending --

THE [TRIAL] COURT: My impartiality?

[DEFENSE COUNSEL]: I would be afraid of the appearance. I am not worried about your impartiality, per se. I know you very well. But, I didn't want there to be some lingering, or languishing, decision as to whether there is going to be some impending investigation. It's on the record there is not, so there we are. That is all I wanted to do.

THE [TRIAL] COURT: All right.

[THE STATE]: I would suggest, maybe, out of abundance of caution, that she -- based on all this, that something else could come out, that she, probably, not have any contact with the jury, if you could work that out with your staff. I don't know what your staffing situation is.

THE [TRIAL] COURT: Oh, we can switch that out.

[THE STATE]: I think that would be just out of a concern, that she not have contact with the jury, based on this allegation.

THE [TRIAL] COURT: Yeah, yeah. I think that's the cautious thing to do.

Here, we agree with the State that Defendant has failed to establish that the trial court breached a clear and unequivocal rule of law by not recusing itself on this ground. After the State clarified that there was no open investigation into the bailiff's actions, Defendant did not ask the trial court to recuse or for any other relief. In contrast, the State suggested that the trial court employ a different bailiff in the courtroom for the remainder of the trial, which the trial court agreed to do. The evidence presented by the State during the in-chambers conference reflected that the bailiff "was making

inappropriate comments"; these comments may "have included comments about jurors" or "may have just been comments on what she observed in open court." The State clarified that it had "no information that there was any criminal misconduct[.]" It appears from the record that neither defense counsel nor the State could play the recording that they received, and this recording was not admitted into the record and thus was not included in the record on appeal. Based on the lack of evidence surrounding the circumstances of the bailiff's comments, the State's declining to investigate the bailiff's actions, and the trial court's agreement to employ a different bailiff for the remainder of Defendant's trial, we conclude that "a person of ordinary prudence in the judge's position" would not find "a reasonable basis for questioning the judge's impartiality." *See Alley*, 882 S.W.2d at 820. Defendant is not entitled to plain error relief on this ground.

### *(13) Exclusion of evidence of prior bad acts*

Defendant argues that the trial court erred in excluding evidence that Co-defendants McKenzie, Banks, and Batey allegedly sexually assaulted a minor victim, "Jane Doe," the day before the immediate offenses occurred. On appeal, Defendant argues the evidence was admissible under Tennessee Rules of Evidence 403, 404(b), 608(b), and 616 because the evidence was relevant to both parties' theories of the case. More specifically, he argues that the evidence would have shown similarities between the co-defendant's actions towards E.L. and Jane Doe and would have "directly refuted the State's allegations that [Defendant] was a 'ringleader.'" Additionally, Defendant argues that the exclusion of this evidence violated his constitutional right to present a defense and to confront witnesses.

The State initially argues that Defendant waived review of this issue by failing to include Co-defendant McKenzie's proffer[23] and the trial court's ruling on its admissibility in the appellate record. The State also contends that Defendant "failed to establish that the evidence was relevant or that, even if relevant, the probative value outweighed the prejudicial effect." The State asserts that Defendant "failed to show that anything improper, much less illegal occurred on the night prior to the offenses."

At a pretrial motion hearing on October 9, 2014, Defendant asked to access the incident report regarding an alleged incident of rape on June 22, 2013, that involved Co-defendants Batey, Banks, and McKenzie. Defendant expressed his desire to cross-examine Co-defendants Batey, Banks, and McKenzie on whether they were testifying for the State in exchange for the State's agreement to not prosecute them. The State

---

[23] We presume that the "proffer" refers to Co-defendant McKenzie's interview with police on September 19, 2013, based on the parties' arguments.

disclosed that the MNPD investigated the incident but "determined [that] there was insufficient evidence to go forward"; thus, the State did not enter into an agreement not to prosecute any of the co-defendants because no criminal charges were brought. The State explained that the father of a seventeen-year-old female reported to the MNPD that the minor female, Jane Doe, alleged that she had been raped by one or more of the co-defendants in this case. MNPD officers attempted to interview Jane Doe but were unsuccessful. MNPD eventually closed the case without submitting it to the State. The trial court stated that it would review the incident report and determine if the report contained any exculpatory information. On October 21, 2014, the trial court entered an order granting Defendant, in pertinent part, discovery of "the police reports, victim's statements and witness statements resulting from any Vanderbilt, [VPD] or [MNPD] investigation regarding an alleged sexual assault that took place on the Vanderbilt campus and involved a minor and members of the Vanderbilt University football team." The trial court later entered an amended order that granted Defendant access to "documents from the [MNPD] investigative file regarding an incident which occurred on June 22, 2013, if after an in camera review, the Court determines any such information is relevant."

Prior to the direct examination of Co-defendant McKenzie during a jury-out hearing in Defendant's first trial, the following exchange occurred:

> [DEFENSE COUNSEL]: Your Honor, additionally, yesterday there was some discussion about the rape the night before with [Co-defendant] McKenzie and [Co-defendant] Banks. What I would like to do, because it is significantly covered in the proffers, that I need to go into some of it, because it is a benefit, in my opinion, that [Co-defendant] McKenzie and [Co-defendant] Banks raped a girl previously.

> [THE STATE]: Your Honor please, I'm going to object to that in open record. [Co-defendant] Banks didn't do anything. He's misstating the facts. And this has been done in chambers where it ought to be.

> THE COURT: Right. We have dealt with this issue. That's why we dealt with it.

While the jury was still outside the courtroom, the State conducted a proffer of Co-defendant McKenzie's testimony about his conversation with Defendant in the restroom of the second floor of Gillette Hall after the offenses at issue. Later, after the jury entered the courtroom, the following exchange occurred during an in-chambers hearing:

[DEFENSE COUNSEL]: Yes, Your Honor. I didn't want to do it in front of -- do it outside, again, so that's why I asked to come back here.

My understanding about [Co-defendant] McKenzie, about cross-examination about the night before: He was asked questions about the night before on a proffer. I am not going to get into the events of the night before. But, he gave a statement in between two other statements -- which, I would like to say, were you questioned about some criminal conduct the night before. Additionally, in his last proffer that we received on July of 2014, [Co-defendant] McKenzie is asked the question: "Mr. Vandenburg was not present the night before," and he says "No."

Those are the two questions I would like to ask [Co-defendant] McKenzie.

[THE STATE]: Your Honor, please, there wasn't criminal activity the night before. This is double hearsay reported to the police. They investigated. That proffer wasn't a proffer in this case. It was an interview with [Co-defendant] McKenzie about what happened the night before. All it was[,] was acknowledgment that he and [Co-defendant] Batey had sex with a seventeen-year old and he was eighteen years old. So, it's not a crime. You know, there is no criminal -- further criminal investigation going on. He was not charged with a crime. It is just asking him, did he have sex the night before. And there's just [n]o basis for it, Your Honor please.

Plus it implicates [Co-defendant] Batey. If we put on [Co-defendant] Batey, yeah, he had sex with a girl that was a year younger than him the night before.

It is totally irrelevant, Your Honor, please. There is no relevance to it. Your Honor reviewed that file. Nothing has come of it. There wasn't any criminal activity uncovered.

[DEFENSE COUNSEL]: Your Honor, didn't read the proffer. The proffer was numerous individuals, D.A.'s there, detectives there; and, the girl's father made a complaint of rape. And they said [Co-defendant] McKenzie did it, and [Co-defendant] Banks did it.

[THE STATE]: No, he did not.

- 119 -

[DEFENSE COUNSEL]: I'll get the proffer then. You want me to get it?

[THE STATE]: Get the file. It says she ID'd [Co-defendant] Batey, but it's totally irrelevant.

[DEFENSE COUNSEL]: And I don't want to bring that up, Your Honor. All's I want to do is bring up the fact that [Co-defendant] McKenzie was interviewed on, I think, it was September 19th, 2013, on the night before. Because in his proffer, the one that they're going to use today, they asked him that question was [Defendant] present on the night before.

THE [TRIAL] COURT: Yeah. But how is that relevant to what happened on the 23rd? And, you know, you're talking about prior bad acts, or alleged prior bad acts, which is something --

[DEFENSE COUNSEL]: Well, here's where it comes in. I'm sorry, Your Honor.

THE [TRIAL] COURT: Go ahead.

[DEFENSE COUNSEL]: Because the Government has solicited some text messages from [Defendant] saying "I'm going to" -- it was from the night before about, "I am going to f[**]k," or "I'm going to do" something like that. I don't know the exact language. And this was from the night before. They brought in some conduct from the night before.

[THE STATE]: It was the same day, I think.

[DEFENSE COUNSEL]: It is completely irrelevant. But, they have created that scenario that [Defendant] was on a hunt from the night before. And this is relevant to that.

[THE STATE]: [Defense counsel], just to clarify: It was from the night of. It was from several hours . . . before this happened. It wasn't the night before. It was Saturday night. That is when he made that statement, right before he went out.

[THE STATE]: Totally different issues. Totally different issue, Your Honor, goes to the motive and intent[.] This other case -- there

- 120 -

wasn't a case. There's no criminal conduct. It doesn't come in under any rule for impeachment purposes, whatsoever.

THE [TRIAL] COURT: I don't see how it comes in either. It is a separate event. It's not a part of this particular trial. [Defendant] wasn't involved in it. I don't see how it could come in.

. . . .

[DEFENSE COUNSEL]: Your Honor, but I can ask [Co-defendant McKenzie] if he was interviewed on that day; correct?

THE [TRIAL] COURT: On what date?

[DEFENSE COUNSEL]: On the date of 9/19/2013.

THE [TRIAL] COURT: Yeah. I mean, if he was interviewed he was interviewed.

[DEFENSE COUNSEL]: Okay, okay.

[THE STATE]: And not what it was about, or anything else.

THE [TRIAL] COURT: Right.

[THE STATE]: Not "a criminal investigation." Just that he was interviewed by the police on that particular day. It was a totally different deal. It was a totally -- as far as I'm concerned --

[DEFENSE COUNSEL]: We'll see if you open the door. If you open the door, we'll walk in it.

THE [TRIAL] COURT: Okay. Let's go.

At a motion hearing on April 29, 2016, the State informed the trial court that Defendant had issued a subpoena *duces tecum* for the police report on the incident involving Jane Doe. The trial court again ruled that the evidence was "not relevant to this case." However, the trial court permitted Defendant to file a motion or brief regarding the issue. On May 6, 2016, Defendant filed a "Motion to Allow Prior Bad Acts and Conduct of [Co-defendants McKenzie, Banks, and Batey.]" Defendant argued that, under Tennessee Rule of Evidence 608(b), he could cross-examine Co-defendants

- 121 -

McKenzie, Banks, and Batey on a prior instance of conduct "to call into question their credibility." The specific instance of conduct at issue was the alleged rape of Jane Doe by Co-defendants McKenzie, Banks, and Batey on the day prior to the instant offenses. The Motion also cited to Tennessee Rule of Evidence 616 to support Defendant's request to cross-examine Co-defendants McKenzie, Banks, and Batey about this prior incident because the co-defendants initially stated that Defendant was not involved in the offenses against E.L., but they later changed their statements to implicate him. Defendant asserted that he wanted to cross-examine Co-defendants McKenzie, Banks, and Batey about "their character for truthfulness and credibility" by discussing their alleged prior bad acts.

At an in camera conference on May 13, 2016, the trial court found that, regarding the alleged incident of rape, Jane Doe "was not able to provide any information regarding it." The trial court stated that "without any substantive information regarding it, it's hard to see how [the trial court] could allow so-called prior bad acts when there's really no proved prior bad acts." The trial court concluded that Defendant could cross-examine Co-defendant McKenzie at trial on whether he had received any consideration from the State in exchange for his testimony. On May 18, 2016, the trial court denied Defendant's Rule 608(b) motion in an order which stated that the trial court "previously ruled that prior bad acts of the co-defendants were not admissible."[24]

Generally, "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this [c]ourt will not interfere in the absence of abuse appearing on the face of the record." *State v. Plyant*, 263 S.W.3d 854, 870 (Tenn. 2008). A trial court abuses its discretion when it "applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *Id.* (citing *Ruiz*, 204 S.W.3d at 778 ).

---

[24] On June 3, 2016, Defendant filed a motion asking the trial court to reconsider its order of May 18 that denied Defendant's Rule 608(b) motion. The appellate record does not contain the trial court's order ruling on this motion to reconsider, if such order was entered. On May 31, 2016, Defendant filed an application for permission to appeal to this court under Tennessee Rule of Appellate Procedure 10, arguing in part that the trial court erred in prohibiting Defendant from cross-examining the co-defendants about prior bad acts. On June 1, 2016, this court denied Defendant's application for permission to appeal under Tennessee Rule of Appellate Procedure 10. This court noted that Defendant's application failed to follow the requirements of Rule 10. This court also noted that Defendant filed his application on May 31, 2016, one week before jury selection for trial was scheduled to begin. In any event, this court considered Defendant's application and concluded that Defendant had "not satisfied the 'narrowly circumscribed' requirements for an extraordinary appeal." This court determined that "[t]he trial court's order reflects that the trial court followed the accepted and usual course of judicial proceedings prior to ruling on the four motions at issue."

*(A) Relevance*

Under the Tennessee Rules of Evidence, evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Tennessee Rule of Evidence 403 states that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

The State argues that evidence relating to Jane Doe's allegations of rape was not relevant to Defendant's trial strategy because the police report does not establish that any Vanderbilt student had sex with Jane Doe, that Jane Doe was raped, or that Jane Doe was unconscious while on Vanderbilt's campus. In his brief, Defendant quotes portions of interviews of Co-defendant McKenzie and Co-defendant Banks with MNPD and the State. However, Defendant's brief cites to his "Motion to Allow Prior Bad Acts and Conduct of [Co-defendants McKenzie, Banks, and Batey,]" which merely includes quotes from these interviews. Because these interviews were not admitted at trial and are not in the record on appeal, we cannot consider this evidence. *See* Tenn. R. App. 24(g) ("Nothing in this rule shall be construed as empowering the parties or any court to add to or subtract from the record except insofar as may be necessary to convey a fair, accurate and complete account of what transpired in the trial court with respect to those issues that are the bases of appeal."); *see also State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988) ("the recitation of facts contained in a brief, or a similar pleading, [is] not evidence").

During Defendant's first trial, the trial court found that Jane Doe's allegations pertained to "a separate event" and that "[Defendant] wasn't involved in it." Additionally, the trial court found that Jane Doe "was not able to provide any information regarding" the alleged incident of rape. We conclude that the trial court did not abuse its discretion by excluding the police report and other evidence related to Jane Doe's allegations on the grounds that the evidence was not relevant to Defendant's case. The police report and other related documents in the appellate record do not mention that Defendant was involved in Jane Doe's allegations. Further, the MNPD closed the case prior to submitting it to the State because Jane Doe would not give a statement to the MNPD to explain what happened to her on Vanderbilt's campus on the evening of June 22, 2013. Thus, evidence relating to Jane Doe's allegations of rape is not relevant to any issues that were raised at Defendant's trial. Because we have concluded that evidence relating to Jane Doe's allegations is not relevant to Defendant's case, we decline to address Defendant's arguments that the evidence is admissible under Tennessee Rules of

Evidence 404(b), 608(b), or 616. *See* Tenn. R. Evid. 402 ("Evidence which is not relevant is not admissible.").

## *(B) Right to present a defense*

As noted above, Defendant also argues that the trial court's exclusion of evidence pertaining to Jane Doe's allegations violated his right to present a defense. We have previously set out in this opinion the case law that pertains to a defendant's right to present a defense. In determining whether a defendant's right to present a defense has been violated by the exclusion of evidence, courts should consider whether "(1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important." *Brown*, 29 S.W.3d at 433-34 (citing *Chambers*, 410 U.S. at 298-301). Here, the evidence in the appellate record that pertained to Jane Doe's allegations, namely the police report, did not establish that any of the co-defendants had sex with Jane Doe, that Jane Doe was raped while on Vanderbilt's campus, or that Jane Doe was unconscious while on Vanderbilt's campus. Because we have previously concluded that the evidence was not relevant to the issues raised at Defendant's trial, we must also conclude that the evidence was not critical to Defendant's theory of the case. Therefore, Defendant's right to present a defense was not violated by the trial court's exclusion of evidence pertaining to Jane Doe's allegations.

## *(14) Denial of Defendant's Rule 412 motion*

On September 15, 2014, Defendant filed a motion under Tennessee Rule of Evidence 412, arguing that the trial court should admit evidence of E.L's sexual behavior with Defendant to explain the source of DNA found at the crime scene and to establish E.L's pattern of behavior and sexual consent. Specifically, Defendant alleged, in pertinent part:

- Defendant met E.L. while he visited Vanderbilt University on a recruiting trip; Defendant and E.L. both attended a party where E.L. hugged and kissed Defendant and grabbed his penis.
- On June 15, 2013, Defendant's twentieth birthday, E.L. initiated sex with Defendant in his dorm room. After E.L. and Defendant had sex, Mr. Boyd entered Defendant's dorm room and E.L. invited Mr. Boyd to have sex with her while Defendant was still in the bed.
- On June 22, 2013, E.L. texted Defendant around 1 a.m. and invited Defendant to come to her apartment to have sex with her.
- After E.L. arrived at Tin Roof and met up with Defendant, she initiated sexual contact with him in a photo booth. Later, E.L. danced in a sexual manner

between Defendant and another football player. She told Defendant that she wanted to have sex with him and that she wanted him to take photographs of her so she could remember the evening.

- During the cab ride from Tin Roof to E.L.'s apartment, E.L. inserted Defendant's fingers into her vagina.
- E.L. engaged in consensual sex with Defendant on the evening of June 23.
- On June 24, 2013, E.L. posted the following statement on her Twitter account: "'So have you girls ever been in a hot tub with three brothas before?' Lolllllll[.]"
- Analysis of the underwear that E.L. wore during the offenses showed the presence of DNA from two unidentified males.

On October 8, 2014, the trial court held a hearing on Defendant's Rule 412 motion. Regarding his previous sexual contact with E.L., Defendant testified that E.L. twice asked Defendant to take nude photographs of her—once during sex on June 15 and again on the evening of June 21. Defendant testified that around 1:00 a.m. on June 22, 2013, E.L. texted Defendant to ask him to come over to her apartment. After Defendant arrived at E.L.'s apartment, they had consensual sex, during which E.L. told Defendant that "she liked having nude photos of herself taken" and that "she liked having nude photos of guys that she's been with." E.L. did not ask Defendant to take photos of her at that time. However, Defendant stated that he and E.L. planned to take nude photographs of each other to celebrate his birthday.

While at Tin Roof on the evening of June 22, 2013, Defendant and E.L. discussed having sexual intercourse later that night. Defendant stated that E.L. handed him a drink and said, "You need to relax and get ready for tonight." Defendant interpreted her statement as meaning that she wanted him to return with her to her apartment to have sex. He stated that E.L. later confirmed this interpretation because she said, "I can't wait to f[**]k you tonight. Your body is so sexy." Defendant stated that E.L. grabbed his buttocks and genital area, kissed him, and danced in a sexual manner with him and another football player. Defendant stated that, shortly after dancing, E.L. indicated to him that she wanted to return to her apartment and have sex with him. E.L. told Defendant that she could not wait to have sex with him. Defendant and E.L. left Tin Roof around 1:55 a.m. on June 23. In the cab on the way to E.L.'s apartment, she placed Defendant's hand on her genital area and again stated that she could not wait to have sex with him. The cab driver dropped Defendant and E.L. off in front of her apartment at the Village at Vanderbilt. While E.L. and Defendant walked up to her apartment, she again grabbed his buttocks and genital area, kissed his ear, and whispered to him that she wanted to have sex all night long.

During cross-examination, Defendant testified that E.L. last told him that she wanted to have sex with him while they were driving from her apartment building to Gillette Hall. He explained that he told Mr. Black that he did not take any photographs or videos of E.L. on the morning of June 23 because he was intoxicated during the offenses and did not recall taking videos and photographs. Defendant asserted that E.L. consented to having sex with him less than thirty minutes before the offenses occurred.

E.L. testified that she did not remember the total number of alcoholic beverages that she consumed on the evening of June 22, 2013. She also did not recall riding in a cab with Defendant from Tin Roof to her apartment that evening. E.L. stated that she never gave consent to Defendant to take nude photographs of her or to disseminate nude photographs of her. E.L. recalled sending a tweet to Ms. Miller on June 24, 2013, that contained the quote "'So have you girls ever been in a hot tub with three brothas before?' Lollllll[.]" E.L. explained that on June 24, she was hanging out with Ms. Miller at Madison Jenson's apartment complex. The three women were in the hot tub at the complex, and three strangers approached the women and asked, "So, have you girls ever been in a hot tub with three brothers before?" E.L. and her friends thought that the question was strange, so she tweeted the question to make fun of it. E.L. did not recall having sex with anyone on June 22, and she did not have sex with anyone between the time she left Defendant's dorm room around 8:00 a.m. on June 23 and when she changed her clothes later that day.[25]

The DNA report prepared by the TBI that was admitted at the hearing showed that the TBI tested two pairs of underwear from E.L. Examination of one pair "confirmed the presence of a limited amount of spermatozoa." The pairs of underwear were additionally submitted to DNA testing by Cellmark Forensics, whose report concluded that "[t]he Y-STR profile obtained from the underwear [non-sperm fraction] DNA extract [wa]s a mixture of at least two males including a major unknown male donor." Defendant, his co-defendants, Mr. Woods, Mr. van der Wal, Mr. Retta, Mr. Boyd, and Mr. Prioleau were excluded as major contributors to this DNA extract. Cellmark also tested "[t]he partial Y-STR profile obtained from the underwear [sperm fraction] DNA extract" and found that the DNA was "a mixture consistent with originating from two males." Cellmark excluded Mr. Woods, Mr. van der Wal, Defendant, and Co-defendant Batey as contributors but was unable to make any determinations regarding whether Co-defendant Banks or McKenzie were contributors.

---

[25] At the hearing, the trial court ruled that E.L. could be asked whether she consented to having photographs taken of her person on the night of the offenses, about her level of consciousness during the offenses, specifically if she was conscious when she was depicted on surveillance video getting into a vehicle with Defendant outside of her apartment complex, about the "hot tub" tweet, whether the underwear the State collected was the underwear that E.L. was wearing during the offenses, and whether E.L. had sexual contact with other individuals after she left Defendant's dorm room.

- 126 -

On October 14, 2014, the trial court denied Defendant's Rule 412 motion. In its written order, the trial court concluded that Defendant "did not present any specific evidence that related to the victim's consent, therefore[,] any other evidence related to the victim's consensual sexual history is immaterial and protected by Rule 412." Additionally, the trial court determined that Defendant did not present sufficient evidence to establish that E.L. had a distinctive pattern of behavior "to satisfy an exception to Rule 412." The trial court stated that, "[s]ince none of the exceptions apply, the Court need not make a determination of whether the probative value of the evidence outweighs the unfair prejudice to the victim." Lastly, the trial court found that, while Defendant argued that the exclusion of evidence of E.L.'s prior sexual behavior violated his constitutional right to present a defense, "no credible evidence was presented to support [his] contention."

Prior to May 2016, the State filed a motion to redact Defendant's statement by omitting references to specific instances of sexual activity between Defendant and E.L. Defendant filed a response to this motion and argued that redaction of his statement would violate his due process rights to confront the witnesses against him and to present a defense. Additionally, Defendant argued that specific instances of E.L's sexual behavior were admissible under Rule 412 to rebut the State's theory of prosecution. On May 18, 2016, the trial court granted the State's motion to redact Defendant's statement by omitting references to E.L.'s previous sexual activity.

*(A) Tennessee Rule of Evidence 412*

Tennessee Rule of Evidence 412 states that "in a criminal trial[] . . . in which a person is accused of" aggravated rape and aggravated sexual battery, "[e]vidence of specific instances of a victim's sexual behavior is inadmissible unless admitted in accordance with the procedures in subdivision (d) of this rule" and "[i]f the sexual behavior was with the accused," the evidence pertains to "the issue of consent[.]" Tenn. R. Evid. 412(c)(3). Additionally, "[i]f the sexual behavior was with persons other than the accused," evidence of specific instances of the victim's sexual behavior is admissible "to rebut or explain scientific or medical evidence," "to prove or explain the source of semen, injury, disease, or knowledge of sexual matters," or "to prove consent if the evidence is of a pattern of sexual behavior so distinctive and so closely resembling the accused's version of the alleged encounter with the victim that it tends to prove that the victim consented to the act charged or behaved in such a manner as to lead the defendant reasonably to believe that the victim consented." Tenn. R. Evid. 412(c)(4)(i)-(iii). Rule 412 defines "sexual behavior" as "sexual activity of the alleged victim other than the sexual act at issue in the case." Tenn. R. Evid. 412(a). "This broad definition deals with sexual intercourse as well as every other variety of sexual expression." *State v. Wyrick,*

62 S.W.3d 751, 770-771 (Tenn. Crim. App. 2001) (quoting *State v. Sheline*, 955 S.W.2d 42, 47 n.6 (Tenn. 1997)) (internal quotation marks omitted).

Regarding Rule 412(c)(4), the Tennessee Supreme Court has stated that "it is clear that a 'pattern' of sexual conduct requires more than one act of sexual conduct." *Sheline*, 955 S.W.2d at 46 (citing Cohen, Paine and Sheppeard, *Tennessee Law of Evidence*, § 412.4 at 236). The *Sheline* court also noted that "[t]he plain language of the rule speaks of 'specific instances' of sexual conduct with 'persons' other than the defendant" and cited approvingly to other jurisdictions that had concluded that a "pattern" of sexual behavior "denotes repetitive or multiple acts and not just an isolated occurrence." *Id.* (citing *State v. Ginyard*, 468 S.E.2d 525 (N.C. Ct. App. 1996); *State v. Woodfork*, 454 N.W.2d 332 (S.D. 1990); *Kaplan v. State*, 451 So.2d 1386, 1387 (Fla. Dist. Ct. App. 1984); *State v. Patnaude*, 438 A.2d 402 (Vt. 1981); *State v. Jones*, 617 P.2d 1214 (Haw. 1980); *Parks v. State*, 249 S.E.2d 672 (Ga. Ct. App. 1978)). "Rule 412 is a rule of relevance and is written as a rule of exclusion." *Brown*, 29 S.W.3d at 430. Admissibility of evidence under Rule 412 is a decision that is left to the discretion of the trial court. *Sheline*, 955 S.W.2d at 46.

Defendant asserts that his defense at trial was largely based on his argument that he had a continuing sexual relationship with E.L. that began when he first visited Vanderbilt's campus and continued after he arrived as a student. Defendant argues that introducing proof of his sexual relationship with E.L. and her sexual behavior towards him as a part of that relationship would have established the fact that E.L. gave Defendant consent to have sex with him on the night of the offenses. The State responds that Defendant "failed to establish how his alleged prior sexual encounters with [E.L.] were relevant to show that she consented to what occurred in Gillette Hall." We agree with the trial court's conclusion that Defendant "did not present any specific evidence that related to the victim's consent" that would be admissible under Rule 412(c)(3). E.L. testified that she did not give consent to Defendant to have sex with her or take nude photographs of her on the night of the offenses. Even if E.L. did consent to having sex with Defendant prior to the offenses, that consent cannot be expanded to apply when E.L. was unconscious during the offenses and Defendant's theory at trial was that he never had sex with E.L. during the offenses. Defendant testified at the hearing that he did not have sexual contact with E.L. and made similar statements to police. Further, Defendant presented no evidence that E.L. consented while she was conscious to have Defendant take nude photographs of her while she was unconscious. The trial court properly acted within its discretion to deny admission of E.L.'s alleged previous sexual behavior with Defendant to establish that she consented to Defendant's actions under Rule 412(c)(3).

Additionally, Defendant asserts that the evidence of semen in E.L.'s underwear from two unidentified males should have been admitted under Rule 412(c)(4)(iii) because

it was "indicative of the possibility that E.L. had engaged in group sex before" and was "evidence . . . 'of a pattern of sexual behavior so closely resembling the accused's version of the alleged encounter with the victim that it tends to prove that the victim consented to the act charged or behaved in such a manner as to lead the defendant reasonably to believe that the victim consented.'" The State responds that "[n]othing about [E.L.'s] past behavior, even if true, would suggest that she consented or appeared to consent to having sex with multiple men, whom she did not know, while she was passed out on a dorm room floor." We agree with the trial court that Defendant did not present sufficient evidence to establish that E.L. had a distinctive pattern of behavior to satisfy Rule 412(c)(4). Defendant did not present any evidence at the hearing that E.L. had engaged in group sex prior to the offenses at issue. Because Defendant failed to establish the existence of any prior instances in which E.L. engaged in group sex, the DNA evidence in E.L.'s underwear could not be admitted as evidence that E.L. consented to sexual intercourse with the co-defendants on June 23. *See Sheline*, 955 S.W.2d at 46 (concluding that the defendant must offer evidence of multiple instances of sexual conduct to establish a pattern).

### *(B) Right to present a defense*

Finally, Defendant contends that the exclusion of evidence of E.L.'s prior sexual behavior deprived him of his constitutional right to present a defense. The State responds that Defendant's right to present a defense was not violated by the exclusion of this evidence because "the evidence bears little indicia of reliability and the interest supporting its exclusion is substantially important." The State also argues that "[b]ecause . . . [D]efendant did not claim that the victim consented to the acts, the evidence was not critical to his defense[.]" In his reply brief, Defendant asserts that E.L.'s statements to Defendant are "analogous to admissions by a party-opponent and would possess inherent reliability."

In some situations, admission of evidence of a victim's prior sexual behavior may be "[r]equired by the Tennessee or United States Constitution[.]" Tenn. R. Evid. 412(c)(1).

> Although [t]he right to present witnesses is of critical importance . . . it is not absolute. In appropriate cases, the right must yield to other legitimate interests in the criminal trial process. Specifically, [i]n the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. However, these procedural and evidentiary rules of exclusion may not be applied mechanistically to defeat the ends of justice. Such rules do not

abridge an accused's right to present a defense so long as they are not arbitrary or disproportionate to the purposes they are designed to serve.

*Brown*, 29 S.W.3d at 432-33 (internal citations and quotation marks omitted) (alterations in original). "In determining whether a defendant's right to present a defense has been violated by the exclusion of evidence, courts should consider whether "(1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important." *Id.* at 433-34 (citing *Chambers*, 410 U.S. at 298-301).

We conclude that the trial court's exclusion of evidence of E.L.'s prior sexual behavior did not violate Defendant's right to present a defense. The evidence proffered by Defendant, that E.L. consented to having sexual intercourse with Defendant prior to the offenses and DNA evidence from two unknown males found on E.L.'s underwear, was not critical to Defendant's defense. As stated earlier in this opinion, Defendant was charged for aggravated rape under a theory of criminal responsibility and not for his direct actions. Defendant stated numerous times to police and Vanderbilt officials that he did not have sexual contact with E.L. on the night of the offenses. As stated in his appellate briefs, Defendant's main goal at trial was to rebut the State's theory that he was the "ringleader" or organizer of the offenses by asserting that he and E.L. had an ongoing sexual relationship. Because the State charged Defendant under a theory of criminal responsibility for the offenses, Defendant's assertion that E.L. consented to have sexual intercourse with him shortly before the offenses occurred was not critical to his defense because it would not have rebutted any essential element of the crime of aggravated rape as charged. Similarly, DNA evidence of two unidentified males on E.L.'s underwear would not have exculpated Defendant from being criminally responsible for aggravated rape. Further, Defendant's testimony that E.L. said she wanted to have sex with him would not have exculpated him for his actions of taking explicit photographs of E.L. while she lay unconscious on the floor and of encouraging his co-defendants to rape and sexually batter her. For these reasons, these pieces of evidence were not critical to Defendant's defense at trial.

Second, Defendant's hearsay assertion that E.L. consented to have sex with him shortly before the offenses occurred does not bear "sufficient indicia of reliability[.]" *See id.* at 433-34. Although Defendant asserts that E.L.'s comments consenting to have sex with Defendant should be treated as party-opponent statements, *see* Tennessee Rule of Evidence 803 (1.2), we decline to expand this exception to the hearsay rule to encompass victims of sexual offenses. *See State v. Flood*, 219 S.W.3d 307, 314 (Tenn. 2007) ("[A] victim in a criminal case does not meet the definition of a 'party.'"); *see also State v. Howard*, 504 S.W.3d 260, 277 n.6 (Tenn. 2016). Moreover, because Defendant's testimony that E.L. verbally consented to having sex with him multiple times throughout

the evening of June 22 and early morning of June 23 is self-serving, this testimony is unreliable hearsay that does not fall under any exception. *See Dotson*, 254 S.W.3d at 394. Consequently, we conclude that the exclusion of E.L.'s comments and DNA from two unidentified males did not violate Defendant's right to present a defense.

### *(15) Cumulative error*

Lastly, Defendant argues that the cumulative effect of the errors he previously alleged "collectively resulted in the trial below being fundamentally unfair to him and a violation of due process."

The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation, but "have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To warrant review under the cumulative error doctrine, there must have been more than one actual error during the trial proceedings. *Id.* at 77.

We have previously discussed in this opinion how the trial court incorrectly applied two enhancement factors to Defendant's sentence. However, because the application of enhancement factors is advisory only, *see Carter*, 254 S.W.3d at 345, and we have otherwise affirmed the trial court's sentencing determinations; Defendant is not entitled to cumulative error relief.

### III. Conclusion

After a thorough review of the facts and applicable case law, we affirm the trial court's judgments in counts one through four and six through eight. We vacate Defendant's conviction of aggravated rape in count five, modify the conviction to attempted aggravated rape, and remand to the trial court for sentencing.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 131 -